# Exhibit A

## IN THE NINTH JUDICIAL CIRCUIT COURT
## OF ORANGE COUNTY, FLORIDA

THE CITY OF ORLANDO, FLORIDA

               Plaintiff,

    vs.

CVS HEALTH CORPORATION; CVS HEALTH
SOLUTIONS, LLC; CVS PHARMACY, INC.; CVS
ORLANDO FL DISTRIBUTION, L.L.C., CVS
VERO FL DISTRIBUTION, L.L.C., CVS RX
SERVICES, INC.; HOLIDAY CVS L.L.C.; TEVA
PHARMACEUTICAL INDUSTRIES, LTD; TEVA
PHARMACEUTICALS USA, INC.; CEPHALON,
INC.; JOHNSON & JOHNSON; JANSSEN
PHARMACEUTICALS, INC.; NORAMCO, INC.;
MALLINCKRODT PLC; MALLINCKRODT
BRAND PHARMACEUTICALS, INC.;
MALLINCKRODT, LLC; MALLINCKRODT
ENTERPRISES, LLC; SPECGX LLC; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS OF NEW YORK LLC;
ENDO HEALTH SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.; ENDO
INTERNATIONAL PLC; PAR
PHARMACEUTICAL COMPANIES, INC.; PAR
PHARMACEUTICAL, INC.; ALLERGAN PLC;
ALLERGAN SALES, LLC; ALLERGAN USA,
INC.; ACTAVIS ELIZABETH LLC; ACTAVIS
KADIAN LLC; ACTAVIS LABORATORIES FL,
INC.; ACTAVIS LABORATORIES UT, INC.;
ACTAVIS LLC; ACTAVIS MID ATLANTIC LLC;
ACTAVIS PHARMA, INC.; ACTAVIS SOUTH
ATLANTIC LLC; ACTAVIS TOTOWA LLC;
WATSON LABORATORIES, INC.; WARNER
CHILCOTT SALES (US), LLC; MCKESSON
CORPORATION; HEALTH MART SYSTEMS,
INC.; CARDINAL HEALTH INC.; CARDINAL
HEALTH 100, INC.; CARDINAL HEALTH 105,
INC.; CARDINAL HEALTH 107, LLC;
CARDINAL HEALTH 108, LLC; CARDINAL
HEALTH 110, LLC; CARDINAL HEALTH 112,
LLC; CARDINAL HEALTH 122, LLC;
CARDINAL HEALTH 132, LLC; CARDINAL

Case No.:

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

HEALTH 200, LLC; CARDINAL HEALTH 414,
LLC; CARDINAL HEALTH 5, LLC; CARDINAL
HEALTH 7, LLC; CARDINAL HEALTH
PHARMACY SERVICES, LLC;
AMERISOURCEBERGEN DRUG
CORPORATION; H.D. SMITH, LLC;
WALGREENS BOOTS ALLIANCE, INC.;
WALGREEN CO.; WALGREEN EASTERN CO.,
INC.; WALMART, INC.; WAL-MART STORES
EAST, LP; CAREMARK RX, LLC;
UNITEDHEALTH GROUP INCORPORATED; and
EXPRESS SCRIPTS, INC.

Defendants.

# TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE ................................................................................................ 8

PARTIES ................................................................................................................................... 8

I.     Plaintiff ............................................................................................................................ 9

II.    Defendants ..................................................................................................................... 10

    A.    Manufacturer/Marketing Defendants .............................................................. 10

        1.    Teva.................................................................................................... 10

        2.    Janssen .............................................................................................. 11

        3.    Endo .................................................................................................. 12

        4.    Allergan............................................................................................. 13

        5.    Mallinckrodt...................................................................................... 16

        6.    Amneal Pharmaceuticals, Inc............................................................ 19

    B.    Distributor Defendants........................................................................................ 19

        1.    Cardinal Health, Inc. ......................................................................... 20

        2.    McKesson Corporation ..................................................................... 22

        3.    Health Mart Systems, Inc.................................................................. 23

        4.    AmerisourceBergen Drug Corporation............................................. 24

        5.    H.D. Smith, LLC............................................................................... 24

        6.    CVS Entities...................................................................................... 25

        7.    Walgreen Co. ..................................................................................... 28

        8.    Walmart............................................................................................. 31

    C.    National Pharmacies ........................................................................................... 32

        1.    CVS.................................................................................................... 33

        2.    Walgreens ......................................................................................... 33

        3.    Walmart............................................................................................. 34

    D.    Pharmacy Benefit Managers .............................................................................. 34

        1.    Express Scripts .................................................................................. 35

        2.    Caremark Rx, LLC............................................................................ 36

        3.    Unitedhealth Group Incorporated .................................................... 36

    E.    Unnamed Related Parties ................................................................................... 37

    F.    Agency and Authority........................................................................................ 43

**TABLE OF CONTENTS**
**(continued)**

Page

BACKGROUND ................................................................................................ 44

III.   Florida Has Been Overwhelmed by the Opioid Epidemic.............................. 44

IV.   The Opioid Epidemic in Orlando................................................................... 48

FACTUAL ALLEGATIONS ............................................................................ 52

V.   Facts Common to All Claims........................................................................ 52

    A.   Opioids and Their Effects ................................................................... 52

    B.   The Resurgence of Opioid Use in the United States............................ 56

        1.   The Sackler Family Integrated Advertising and Medicine ...................... 56

        2.   Purdue and the Development of OxyContin ............................................ 58

        3.   Other Marketing Defendants and Unnamed Related Parties Leapt at the Opioid Opportunity .................................................................... 62

        4.   The Marketing Defendants and Unnamed Related Parties Multi-Pronged Scheme to Change Prescriber Habits and Public Perception and Increase Demand of Opioids........................................... 66

        5.   The National Retail Pharmacies Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids ..................... 146

        6.   As Registrants Under the Controlled Substances Act, Supply Chain Defendants and National Pharmacies Have a Duty to Maintain Effective Controls Against Diversion and Supply Chain Defendants Have a Duty to Detect, Report, and Halt Suspicious Orders.................................................................................................... 148

        7.   Defendants' Violations in Other Jurisdictions Further Exacerbated the Flood of Opioids into the Plaintiff's Community. ........................... 183

        8.   Defendants and Unnamed Related Parties Worked Together to Sustain their Market and Boost their Profits.......................................... 184

        9.   Distributor Defendants Marketed Manufacturers' Opioid Products...... 193

        10.   The PBM Defendants Further Exacerbated the Flood of Opioids into the Market .................................................................................... 195

VI.   Facts Pertaining to CONSPIRACY Claims ................................................ 198

    A.   The Opioid Marketing Enterprise ..................................................... 198

        1.   The Common Purpose and Scheme of the Opioid Marketing Enterprise ............................................................................................ 198

        2.   The Conduct of the Opioid Marketing Enterprise Violated Civil Conspiracy Laws.................................................................................. 203

**TABLE OF CONTENTS**
**(continued)**

**Page**

|   |   | 3. | The Marketing Defendants and Unnamed Related Parties Controlled and Paid Front Groups and KOLs to Promote and Maximize Prescription Opioid Use | 207 |
|---|---|---|---|---|
|   | B. |   | The Opioid Supply Chain Enterprise | 207 |
|   | C. |   | Effect of Opioid Marketing Enterprise and Opioid Supply Chain Enterprise on Orlando | 212 |
|   | D. |   | Statutes of Limitations Are Tolled and Defendants Are Estopped from Asserting Statutes of Limitations As Defenses | 214 |
|   |   | 1. | Continuing Conduct | 214 |
|   |   | 2. | Equitable Estoppel and Fraudulent Concealment | 214 |
|   | E. |   | Facts Pertaining to Punitive Damages | 217 |
| CLAIMS FOR RELIEF | | | | 218 |
| PRAYER FOR RELIEF | | | | 237 |
| JURY DEMAND | | | | 239 |

Plaintiff, The City of Orlando, Florida ("Orlando," the "City," or "Plaintiff") sues Defendants CVS Health Corporation; CVS Health Solutions, LLC; CVS Pharmacy, Inc.; CVS Orlando, FL Distribution, L.L.C.; CVS Vero FL Distribution, LLC; CVS RX Services, Inc.; Holiday CVS L.L.C.; Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Mallinckrodt PLC; Mallinckrodt Brand Pharmaceuticals, Inc.; Mallinckrodt, LLC; Mallinckrodt Enterprises, LLC; SpecGx LLC; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals of New York, LLC; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Endo International plc; Par Pharmaceutical Companies, Inc.; Par Pharmaceutical, Inc.; Allergan PLC; Allergan Sales, LLC; Allergan USA, Inc.; Actavis Elizabeth LLC; Actavis Kadian LLC; Actavis Laboratories FL, Inc.; Actavis Laboratories UT, Inc.; Actavis LLC; Actavis Mid Atlantic LLC; Actavis Pharma, Inc.; Actavis South Atlantic LLC; Actavis Totowa LLC; Watson Laboratories, Inc.; Warner Chilcott Sales (US), LLC; McKesson Corporation; Health Mart Systems, Inc.; Cardinal Health, Inc.; Cardinal Health 100, Inc.; Cardinal Health 105, Inc.; Cardinal Health 107, LLC; Cardinal Health 108, LLC; Cardinal Health 110, LLC; Cardinal Health 112, LLC; Cardinal Health 122, LLC; Cardinal Health 132, LLC; Cardinal Health 200, LLC; Cardinal Health 414, LLC; Cardinal Health 5, LLC; Cardinal Health 7, LLC; Cardinal Health Pharmacy Services, LLC; AmerisourceBergen Drug Corporation; H.D. Smith, LLC; Walgreens Boots Alliance, Inc.; Walgreen Co.; Walgreen Eastern Co., Inc.; Walmart, Inc.; Wal-Mart Stores East, LP; Caremark Rx, LLC; UnitedHealth Group Incorporated, and Express Scripts, Inc., for the causes of action stated as follows:

## INTRODUCTION

1.     This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids.[1]

2.     By now, most Americans have been affected, either directly or indirectly, by the opioid epidemic.  But few realize that this crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use, together with the distributors' equally deliberate efforts to evade restrictions on opioid distribution.  Manufacturers and distributors alike acted without regard for the lives that would be trampled in pursuit of profit.[2]

3.     Since the push to expand prescription opioid use began in the late 1990s, the death toll has steadily climbed, with no sign of slowing.  The number of opioid overdoses in the United States rose from 8,000 in 1999 to over 20,000 in 2009, and to over 33,000 in 2015.[3]  In the 12 months that ended in September 2017, opioid overdoses claimed 45,000 lives.

4.     From 1999 through 2016, overdoses killed more than 350,000 Americans.[4]  Over 200,000 of them, more than were killed in the Vietnam War, died from opioids prescribed by doctors ostensibly to treat pain.[5]  These opioids include brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

---

[1] Unless otherwise indicated, as used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.
[2] *Overdose Death Rates*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (last updated Sept. 2017).
[3] *Understanding the Epidemic*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/epidemic/index.html (last updated Aug. 30, 2017).
[4] *Prescription Opioid Overdose Data*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/data/overdose.html (last updated Aug. 1, 2017).
[5] *Examining the Growing Problems of Prescription Drug and Heroin Abuse* Ctrs. for Disease Control and Prevention (Apr. 29, 2014), http://www.cdc.gov.washington/testimony/2014/t20140429.html; *see also* Letter from Vivek H. Murthy, M.D., M.B.A., 19th U.S. Surgeon General, Turn the Tide RX (Aug. 2016), http://turnthetiderx.org .

5.      Most of the overdoses from non-prescription opioids are also directly related to prescription opioids.  Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin.  According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription opioids—which, at the molecular level and in their effect, closely resemble heroin.  In fact, people who are addicted to prescription opioids are 40 times more likely to become addicted to heroin. The Centers for Disease Control and Prevention ("CDC") has identified addiction to prescription opioids as the strongest risk factor for heroin addiction.

6.      As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans under 50.

7.      In the words of Robert Anderson, who oversees death statistics at the CDC, "I don't think we've ever seen anything like this.  Certainly not in modern times."  On October 27, 2017, the President declared the opioid epidemic a public health emergency.

8.      This suit takes aim at the two primary causes of the opioid crisis:  (a) a marketing scheme based on the false and deceptive marketing of prescription opioids, which was designed to dramatically increase the demand for and sale of opioids and opioid prescriptions; and (b) a supply chain scheme, pursuant to which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs.

9.      On the demand side, the crisis was precipitated by the Defendants who manufacture, sell, and market prescription opioids ("Marketing Defendants").  Through a massive

marketing campaign premised on false and incomplete information, the Marketing Defendants and Unnamed Related Parties engineered a dramatic shift in how and when opioids were prescribed by the medical community and used by patients.  The Marketing Defendants and Unnamed Related Parties relentlessly and methodically, but untruthfully, asserted that the risk of addiction was low when opioids were used to treat chronic pain, and overstated the benefits and trivialized the risk of the long-term use of opioids.

10.     The Marketing Defendants' and Unnamed Related Parties' goal was simple:  to dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain, but also for common chronic pains, such as back pain and arthritis.  They did this even though they knew that opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

11.     The Marketing Defendants' and Unnamed Related Parties' push to increase opioid sales worked.  Through their publications and websites, endless stream of sales representatives, "education" programs, and other means, the Marketing Defendants and Unnamed Related Parties dramatically increased their sales of prescription opioids and reaped billions of dollars of profit as a result.  Since 1999, the amount of prescription opioids sold in the United States nearly quadrupled.  In 2016, 289 million prescriptions for opioids were filled in the United States— enough to medicate every adult in America around the clock for a month.

12.     Meanwhile, Defendants and Unnamed Related Parties made blockbuster profits.  In 2012 alone, opioids generated $8 billion in revenue for drug companies.  By 2015, sales of opioids grew to approximately $9.6 billion.

13.     On the supply side, the crisis was fueled and sustained by those involved in the supply chain of opioids, including manufacturers, distributors, and pharmacies (together, "Defendants"), who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls.  Defendants and Unnamed Related Parties have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt, suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

14.     From the day they made the pills to the day those pills were consumed in the Orlando community, these manufacturers have had control over the information regarding addiction they chose to spread and emphasize as part of their massive marketing campaign.  By providing misleading information to doctors about addiction being rare and opioids being safe even in high doses, then pressuring doctors into prescribing their products by arguing, among other things, that no one should be in pain, the Marketing Defendants and Unnamed Related Parties created a population of addicted patients who sought opioids at never-before-seen rates.  The scheme worked, and through it the Marketing Defendants and Unnamed Related Parties caused their profits to soar as more and more people became dependent on opioids.  Today, as many as one-in-four patients who receive prescription opioids long-term for chronic pain in a primary care setting struggles with addiction.  And as of 2017, overdose death rates involving prescription opioids were five times higher than they were in 1999.

15.     As millions became addicted to opioids, "pill mills," often styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non-medical use. These pill mills, typically under the auspices of licensed medical professionals, issue high volumes

of opioid prescriptions under the guise of medical treatment. Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without at least the tacit support and willful blindness of Defendants, if not their knowing support.

16.     As a direct and foreseeable result of Defendants' and Unnamed Related Parties' conduct, cities and counties across the nation, including Plaintiff, are now swept up in what the CDC has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[6] The increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose, and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire—or simply could not afford—prescription opioids.

17.     Thus, rather than compassionately helping patients in pain, this explosion in opioid use, and Defendants' and Unnamed Related Parties' profits, has come at the expense of patients and Plaintiff has caused ongoing harm and damages to Plaintiff. As the CDC director concluded in 2014: "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently."[7]

18.     Defendants' and Unnamed Related Parties' conduct in promoting opioid use has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction, overdose, and death from illicit drugs such as heroin. The costs are borne by Plaintiff and other governmental entities. These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations,

---

[6] *Id.*
[7] *Id.*

treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.

19.     The burdens imposed on Plaintiff are not the normal or typical burdens of governmental programs and services.  Rather, these are extraordinary costs and losses that are directly related to Defendants' and Unnamed Related Parties' illegal actions.  Defendants' and Unnamed Related Parties' conduct has created a public nuisance and a blight.  Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

20.     Defendants and Unnamed Related Parties have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis.

21.     Within the next hour, six Americans will die from opioid overdoses; two babies will be born dependent on opioids and begin to go through withdrawal; and drug manufacturers will earn over $2.7 million from the sale of opioids.

22.     Orlando is filing this lawsuit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.  Orlando asserts two categories of claims: (a) claims against the pharmaceutical manufacturers of prescription opioid drugs that engaged in a massive false marketing campaign to drastically expand the market for such drugs and their own market share; and (b) claims against entities in the supply chain that reaped enormous financial rewards by refusing to monitor and restrict the improper distribution of those drugs.

23.     Orlando is both at the center of the Florida, as well as the center of Florida's opioid epidemic, which equally plagues the nation.  In a state with ever-climbing opioid-overdose death rates, Orlando stands out with skyrocketing opioid and heroin overdose statistics.  Yet, the startling

number of overdoses and overdose-related deaths is only one way to measure the pervasive and unprecedented manner opioids have affected Orlando.  This influx of opioids and related abuse, misuse, addiction, and overdoses has resulted in substantial loss and expenditure by the City, which foots the bill for deaths inside its limits regardless of whether the victim is a resident or one of hundreds of thousands of tourists and travelers passing through the city each day.

24.     To care for and to protect the members of the community, Plaintiff has unexpectedly had to spend vast funds on a wide range of services to fight the opioid epidemic's staggering, unanticipated, and far-reaching effects.  The opioid epidemic has strained Plaintiff's resources, by causing Plaintiff to incur substantial and unusual costs for providing, amongst other things, health care, foster care, law enforcement and emergency responder services, public assistance, addiction treatment programs, overdose reversal medications, neonatal abstinence syndrome treatment, and other social services and public programs.

25.     As detailed herein, the opioid epidemic was caused by the malicious conduct of the Defendants motivated by the corporate need for ever greater profit.  Orlando brings this suit in order to force the Defendants to share in shouldering the costs with which they have burdened the City.

## JURISDICTION AND VENUE

26.     The Florida State Courts have jurisdiction over this case and over Defendants pursuant to the provisions of Fla. Stat. §26.012.  Federal subject matter jurisdiction does not exist.

27.     This is an action for damages that exceeds the sum of THIRTY THOUSAND DOLLARS ($30,000.00), exclusive of costs, interest and attorneys' fees (The estimated value of Plaintiff's claim is in excess of the minimum jurisdictional threshold required by this Court).  Accordingly, Plaintiff has entered "$30,001" in the civil cover sheet for the "estimated amount of the claim" as required in the preamble to the civil cover sheet for *jurisdictional purposes*

-8-

*only* (the Florida Supreme Court has ordered that the estimated "amount of claim" be set forth in the civil cover sheet for data collection and clerical purposes only). The actual value of Plaintiff's claim will be determined by a fair and just jury in accordance with Article 1, Section 21, Fla. Const.

28.     This Court has personal jurisdiction over Defendants in that they conducted business in Florida at all times material hereto, committed acts and/or omissions in or outside Florida which caused tortious injury to Plaintiffs within Florida.

29.     Venue is appropriate in Orange County pursuant to Fla. Stat. §47.051 as Defendants, together and individually, deliberately and regularly conducted business in Orange County.

## PARTIES

### I.     Plaintiff

30.     Orlando is a political subdivision of the State of Florida, established pursuant to Fla. Const. Art. VIII, §2, which may sue and plead in its own name.

31.     Orlando is responsible for the public health, safety, and welfare of its residents, is a citizen of the State of Florida, and has the capacity to sue under Fla. Stat. §166.021. Further, Orlando is self-insured for certain of its employees' health benefits.

32.     Plaintiff has declared, *inter alia*, that opioid abuse, addiction, morbidity, and mortality has created a serious public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

33.     The distribution and diversion of opioids into Orlando created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

34.     Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which Plaintiff seeks relief.   These damages have been suffered, and continue to be suffered directly, by Plaintiff.

35.     Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

36.     Plaintiff has standing to bring an action for the opioid epidemic nuisance created by Defendants.

37.     Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions.   Plaintiff has standing to bring all claims pled herein.

## II.     **Defendants**

### A.     **Manufacturer/Marketing Defendants**

38.     At all relevant times, the Manufacturer Defendants and Unnamed Related Parties, each of whom is defined below, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.

39.     The Manufacturer Defendants and Unnamed Related Parties, at all times, manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders. For ease of reference, the Manufacturer Defendants and Unnamed Related Parties are also referred to as "Marketing Defendants."

### 1.     **Teva**

40.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva USA") is a Delaware corporation with its principal place of business in North Whales, Pennsylvania.   Teva USA was in the business of selling generic opioids, including a generic form of OxyContin beginning in 2007.

Teva USA is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd., ("Teva Ltd.") an Israeli corporation. Collectively, these entities are referred to as "Teva."

41.     Defendant Cephalon, Inc., is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  In 2011, Teva Ltd. acquired Cephalon, Inc.

42.     From 2000 forward, Cephalon made thousands of payments to physicians nationwide, ostensibly for activities such as, participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, that deceptively promoted and maximized the use of opioids.

43.     Teva USA and Cephalon, Inc., and their DEA registrant subsidiaries and affiliates (collectively "Teva") are or have been engaged in the manufacture, promotion, distribution, and sale of generic and brand opioids (including the Schedule II opioid drugs Actiq and Fentora) nationally, including in Plaintiff's Community.

        **2.**      **Janssen**

44.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

45.     Defendant Janssen Pharmaceuticals, Inc., ("Janssen"), f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., f/k/a Janssen Pharmaceutica, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of J&J. J&J corresponds with the FDA regarding Janssen's products.

46.     Defendant Noramco, Inc. ("Noramco") is a Georgia corporation, headquartered in Wilmington, Delaware with offices in Athens, Georgia and Neuhausen, Switzerland.  Noramco, Inc., was a wholly owned subsidiary of J&J until July 2016.

47.     J&J, Janssen Pharmaceuticals, Noramco, Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc., (collectively, "Janssen") are or have been engaged in the

manufacture, promotion, distribution, and sale of opioids nationally, including Florida.   The Schedule II opioid drugs Janssen manfuactures or manufactured include Duragesic, Nucynta and Nucynta ER.[8]

48.     Janssen made thousands of payments to physicians nationwide, ostensibly for activities such as, participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, that deceptively promoted and maximized the use of opioids in Plaintiff's Community.   Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.   Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

### 3.     Endo

49.     Defendant Endo Health Solutions, Inc. ("EHS") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.   Endo Pharmaceuticals, Inc., ("EPI") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.   EHS and EPI are wholly owned subsidiaries of Endo International PLC.

50.     Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York.   Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York.   Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. were acquired by Endo International plc in September 2015 and are operating companies of Endo International plc.

---

[8] Depomed, Inc., acquired the rights to Nucynta and Nucynta ER from Janssen in 2015. https://www.prnewswire.com/news-releases/depomed-announces-closing-of-acquisition-of-us-rights-to-nucynta-tapentadol-nucynta-er-tapentadol-extended-release-tablets-and-nucynta-tapentadol-oral-solution-from-janssen-pharmaceuticals-inc-for-105-billion-300060453.html

51.     EHS, EPI, Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc. and their DEA registrant subsidiaries and affiliates (collectively, "Endo") manufacture opioids sold nationally, and in the Plaintiff's Community.

52.     Endo is or has been engaged in the manufacture, promotion, distribution, and sale of opioids nationally, including Florida.  The Schedule II opioid drugs Endo manfuactures or manufactured include Opana, Opana ER, Percodan, and Percocet.

53.     Endo also manufactures and sells generic Schedule II opioid drugs, both directly and through its subsidiaries, including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

54.     The opioids sold by Endo contributed approximately $403 million of Endo's $3 billion in revenue in 2012.  Opana ER alone accounted for approximately $1.15 billion total from 2010 through 2013.

55.     The Food and Drug Administration requested that Endo remove Opana ER from the market in June 2017. The FDA relied on post-marketing data in reaching its conclusion based on risk of abuse.

### 4.     Allergan

56.     Defendant Allergan plc (f/k/a Actavis plc) is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland, with its administrative headquarters and all executive officers located in Madison, New Jersey.

57.     By way of history, Watson Pharmaceuticals, Inc. was a Nevada corporation with its principal place of business in Parsippany, New Jersey.  Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc. in January 2013.

58.     Actavis plc was incorporated in Ireland for the purpose of facilitating business between Actavis, Inc. and Warner Chilcott plc. Pursuant to Rule 12g-3(c) under the Securities

Exchange Act of 1934, Actavis plc is the successor to Actavis, Inc. and Warner Chilcott plc.  Actavis plc acquired Allergan plc in March 2015.  The acquisition resulted in another name change to Allergan plc. Actavis plc's SEC filings explain that "references throughout to 'we,' 'our,' 'us,' the 'Company' or 'Actavis' refer interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date."[9]

59.     Defendant Warner Chilcott Sales (US), LLC is a Delaware limited liability company with principal place of business in Madison, New Jersey.  Warner Chilcott Sales (US), LLC is registered to do business in the state of Florida.  Since 2015, Warner Chilcott Sales (US), LLC has been the manufacturer of Norco. Warner Chilcott Sales (US) LLC was a subsidiary of Warner Chilcott plc when Warner Chilcott plc became a wholly owned subsidiary of Allergan plc in 2013. Warner Chilcott Sales (US) LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

60.     Defendant Allergan Sales, LLC is a Delaware limited liability company with its principal place of business in Irvine, California.  Allergan Sales, LLC is registered to do business in the State of Florida and is the wholly owned subsidiary of Allergan plc.

61.     Defendant Allergan USA, Inc. is a Delaware corporation with its principal place of business in Madison, New Jersey. Allergan USA, Inc. is registered to do business in the State of Florida.

62.     Defendant Actavis Elizabeth LLC is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. Actavis Elizabeth LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

---

[9] https://www.sec.gov/Archives/edgar/data/1578845/000119312514066242/d648811d10k.htm
*See* also City of Chicago v. Purdue Pharma L.P., et al, No. 14 C 4361 at *7 (N.D. Ill, May 8, 2015).

63.     Defendant Actavis Kadian LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Kadian LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

64.     Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) is a Florida Corporation with its principal place of business in Davie, Florida.  Actavis Laboratories FL, Inc. was sold to Teva Pharmaceutical Industries Limited as part of Allergan plc's 2016 sale of its generic businesses to Teva.

65.     Defendant Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City) is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.  Actavis Laboratories UT, Inc. was sold to Teva Pharmaceutical Industries Limited as part of Allergan plc's 2016 sale of its generic businesses to Teva.

66.     Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

67.     Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Actavis Mid Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

68.     Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Actavis Pharma, Inc. is registered to do business with the Florida Secretary of State.  Actavis Pharma, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

69.     Defendant Actavis South Atlantic LLC is a Delaware limited liability company with its principal place of business in Sunrise, Florida.  Actavis South Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

70.     Defendant Actavis Totowa LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Totowa LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

71.     Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Parsippany, New Jersey. Watson Laboratories, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

72.     Allergan plc, Warner Chilcott (US), LLC, Allergan Sales, LLC, Allergan USA, Inc., Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Laboratories FL, Inc., Actavis Laboratories UT, Inc., Actavis LLC, Actavis Mid Atlantic LLC, Actavis Pharma, Inc., Actavis South Atlantic LLC, Actavis Totowa LLC, and Watson Laboratories, Inc. are collectively referred to as "Allergan."  Allergan manufactures, promotes, distributes and sells opioids nationally and in the Plaintiff's Community.

### 5.      Mallinckrodt

73.     Defendant Mallinckrodt, plc, is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom.  Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc. Mallinckrodt plc has a corporate office in Hazelwood, Missouri.

74.     Mallinckrodt Brand Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business in Hazelwood, Missouri.  Mallinckrodt Brand Pharmaceuticals, Inc. is a wholly-owned subsidiary of Mallinckrodt plc.

75.     Defendant Mallinckrodt Enterprises, LLC, is a Delaware limited liability company with its principal place of business in Hazelwood, Missouri.  Mallinckrodt Enterprises, LLC is a wholly owned subsidiary of Mallinckrodt plc and is registered to do business in the State of Florida.

76.     Defendant Mallinckrodt, LLC is a Delaware limited liability company with its principal place of business in Hazelwood, Missouri.  Mallinckrodt, LLC is a wholly-owned subsidiary of Mallinckrodt plc and is registered to do business in the State of Florida.

77.     Defendant SpecGx, LLC, is a Delaware limited liability company with its principle place of business in Clayton, Missouri. Mallinckrodt plc operates its Specialty Generics business through SpecGX, LLC in Webster Groves, Missouri.  SpecGx, LLC is a wholly-owned subsidiary of Mallinckrodt plc, and is registered to do business in the State of Florida.

78.     Mallinckrodt plc, Mallinckrodt Brand Pharmaceuticals, Inc., Mallinckrodt, LLC, Mallinckrodt Enterprises, LLC, SpecGx LLC, and their DEA registrant subsidiaries and affiliates are collectively referred to herein as "Mallinckrodt".  Mallinckrodt plc's SEC filings explain that references to "Mallinckrodt plc," "Mallinckrodt," "we," "us," "our" and "the Company" refer to Mallinckrodt plc, an Irish public limited company, and its consolidated subsidiaries.[10]

79.     In 2009, Mallinckrodt Inc., then a subsidiary of Covidien plc, acquired the U.S. rights to Exalgo.  The FDA approved Exalgo for treatment of chronic pain in 2012.  Mallinckrodt further expanded its branded opioid portfolio in 2012 by purchasing Roxicodone from Xanodyne Pharmaceuticals.  In addition, Mallinckrodt developed Xartemis XR, an extended-release combination of oxycodone and acetaminophen, which the FDA approved in March 2014, and

---

[10] https://www.sec.gov/ix?doc=/Archives/edgar/data/1567892/000156789219000009/mnk10-k122818.htm; *See* also City of Chicago v. Purdue Pharma L.P., et al, No. 14 C 4361 at *7 (N.D. Ill, May 8, 2015).

which Mallinckrodt has since discontinued.  Mallinckrodt promoted its branded opioid products with its own direct sales force.

80.     While it sought to develop its own branded opioid products, Mallinckrodt has long been a leading manufacturer of generic opioids. Mallinckrodt estimated that in 2015 it received approximately 25% of the U.S. Drug Enforcement Administration's ("DEA") entire annual quota for controlled substances that it manufactures. Mallinckrodt also estimated, based on IMS Health data for the same period, that its generics claimed an approximate 23% market share of DEA Schedules II and III opioid and oral solid dose medications

81.     Mallinckrodt develops, markets, and sells Schedule II opioid drugs Exalgo, Roxicodone, Xartemis XR and Methtadose.

82.     Mallinckrodt also manufactures and sells, both directly and through its subsidiaries, generic Schedule II opioid drugs, including generic morphine sulphate, fentanyl transdermal system, oral transmucosal fentanyl citrate, oxycodone and acetaminophen, hydrocodone bitartrate and acetaminophen, hydromorphone hydrochloride, hydromorphone hydrochloride (extended release), oxymorphone hydrochloride, methadone hydrochloride, oxycodone hydrochloride and buprenorphine and naloxone.

83.     Mallinckrodt made thousands of payments to physicians nationwide, ostensibly for activities such as, participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, that deceptively promoted and maximized the use of prescription opioids.

84.     Mallinckrodt manufactures, promotes, distributes, and sells generic prescription opioid throughout the country, including into Florida andthe Plaintiff's Community.

### 6.   Amneal Pharmaceuticals, Inc.

85.   Defendant Amneal Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.  Amneal Pharmaceuticals, Inc. was formed under the name Atlas Holdings, Inc. for the purpose of facilitating the combination of Amneal Pharmaceuticals LLC, a Delaware limited liability company, and Impax Laboratories, Inc., a Delaware corporation.  As a result of the combination, Impax became a Delaware limited liability company, wholly owned by Amneal and Amneal became the operating company for the combined business.  Amneal Pharmaceuticals, Inc. is registered to do business in Florida.

86.    Defendant Amneal Biosciences LLC is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Amneal Biosciences, LLC is a wholly owned subsidiary of Amneal Pharmaceuticals, Inc. and is registered to do business in Florida.

87.   Amneal Pharmaceuticals, Inc., and Amneal Biosciences, LLC, are collectively referred to as "Amneal."  Amneal manufactures, promotes, distributes and sells opioids throughout the country, including into Florida and the Plaintiff's Community.

88.    Collectively, Teva, Janssen, Endo, Allergan, Mallinckrodt, and Amneal are referred to as "**Manufacturer Defendants**" and are also included within the definition of "**Marketing Defendants.**"

### B.   Distributor Defendants

89.   Distributor Defendants are defined below. At all relevant times, Distributor Defendants distributed, supplied, sold, and placed into the stream of commerce prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. Distributor Defendants universally failed to comply with federal and/or state law.  Distributor Defendants are engaged in "wholesale distribution," as defined under state and federal law. Plaintiff alleges the unlawful conduct by

Distributor Defendants is a substantial cause for the volume of prescription opioids plaguing Plaintiff's community.

      1.    **Cardinal Health, Inc.**

90.    Defendant Cardinal Health, Inc. (hereinafter "Cardinal Health") is an Ohio corporation with its principal place of business in Dublin, Ohio.

91.    Defendant Cardinal Health 100, Inc., is an Indiana corporation, with its principal place of business in Dublin, Ohio, and is registered to do business in Florida. Cardinal Health 100, Inc. is a wholly-owned subsidiary of Cardinal Health, Inc.

92.    Cardinal Health 105, Inc., is an Ohio corporation, with its principal place of business in Dublin, Ohio, and is registered to do business in Florida. Cardinal Health 105, Inc. is a wholly-owned subsidiary of Cardinal Health, Inc.

93.    Defendant Cardinal Health 107, LLC is an Ohio corporation, with its principal place of business in Dublin, Ohio, and is registered to do business in Florida. Cardinal Health 107, LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

94.    Defendant Cardinal Health 108, LLC is an Ohio corporation, with its principal place of business in Dublin, Ohio, and is registered to do business in Florida. Cardinal Health 107, LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

95.    Defendant Cardinal Health 110, LLC is a Delaware limited liability company, with its principal place of business in Dublin, Ohio, and is registered to do business in Florida. Cardinal Health 110 LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

96.    Defendant Cardinal Health 112, LLC, is a Delaware limited liability company, with its principal place of business in Dublin, Ohio, and is registered to do business in Florida. Cardinal Health 112, LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

97.     Defendant Cardinal Health 122, LLC, is a Delaware limited liability company, with its principal place of business in Dallax, Texas, and is registered to do business in Florida. Cardinal Health 122 LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

98.     Defendant Cardinal Health 132, LLC is a Delaware limited liability company, with its principal place of business in Houston, Texas, and is registered to do business in Florida. Cardinal Health 132, Inc., is a wholly-owned subsidiary of Cardinal Health, Inc.

99.     Defendant Cardinal Health 200, LLC, is a Delaware limited liability company, with its principal place of business in Dublin, Ohio and is been registered to do business in Florida. Cardinal Health 200, LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

100.    Defendant Cardinal Health 414, LLC, is a Delaware limited liability company, with its principal place of business in Dublin Ohio, and is registered to do business in Florida.  Cardinal Health 414 LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

101.    Defendant Cardinal Health 5, LLC, is a Delaware limited liability company, with its principal place of business in Dublin Ohio, and is registered to do business in Florida.  Cardinal Health 5 LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

102.    Defendant Cardinal Health 7, LLC, is a Delaware limited liability company, with its principal place of business in Dublin Ohio, and is registered to do business in Florida.  Cardinal Health 7 LLC, is a wholly-owned subsidiary of Cardinal Health, Inc

103.    Defendant Cardinal Health Pharmacy Services, LLC, is a Delaware limited liability company, with its principal place of business in Houston, Texas, and is registered to do business in Florida.  Cardinal Health Pharmacy Services, LLC, is a wholly-owned subsidiary of Cardinal Health, Inc.

104.    Defendants Cardinal Health, Inc., Cardinal Health 100, Inc., Cardinal Health 105, Inc., Cardinal Health 107, LLC, Cardinal Health 108, LLC, Cardinal Health 110, LLC, Cardinal Health 112, LLC, Cardinal Health 122, LLC, Cardinal Health 132, LLC, Cardinal Health 200, LLC, Cardinal Health 414, LLC, Cardinal Health 5, LLC, Cardinal Health 7, LLC, and Cardinal Health Pharmacy Services, LLC, are collectively referred to herein as "Cardinal Health." The SEC filings for Cardinal Health, Inc. states, "As used in this report, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries."[11]

105.    Upon information and belief, each of the above-named Cardinal Health entities is a DEA registered "distributor" of prescription opioids[12] and as such, owes a duty to maintain effective control against diversion of prescription opioids.[13]

106.    Through its various DEA registered subsidiaries and affiliated entities, Cardinal Health distributes pharmaceutical drugs, including prescription opioids, throughout the country, including into Florida and the Plaintiff's Community.

107.    Cardinal Health describes itself as a "global, integrated health care services and products company,"[14] and is the fifteenth largest company by revenue in the United States[15], with annual revenue of $121 billion in 2016.[16]

## 2.    McKesson Corporation

108.    Defendant McKesson Corporation ("McKesson") is a Delaware Corporation with its principal place of business in Irving, Texas, and is registered to do business in Florida.

---

[11] https://www.sec.gov/Archives/edgar/data/721371/000072137115000107/a15q4_10kx63015xform10-k.htm; *See* also City of Chicago v. Purdue Pharma L.P., et al, No. 14 C 4361 at *7 (N.D. Ill, May 8, 2015).
[12] 21 U.S.C. § 802(11) and § 822(a)(1).
[13] 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.71.
[14] https://www.cardinalhealth.com/en/about-us.html
[15] https://fortune.com/fortune500/2017/cardinal-health/
[16] https://ir.cardinalhealth.com/news/press-release-details/2016/Cardinal-Health-Reports-Q4-And-Fiscal-2016-Results-Provides-Fiscal-2017-Outlook/default.aspx

109.    McKesson is a DEA registered "distributor" of prescription opioids[17] and as such, owes a duty to maintain effective controls against diversion of prescription opioids.[18]

110.    Among its many business interests, McKesson distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

111.    McKesson is the largest pharmaceutical distributor in North America.[19]  McKesson delivers approximately one third of all pharmaceuticals used in North America.

112.    McKesson does substantial business in the state of Florida and at all relevant times, operated as a distributor wholesaler in Florida.

113.    McKesson distributes pharmaceutical drugs, including opioids, throughout the country, including into Florida and the Plaintiff's Community.

114.    Between 2006 and 2012, McKesson distributed more than 318,535,441 doses of hydrocodone and oxycodone into Plaintiff's Community.[20]

### 3.    Health Mart Systems, Inc.

115.    Defendant Health Mart Systems, Inc. ("Health Mart") is a Delaware corporation with its principal place of business in Irving, Texas, and is registered to do business in Florida. Health Mart operates as a subsidiary of McKesson Corporation.  During all relevant times, Health Mart sold and continues to sell prescription opioids in and around Orlando. Health Mart is a franchising and marketing arm of McKesson that has relationships with 4,700 retail pharmacies nationally, including in Orlando.

---

[17] 21 U.S.C. §802(11) and §822(a)(1).
[18] 21 U.S.C. §823(b)(1); 21 C.F.R. § 1301.71.
[19]  See https://fortune.com/global500/2018/mckesson/;  and  https://seekingalpha.com/article/4134592-mckesson-pharmaceutical-distributor-buy
[20] See https://www.slcg.com/search_file_map.php

4.      **AmerisourceBergen Drug Corporation**

116.    Defendant AmerisourceBergen Drug Corporation ("ABDC") is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania and is registered to do business in Florida.

117.    ABDC is a DEA registered "distributor" of prescription opioids[21] and as such, owes a duty to maintain effective controls against diversion of prescription opioids.[22]

118.     ABDC, at all relevant times, operated as licensed distributor wholesaler in Florida.

119.    ABDC is the eleventh largest company by revenue in the United States, with annual revenue of $147 billion in 2016.[23]

120.    Through its various DEA registered subsidiaries and affiliated entities, ABDC distributes pharmaceutical drugs, including opioids, throughout the country, including into Florida, and the Plaintiff's Community.

5.      **H.D. Smith, LLC**

121.    Defendant H.D. Smith, LLC, is a Delaware limited liability company with its principal place of business in Chesterbrook, Pennsylvania and is registered to do business in Florida.  H.D. Smith was a privately held independent pharmaceuticals wholesale distributor of brand, generic and specialty pharmaceuticals until it was acquired by Defendant ABDC in January 2018.

122.    Defendant H.D. Smith is a DEA registered "distributor" of prescription opioids[24] and as such owes a duty to maintain effective controls against diversion of prescription opioids.[25]

---

[21] 21 U.S.C. § 802(11) and § 822(a)(1).
[22] 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.71.
[23] See https://fortune.com/fortune500/2016/amerisourcebergen/
[24] 21 U.S.C. § 802(11) and § 822(a)(1).
[25] 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.71.

123.     At all times relevant to this Complaint, H.D. Smith distributed prescription opioids throughout the United States, including into Florida and the Plaintiff's Community.

### 6.     CVS Entities

124.     Defendant CVS Health Corporation (f/k/a CVS Corporation or CVS Caremark Corporation) is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island.

125.     Defendant CVS Health Solutions, LLC, is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island and is registered to do business in Florida.  CVS Health Solutions, LLC is a wholly-owned subsidiary of CVS Health Corporation.

126.     Defendant CVS Pharmacy, Inc., is Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS Pharmacy, Inc., is a wholly-owned subsidiary of CVS Health Corporation and is registered to do business in Florida.

127.     Defendant Holiday CVS, L.L.C. is a Florida limited liability company with its principal place of business in Woonsocket, Rhode Island.  Holiday CVS, LLC is a wholly-owned subsidiary of CVS Health Corporation and is registered to do business in Florida.

128.     Defendant CVS Orlando FL Distribution, L.L.C. is a Florida limited liability company with its principal place of business in Woosocket, Rhode Island. CVS Orlando FL Distribution, L.L.C. is a wholly-owned subsidiary of CVS Health Corporation and is registered to do business in Florida.

129.     Defendant CVS Vero FL Distribution, L.L.C. is a Florida limited liability company with its principal place of business in Woosocket, Rhode Island.  CVS Vero FL Distribution, L.L.C. is a wholly-owned subsidiary of CVS Health Corporation and is registered to do business in Florida.

130.    Defendant CVS RX Services, Inc., is a New York corporation with its principal place of business in Woonsocket, RI and is registered to do business in Florida.  CVS RX Services, Inc., is a wholly owned subsidiary of CVS Pharmacy, Inc.

131.    Defendants CVS Health Corporation, CVS Health Solutions, CVS Pharmacy, Inc., Holiday CVS L.L.C., CVS Orlando FL Distribution, L.L.C., Defendant CVS Vero FL Distribution, L.L.C., and CVS RX Services, Inc., are collectively referred to herein as "CVS".

132.    CVS and CVS Subsidiaries are both DEA registered "distributors"[26] and DEA registered "dispensers"[27]  of prescription opioids.

133.    CVS and CVS Subsidiaries, as DEA registered distributors and dispensers owe a duty to maintain effective controls against diversion of prescription opioids[28].

134.    CVS acted by and through its CVS Subsidiaries and affiliated entities to distribute prescription opioids throughout the United States, including into Florida and the Plaintiff's Community.

135.    CVS instituted, set-up, ran, directed, and staffed, with its own employees, the majority of the Suspicious Order Monitoring and diversion control functions for the CVS Subsidiaries.

136.    The CVS Subsidiaries are alter-egos of CVS.  The SEC filings for CVS Health Corporation state, "CVS Health Corporation, together with its subsidiaries (collectively, "CVS Health," the "Company," "we," "our" or "us"), is the nation's premier health innovation company helping people on their path to better health."[29]

---

[26] 21 U.S.C. § 802(11) and § 822(a)(1).
[27] 21 U.S.C. § 802(10) and § 822(a)(2).
[28] 21 U.S.C. § 823 (b)(1); 21 C.F.R. § 1301.71.
[29] https://www.sec.gov/Archives/edgar/data/64803/000006480319000013/cvs-2018231x10k.htm; *See* also City of Chicago v. Purdue Pharma L.P., et al, No. 14 C 4361 at *7 (N.D. Ill, May 8, 2015).

137.    As a distributor of prescription opioids, CVS and CVS Subsidiaries distribute only to their own pharmacies, including CVS pharmacies located in and around Orlando, Florida.

138.    The CVS pharmacies located in Orlando, Florida also received distributions of prescription opioids from other Distributor Defendants.

139.    As a vertically integrated distributor and dispenser of prescription opioids, CVS and CVS Subsidiaries knew or should have known that an excessive volume of prescription opioids was being distributed and dispensed in Plaintiff's Community through the CVS pharmacies located in and around Orlando, Florida.

140.    At all relevant times, CVS established national policies and procedures governing the distribution and dispensing of controlled substances throughout the United States and directed and intended that those policies and procedures be implemented on a nationwide basis including, in Florida and Plaintiff's Community.  At all times relevant to this Complaint, Defendant CVS was responsible for directing and implementing policies and procedures governing the distribution and dispensing of controlled substances by its subsidiaries, including but not limited to the CVS Subsidiaries, throughout the United States, including into Florida and the Plaintiff's Community specifically.

141.    CVS had complete access to, and full visibility of, all prescription opioid distribution data related CVS pharmacies located in and around Orlando, Florida.

142.    CVS had complete access to, and full visibility of, all prescription opioid dispensing data related CVS pharmacies located in and around Orlando, Florida.

143.    CVS had complete access to information revealing the customers who filled (or sought to fill) prescriptions for opioids in CVS pharmacies located in and around Orlando, Florida.

144.    CVS had complete access to information revealing the opioid and non-opioid prescriptions dispensed by CVS pharmacies located in and around Orlando, Florida, including those prescriptions which were being paid for in cash.

145.    CVS had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled in CVS pharmacies located in and around Orlando, Florida.

146.    CVS had complete access to information revealing the size, dosage, and frequency of prescriptions written by specific doctors across the CVS pharmacies located in and around Orlando, Florida.

### 7.    Walgreen Co.

147.    Defendant Walgreens Boots Alliance, Inc., ("WBA") is a Delaware corporation with its principal place of business in Illinois. WBA acted by and through its own various DEA registered subsidiaries and affiliated entities to distribute pharmaceutical drugs, including opioids, throughout the country, including into Florida and Plaintiff's Community.

148.    Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, Illinois and is registered to do business in Florida.  Walgreen Co. is a wholly-owned subsidiary of Walgreens Boots Alliance, Inc.  Walgreen Co. conducted business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreen Co. distributed prescription opioids throughout the United States, including into Florida and Plaintiff's Community.

149.    Defendant Walgreen Eastern Co., Inc., is a New York corporation with its principal place of business in Deerfield, Illinois and is registered to do business in Florida. Walgreen Eastern Co., Inc. is a wholly-owned subsidiary of Walgreens Boots Alliance, Inc. Walgreen Eastern Co. Inc. conducts business as a licensed wholesale distributor. At all times relevant to this Complaint,

Walgreen Eastern Co., Inc. distributed prescription opioids throughout the United States, including into Florida and Plaintiff's Community.

150.   WBA, Walgreen Co., and Walgreen Eastern Co., Inc. are collectively referred to herein as "Walgreens".

151.   During the relevant time period, and as further alleged below, Walgreens entities also owned and operated pharmacies in Plaintiff's Community.

152.   As a distributor of prescription opioids, Walgreens distributes only to its own pharmacies.

153.   Walgreens pharmacies in Plaintiff's Community, also received distributions of prescription opioids from other Distributor Defendants.

154.   The volume of prescription opioids distributed to and dispensed by Walgreens pharmacies in and around the Plaintiff's Community is indicative of diversion.

155.   As a vertically integrated distributor and dispenser of prescription opioids, Walgreens knew or should have known that an excessive volume of prescription opioids was being sold into Plaintiff's Community.

156.   Upon information and belief, discovery will reveal that Walgreens knew or should have known that its pharmacies in Florida were (a) filling multiple prescriptions for the same patient using the same doctor (b) filling multiple prescriptions by the same patient using different doctors (c) filling prescriptions of unusual size and frequency for the same patient (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling prescriptions of unusual size and frequency paid for in cash (f) filling prescriptions of unusual size and frequency from the same prescribing physician (g) filling prescriptions of unusual size and frequency from out-of-state physicians; and (h) filing prescriptions for patients and doctors in combinations that

-29-

were indicative of diversion and abuse. Upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.

157.    Walgreens had complete access to, and full visibility of, all prescription opioid distribution data related Walgreens pharmacies in and around Plaintiff's Community.

158.    Walgreens had complete access to, and full visibility of, all prescription opioid dispensing data related Walgreens pharmacies in and around Plaintiff's Community.

159.    Walgreens had complete access to information revealing the doctors who prescribed the prescription opioids dispensed in Walgreens pharmacies in and around Plaintiff's Community.

160.    Walgreens had complete access to information revealing the customers who filled (or sought to fill) prescriptions for opioids in Walgreens pharmacies in and around Plaintiff's Community.

161.    Walgreens had complete access to information revealing the prescription opioids dispensed by Walgreens pharmacies in Plaintiff's Community, which were being paid for in cash.

162.    Walgreens had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled in and around Plaintiff's Community.

163.    Walgreens had complete access to information revealing the size and frequency of prescriptions written by specific doctors across their pharmacies in and around Plaintiff's Community.

8.      **Walmart**

164.    Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas and is registered to do business in Florida.

165.    Defendant Wal-Mart Stores East, LP, is a Delaware limited partnership with its principal place of business in Bentonville, Arkansas and is registered to do business in Florida. . Wal-Mart Stores East, LP is a wholly-owned subsidiary of Walmart Inc.

166.    Walmart Inc. and Wal-Mart Stores East, LP are collectively referred to herein as ("Walmart").

167.    Walmart and its DEA registered distribution subsidiaries[30] owe a duty as distributors to maintain effective controls against diversion of prescription opioids.[31]

168.    Through its various DEA registrant subsidiaries and affiliated entities, Walmart conducts business as a registered wholesale distributor.

169.    At all times relevant to this Complaint, Walmart distributed prescription opioids throughout the United States, including into Florida, and specifically in Plaintiff's Community.

170.    As a distributor of prescription opioids, Walmart distributes only to its own pharmacies.

171.    The Walmart pharmacies in and around Orlando, Florida also received distributions of prescription opioids from other Distributor Defendants.

172.    The volume of prescription opioids distributed to and dispensed by Walmart pharmacies in Plaintiff's Community is indicative of diversion.

---

[30] 21 U.S.C. § 802(11) and § 822(a)(1).
[31] 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.71.

173.    As a vertically integrated distributor and dispenser of prescription opioids, Walmart knew or should have known that an excessive volume of prescription opioid drugs was being sold into Plaintiff's Community.

174.    Defendants include the above-referenced entities as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent they are or were engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

175.    Defendants ABDC, Cardinal, McKesson, H.D. Smith, CVS, Walgreens, and Walmart are collectively referred to herein as "Distributor Defendants."

176.    Together, the Manufacturer or Marketing Defendants and Distributor Defendants are sometimes collectively referred to as "Supply Chain Defendants."

C.    **National Pharmacies**

177.    The National Pharmacies operate as both distributors and retail pharmacies. At all relevant times, the National Pharmacies, in their capacities as distributors, distributed, supplied, sold, and placed prescription opioids into the stream of commerce, without fulfilling the fundamental duty of distributors to detect, report and halt shipment of suspicious orders of controlled substances.

178.    In addition to their duties as distributors, the National Pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations. Specifically, the National Pharmacies had a duty to analyze chain wide data for known red flags such as (a) filling multiple prescriptions for the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling orders of unusual size and frequency for the same patient (d) filling orders for out-of-state patients; (e) filling orders paid for in cash; (f) filling a substantial number of orders from the same

prescribing physician; and (g) filling orders of unusual size and frequency from out-of-state physicians.

179.    The National Pharmacies failed to fulfill these duties and instead, routinely dispensed controlled substances, all the while ignoring the red flags of diversion and abuse. Plaintiff alleges the unlawful conduct by the Dispensing Defendants is a substantial cause for the volume of prescription opioids plaguing Plaintiff's Community.

180.    Given that the National Pharmacy Defendants operated both as distributors and retail pharmacies, for purposes of this Complaint, "Distributor Defendants" is intended to include the National Pharmacy entities only in their capacities as distributors and "National Pharmacy Defendants" is intended to refer to the dispensing pharmacy entities unless stated otherwise.

181.    As set forth below, Defendants CVS, Rite Aid, Walgreens, Kroger, and Wal-Mart are also collectively referred to as National Pharmacies.

### 1.    **CVS**

182.    As previously alleged, Defendant CVS owned and operated dispensing pharmacies in Florida, including in Plaintiff's Community.

183.    At all times relevant to this Complaint, CVS dispensed prescription opioids throughout the United States, including into Florida and the Plaintiff's Community.

184.    As a DEA registered "dispenser" of prescription opioids, CVS owes a duty to provide effective controls and procedures to guard against diversion of controlled substances.

### 2.    **Walgreens**

185.    As previously alleged, Defendant Walgreens owned and operated dispensing pharmacies in Florida, including in Plaintiff's Community.

186.    At all times relevant to this Complaint, Walgreens dispensed prescription opioids throughout the United States, including into Florida and the Plaintiff's' Community.

-33-

187.    As a DEA registered "dispenser" of prescription opioids, Walgreens owes a duty to provide effective controls and procedures to guard against diversion of controlled substances.

188.    Upon information and belief, in addition to dispensing and distributing opioids, Walgreens marketed opioids during the relevant time period.

### 3.    Walmart

189.    As previously alleged, Defendant Walmart owned and operated dispensing pharmacies in Florida, including in Plaintiff's Community.

190.    At all times relevant to this Complaint, Walmart dispensed prescription opioids throughout the United States, including into Florida and the Plaintiff's Community.

191.    As a DEA registered "dispenser" of prescription opioids, Walmart owes a duty to provide effective controls and procedures to guard against diversion of controlled substances.

192.    Upon information and belief, in addition to dispensing and distributing opioids, Walmart marketed opioids during the relevant time period.

### D.    Pharmacy Benefit Managers

193.    Pharmacy Benefit Managers ("PBMs") administer benefit contracts and riders that determine coverage for some or all of the costs of pharmaceutical products and/or provide access to such products, sometimes through the PBM's own mail-order pharmacy. PBMs establish formularies that govern which drugs are reimbursed and how. PBMs determine preauthorization requirements and negotiate with drug manufacturers to offer preferred drug formulary placement for drugs. PBMs establish reimbursement rates for drugs dispensed and can earn revenue from fees from health plans and insurers, rebates and other incentives from drug manufacturers, including administrative fees and volume bonuses, and fees from maintaining pharmacy networks. Given their "gatekeeper" role, PBMs exercise significant power over the quantity of prescription opioids that enter the market.

194.     PBMs have massive quantities of data regarding the opioid prescribing and usage of the doctors and patients who participate in their plans. As a result, PBMs can identify: (a) patients who receive and doctors who prescribe opioids in excessive volumes, frequency, or dosage; (b) patients who receive and doctors who prescribe opioids in combination with other drugs indicative of diversion; (c) patients who receive opioids after having been treated or while being treated for opioid overdoses and addiction; and (d) patients who receive opioids who are at higher risk for overdose, for example, patients who also receive benzodiazepines. Possession of this information, along with affirmative representations regarding efforts to manage and improve patients' health, create an obligation for PBMs to identify, report, and otherwise address potential diversion or other dangerous instances of opioid use and prescribing.

195.     PBMs distribute prescription opioids through their contracted network retail pharmacies and dispense prescription opioids directly through their mail order pharmacies. Like other distributors and pharmacies, PBMs are DEA registrants. In distributing and dispensing prescription opioids, PBMs are have a duty to prevent diversion, by identifying, reporting, and halting shipment of suspicious orders of prescription opioids. Upon information and belief, to be confirmed by transaction data in the exclusive possession of the PBMs, PBMs failed to carry out these duties.

### 1.     **Express Scripts**

196.     Express Scripts, Inc. is a Delaware corporation with its principal place of business in Saint Louis, Missouri and.  Express Scirpts, Inc. is registered to do business in Florida.

197.     Express Scripts, Inc. serves "100 million Americans"  and describes itself as the largest independent PBM company in the United States, offering a full range of services to its clients, which include managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, government health

programs, providers, clinics, hospitals and others, putting medicine within reach of patients while helping health benefit providers improve access to prescription drugs by making them more affordable."

198.    Upon information and belief, Express Scripts, Inc. derived and continues to derive substantial revenue as a result of managing pharmacy benefits throughout Florida, including within Plaintiff's Community.

### 2.    Caremark Rx, LLC

199.    Defendant Caremark Rx, LLC is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island.  Caremark Rx, LLC is registered to do business in Florida and is a wholly-owned subsidiary of CVS Health Corporation.

200.    In 2007, Caremark Rx, Inc. was merged with and into a subsidiary of CVS Corporation, with the CVS subsidiary continuing as the surviving entity, subsequently changing its name from CVS Corporation to CVS/Caremark Corporation.  In 2014, the company changed its name to CVS Health Corporation.  CVS Health Corporation is a previously named Defendant. Through its Pharmacy Services Segment, CVS Health Corporation provides a full range of pharmacy benefit management solutions.  CVS dispenses prescription drugs directly through its mail order dispensing and specialty mail order pharmacies and through pharmacies in its retail network.

### 3.    Unitedhealth Group Incorporated

201.    Defendant UnitedHealth Group Incorporated is a Delaware corporation with principal offices located in Minnetonka, Minnesota.  UnitedHealth Group Incorporated is a diversified health care company operating through two business platforms, one of which is Optum. Optum is organized in three reportable segments: Optum Health, Optum Insight, and OptumRx.

OptumRx, Inc. is a California corporation with its principal place of business in Irvine, California and is registered to do business in Florida.

202.    OptumRx specializes in pharmacy care services and provides a full spectrum of pharmacy care services to more than 66 million people in the United States through its network of more than 67,000 retail pharmacies and multiple home delivery facilities throughout the country.[32]

203.    Upon information and belief, OptumRx derived and continues to derive substantial revenue as a result of managing pharmacy benefits throughout Florida, including within Plaintiff's Community.

204.    Collectively, Defendants Express Scripts, Caremark Rx, LLC, and UnitedHealth Group Incorporated are referred to as the "PBM Defendants."

205.    Together, the PBM Defendants account for nearly 75 percent of the national market.

### E.    Unnamed Related Parties

206.    Defendants are not the only parties responsible for the opioid epidemic that is ravishing the United States. Due to procedural posture of other litigation, certain entities at the center of the opioid epidemic have not been named in this matter. That is in no way representative of their role in this national crisis, but rather a mechanism of the automatic stay and court orders in federal bankruptcy courts enjoining any new actions being taken against entities with cases pending.

207.    Insys Therapeutics, Inc. ("Insys") manufactures, markets, sells and distributes Subsys, a sublingual spray of fentanyl, nationwide. On June 10, 2019, Insys filed for Chapter 11

---

[32] https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2018/UNH-Q4-2018-Form-10-K.pdf

bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware[33], just five days after agreeing to pay $225 million to settle the federal government's criminal and civil cases against the company for bribing doctors to prescribe its fentanyl-based painkiller.[34] The filing of the bankruptcy initiated an automatic stay of the commencement or continuation of any litigation claims, pursuant to the U.S. Bankruptcy Code (11 U.S.C. § 362).

208.   Purdue Pharma L.P, Purdue Pharma Inc., and Purdue Frederick Company, collectively referred to herein as "Purdue", manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States. OxyContin is Purdue's best-selling opioid, and accounts for nearly one-third of the national painkiller market. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion.

209.   On September 15, 2019, Purdue filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York[35]  as part of its plan to settle litigation with dozens of states and other plaintiffs who allege the company fueled the opioid crisis, which initiated an automatic stay[36].  In continuation to the imposition of the automatic stay, the Court entered an order on October 11, 2019 pursuant to section § 105(a) of Title 11 of the United States Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure to enjoin the governmental entities and private litigants from the commencement or continuation of their active judicial, administrative, or other actions or proceedings against Purdue.

---

[33] *In re: Insys Therapeutics Inc. et al.*, No.1:19-bk-11292 (Bankr. D. Del. filed June 10, 2019).
[34] https://www.reuters.com/article/us-insys-opioids-bankruptcy/opioid-drugmaker-insys-therapeutics-files-for-bankruptcy-idUSKCN1TB15Q
[35] *In re: Purdue Pharma LP, et al.,* No.19-23649 (Bankr. S. D. N.Y. filed Sept. 15, 2019).
[36] 11 U.S.C. § 362.

210.   Richard S. Sackler, M.D., is a natural person residing in Travis County, Texas.  He has served as a member of the Board of Directors of Purdue Pharma and Purdue-related entities (hereinafter "Purdue") since the 1990's.  Upon information and belief, Richard S. Sackler, M.D. began working for Purdue in the 1970's as an assistant to his father, Dr. Raymond Sackler, who was then president of Purdue.  He served as head of Purdue's Marketing and Research & Development Departments.  Richard Sackler rose through leadership in the subsequent decades, serving as President of Purdue from 1999 to 2003 and Co-Chairman in 2003 through 2014. Richard Sackler, upon information and belief, has long been the beneficiary of an ownership interest in Purdue, and continues to hold such an ownership interest.  Through his decisions and directives, Richard Sackler knowingly caused and approved the promotion and sales of Purdue opioids.

211.   During his executive tenure at Purdue, Richard S. Sackler actively participated in nearly every aspect of the company's opioid products from invention to marketing to sale.  With the assistance of his father, Raymond Sackler, and his uncle, Mortimer Sackler, Richard S. Sackler introduced OxyContin to the market in one of the largest pharmaceutical advertising campaigns in history.  Within five years, OxyContin was earning the Purdue-related entities $1 billion a year.

212.   At all relevant times, Richard S. Sackler served as a trustee of one or more trusts which own and control Purdue and Purdue-related entities.  Richard S. Sackler is the direct or indirect beneficiary of some portion of the profits earned from the sale of opioids by Purdue.

213.   Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut. He has served as a member of the Board of Directors of Purdue since the 1990's.  Jonathan D. Sackler served as Senior Vice President of Purdue by 2000, until he resigned from this position in 2003.  He continued to serve on Purdue's board after his resignation.

214.    At all relevant times, Jonathan D. Sackler served as a trustee of one or more trusts that own and control Purdue.  He is the direct or indirect beneficiary of some portion of the profits earned from the sale of opioids by Purdue.

215.    Mortimer D. A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue since the 1990s.  Mortimer D. A. Sackler is the direct or indirect beneficiary of the profits earned from the sale of opioids by Purdue.

216.    Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue since the 1990s.  Kathe A. Sackler began serving as Senior Vice President of Purdue by 2000.  She resigned from her position during or after 2003.  Kathe A. Sackler continued to serve on Purdue's board after her resignation.  She is the direct or indirect beneficiary of the profits earned from the sale of opioids by Purdue.

217.    Ilene Sackler Lefcourt is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue since the 1990s.  Ilene Sackler Lefcourt served as Vice President of Purdue during the initial development and launch of OxyContin.  She, too, resigned from her position during or after 2003.  Ilene Sackler Lefcourt continued to serve on Purdue's board after her resignation.  She is the direct or indirect beneficiary of the profits earned from the sale of opioids by Purdue.

218.    Beverly Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue since the 1990s.  At all relevant times, she served as a trustee of one or more trusts, which own and control Purdue, and Purdue related entities.  Beverly Sackler is the direct or indirect beneficiary of some portion of the profits earned by the Purdue through the sale of opioids.

219.    Theresa Sackler is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue since the 1990s.  She is the direct or indirect beneficiary of some portion of the profits earned by Purdue through the sale of opioids.

220.    David A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue since 2012.  He is the direct or indirect beneficiary of some portion of the profits earned by Purdue through the sale of opioids.

221.    The Trust for the Benefit of the Raymond Sackler Family (the "Raymond Sackler Family Trust") is a trust for which Defendants Beverly Sackler, Richard S. Sackler, David A. Sackler, and/or Jonathan D. Sackler may be trustees or co-trustees.  The Trust created for the Benefit of the Raymond Sackler Family is a direct or indirect beneficial owner of Purdue and the recipient of as much as 50% of the profits from the sale of opioids by Purdue.

222.    The Trust for the Benefit of the Mortimer Sackler Family (the "Mortimer Sackler Family Trust") is a trust for which Defendants Theresa Sackler, Ilene Sackler Lefcourt, Kathe A. Sackler and/or Mortimer D. A. Sackler may be trustees or co-trustees.  The Trust created for the Benefit of the Raymond Sackler Family is a direct or indirect beneficial owner of Purdue and the recipient of as much as 50% of the profits from the sale of opioids by Purdue.

223.    Upon information and belief, Richard S. Sackler, M.D., Jonathan D. Sackler, Mortimer D. A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler Trustee(s) of the Trust Created for the Benefit of the Raymond Sackler Family, and Trustee(s) of the Trust Created for the Benefit of the Mortimer Sackler Family, (collectively "Sacklers") upon information and belief, were not only aware of, but approved and exercised control over Purdue's deceptive marketing.

-41-

224.    According to Barry Meier's book Pain Killer, in early 2001 representatives of Purdue met with the DEA, which was starting to raise alarms over OxyContin overdoses. Richard Sackler participated in this meeting and defended OxyContin as an extremely good drug. According to the book, the head of the DEA's Office of Diversion Control leaned across to Richard Sackler and stated: "People are dying. Do you understand that?" Evidently Richard Sackler either did not understand or did not care, for Purdue did nothing to rein in Purdue's misleading promotion of OxyContin.   Instead, internally, Richard Sackler chose to stigmatize and blame those who became addicted to or abused opioids.  In a February, 2001 email he wrote: "We have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."

225.    Federal prosecutors came to suspect, however, that Purdue and certain of its executives were the criminals.  In 2003, while a criminal investigation into Purdue and three of its executives was underway, the Sacklers all quietly resigned from their management positions. Nevertheless, upon information and belief, the Sacklers, remained actively involved in Purdue's affairs and therefore would have been aware of Purdue's deceptive marketing. This involvement is detailed in internal company documents obtained by the Massachusetts Attorney General, parts of which were made public in *Commonwealth of Mass. v. Purdue Pharma L.P., et al.,* C.A. No. 1884-cv-01808 (BLS2), First Amended Complaint, Complete Unredacted Corrected Version for the Public File Submitted According to Court Order January 31, 2019 (Mass. Super. Ct. Jan. 31, 2019) (hereinafter, the "MA AG Complaint").  For example, according to the MA AG Complaint, internal documents show that the Sacklers contemplated selling Purdue after its criminal plea in 2007 and other strategies to allow them to "distribute more free cash flow" to themselves.

226.     As another example, Purdue's Board, while the Sacklers were members, voted to approve a criminal guilty plea by their company, including an Agreed Statement Of Facts admitting, in 2007, that, for more than six years, supervisors and employees intentionally deceived doctors about OxyContin: "Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Purdue's Board, while the Sacklers were members, also voted to enter a Corporate Integrity Agreement with the United States. The Sacklers each certified in writing to the U.S. government that he or she had read and understood the rules under that Agreement, including requirements to ensure that Purdue did not deceive doctors and patients again and to report any deception.

227.     According to internal documents, from the 2007 criminal convictions until 2018 alone, the Sacklers as members of Purdue's Board of Directors, voted to pay out more than four billion dollars to the Sackler family.  Meanwhile, as stated above, Purdue has filed bankruptcy.  In the wake of the 2007 guilty plea, the Corporate Integrity Agreement, a 2007 settlement with state attorneys general, and more recent lawsuits by state and local governments, as well as other plaintiffs, the Sacklers should have anticipated the liability Purdue faced at the time they voted to take money out of the company.

228.     Collectively Insys, Purdue, the Sacklers, the Raymond Sackler Family Trust and the Mortimer Sackler Family Trust will be called "**Unnamed Related Parties**."

### F.     Agency and Authority

229.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' or Unnamed Related Parties' officers, agents, employees, or other representatives while actively

engaged in the management of Defendants' and Unnamed Related Parties' affairs within the course

and scope of their duties and employment, and/or with Defendants' and Unnamed Related Parties'

actual, apparent, and/or ostensible authority.

**BACKGROUND**

III.   **FLORIDA HAS BEEN OVERWHELMED BY THE OPIOID EPIDEMIC**

230.   In 2016, the United States suffered the largest number of opioid overdose deaths in

modern history and Florida shouldered one of the the highest death tolls in the country.

**Drug Overdose deaths, rate per 100,000 persons in the U.S. and Florida**





231.    Fatal opioid overdoses in Florida have been rising rapidly since the mid 1990's.  In 2010, there were 3,061 drug-related deaths in Florida.  That number increased to 5,088 drug-related deaths in 2017.

232.    In August 2016, then U.S. Surgeon General Vivek Murthy published an open letter to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing.  He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."[37]

---

[37] https://www.aafp.org/patient-care/public-health/pain-opioids/turn_the_tide.html

233.    Scientific evidence demonstrates a close link between opioid prescriptions and opioid abuse.  For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[38]

234.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."  The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[39]

235.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."  Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses.  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

236.    By continuing to fill and failing to report suspicious orders of opioids, Defendants enabled an oversupply of opioids, to be distributed into Plaintiff's community, which allowed non-patients to become exposed to opioids, and facilitated access to opioids for patients who could no longer access or afford prescription opioids and individuals struggling with addiction and relapse.[40] Defendants had financial incentives to distribute higher volumes and not to report suspicious orders or guard against diversion.  Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost.  Discounts and rebates from this cost may be offered by manufacturers based on market share and volume.  As a result, higher volume sales frequently decrease the cost per pill to distributors.  Decreased cost per pill in

---

[38] https://www.ncbi.nlm.nih.gov/pubmed/17636553
[39] https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis
[40] https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html

turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit.  Either way, the increased sales volumes result in increased profits.

237.    It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.[41]  In 2011, 55% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet.[42]

238.    In fact, people who are addicted to prescription opioids are 40 times more likely to be addicted to heroin.  The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction.  Roughly 80% of heroin users previously used prescription opioids.

239.    A recent, even more deadly problem stemming from the prescription opioid epidemic involves fentanyl—a powerful opioid prescribed for cancer pain or in hospital settings that has made its way into Florida communities.

240.    Carfentanil, a powerful derivative of fentanyl, has increasingly been found in heroin and fentanyl sold illicitly.  Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants[43], and has been banned from battlefield use under the Chemical Weapons Convention.[44]  A dose the size of a grain of salt can rapidly lead to deadly overdose in humans.  Because of its potency, the DEA recommends that first responders, chemists, and lab technicians who test for carfentanil use protective gear.[45]

241.    These statistics, however, do not communicate the full toll of the prescription opioids on their victims, their families, and the community.

---

[41] https://annals.org/aim/fullarticle/1788221/prescription-drug-abuse-executive-summary-policy-position-paper-from-american
[42] https://annals.org/aim/fullarticle/1788221/prescription-drug-abuse-executive-summary-policy-position-paper-from-american
[43] https://www.justice.gov/usao-edky/file/898991/download
[44] https://www.who.int/medicines/access/controlled-substances/Critical_Review_Carfentanil.pdf
[45] https://www.justice.gov/usao-edky/file/898991/download

-47-

242.    More than 4,000 babies were born with Neonatal Abstinence Syndrome in the State of Florida during 2016.[46] Neonatal Abstinence Syndrome has increased five-fold between 2004 and 2014 State of Florida.[47]

243.    Seventy-eight percent of children in Florida's child care system are there because of a parent's substance use disorder.[48] And in the first six months of 2017, over 60% of all children removed from their homes and placed into the custody of Child and Family Services in Florida was largely due to substance use disorder.[49]  Cases where children are removed from homes because of substance abuse increase the costs borne by the local governments by necessitating longer out-of-home care as well as requiring additional investigation and oversight.[50]

244.    Governor Rick Scott officially declared the opioid epidemic a public health emergency in Florida on May 4, 2017, stating, "[t]he individuals struggling with drug use are sons, daughters, mothers, fathers, sisters, brothers and friends and each tragic case leaves loved ones searching for answers and praying for help . . . .  Families across our nation are fighting the opioid epidemic, and Florida is going to do everything possible to help our communities."[51]

## IV.    THE OPIOID EPIDEMIC IN ORLANDO

245.    City of Orlando is a heavily-traversed area in the middle of the state of Florida. Orlando hosts a population of approximately 277,100, but serves over 600,000 people daily as

---

[46] The News Service of Florida, *Opioid Crisis Taking Its Toll on Florida Children*, WUSF Public Media, (Nov. 9, 2017), http://wusfnews.wusf.usf.edu/post/opioid-crisis-taking-its-toll-florida-children.
[47] *Florida Opioid Summary*, N.I.H. Nat'l Inst. of Drug Abuse (revised Feb. 2018), https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/florida-opioid-summary.
[48] https://www.unitedwaybroward.org/sites/default/files/images/Commission%20on%20Behavioral%20Health%20%26%20Drug%20Prevention/Prevention%20Resource%20Center/The-Opioid-Epidemic-in-Broward-County.pdf
[49] The News Service of Florida, *Opioid Crisis Taking Its Toll on Florida Children*, WUSF Public Media, (Nov. 9, 2017), http://wusfnews.wusf.usf.edu/post/opioid-crisis-taking-its-toll-florida-children.
[50] Dara Kam, *Opioid Crisis Taking Toll on Florida Children*, Panama City News Herald (Nov. 9, 2017), http://www.newsherald.com/news/20171109/opioid-crisis-taking-toll-on-florida-children.
[51] Michael Auslen, *Gov. Scott Declares Public Health Emergency Over Opioid Crisis*, Miami Herald (May 3, 2017), http://www.miamiherald.com/news/health-care/article148355444.html.

commuters and travelers make their way through the city.  In 2016, over 68 million travelers visited Orlando and its community.

**2016 Opioid-Related Overdose Deaths Nationwide By County**[52]



246.     The opioid epidemic claimed 229 drug deaths in Orlando in 2017.[53]   For the calendar year 2016, Orlando ranked eighth in the state for the most hydrocodone-related overdose deaths; tied with Miami, a city with nearly 200,000 more residents than Orlando at the time.[54] Orlando had the fifth-highest number of morphine overdose deaths in the state that same year.[55] Unfortunately, the number of opioid- related drug overdose deaths in Orlando continues to grow.

---

[52] *Opioid & Health Indicators Database - National Opioid Epidemic*, amfAR, http://opioid.amfar.org/indicator/drugdeaths# (last accessed: April 22, 2018).
[53] *Id.*
[54] 2016 Medical Examiners Commission Drug Report at 20 (November, 2017), https://www.fdle.state.fl.us/MEC/Publications-and-Forms/Documents/Drugs-in-Deceased-Persons/2016-Annual-Drug-Report.aspx.
[55] *Id.* at 28.

247.    Reports estimate that the death toll caused by the non-medical use of prescription opioids continues to rise in Florida:[56]



248.    During the meeting, called "A Prescription for Change: Finding Solutions for the Opioid Crisis in Central Florida," University of Central Florida leaders released data saying that 68,000 individuals in Central Florida are dependent on opioids, and many of them have no treatment or help.  According to numbers shown during a presentation at the event, more than

---

[56]https://www.unitedwaybroward.org/sites/default/files/images/Commission%20on%20Behavioral%20Health%20%26%20Drug%20Prevention/Prevention%20Resource%20Center/June-2017-Broward-Substance-Abuse-Trends-Report.pdf

1,083,000 opioid prescriptions were written in Central Florida in 2018 - prescriptions to opioids manufactured, distributed, and otherwise sold by Defendants.[57]

249.    Disturbing statistics indicate that addicts are graduating to easier-to-find and cheaper heroin which is frequently laced with fentanyl, which is killing increasingly more Florida residents, and Orlando residents in particular.[58]  Chief Medical Examiner, Dr. Joshua Stephany says more than half of the peoplewho die of an overdose in Orange County have fentanyl in their system.[59]

250.    The fiscal demands of the extraordinary costs created by the opioid crisis in Orlando continue to stretch the City's budget.  As a result of the increasing human toll, Orlando has also seen dramatic increases in expenses related to, amongst other things, police and fire rescue first responders, hospitalizations and treatment services due to the rising tide of opioid abuse.

251.    The City of Orlando Police Department ("OPD") and City of Orlando Fire Department ("OFD") have seen dramatic increases in staffing needs in part to meet growing numbers of emergency calls serviced by police and fire rescue.  The need for naloxone, an opioid reversal drug, has grown as the departments respond to overdoses.  The OFD requires its firefighters carry naloxone at all times, and recently increased the amount of naloxone available to its personnel.

252.    Necessitated by the severity of the opioid crisis, Orlando has been forced to provide additional services above and beyond what it had previously provided to deal with the effects of the opioid crisis which directly impacting Plaintiff's Community.

---

[57] https://www.clickorlando.com/opioids%20epidemic/2019/10/29/ucf-researchers-release-report-on-opioid-addiction-in-central-florida/
[58] https://www.theguardian.com/science/2016/may/25/opioid-epidemic-prescription-painkillers-heroin-addiction
[59] https://www.wftv.com/news/9-investigates/more-fentanyl-related-deaths-reported-in-central-florida/943095396

253.   Plaintiff has rapidly suffered significant financial consequences as a result of opioid over-prescription, addiction and overdose. Some of the Plaintiff's additional and unanticipated costs include, but are not limited to, increased healthcare expenditures, increased law enforcement and judicial expenditures, increased jail and public works expenditures, increased substance abuse treatment and diversion plan expenditures, increased emergency and medical care services, increased medical examiner expenses, increased health insurance costs, the costs of processing and paying for fraudulent prescriptions and lost economic opportunity.   The opioid crisis caused by the Defendants and Unnamed Related Parties has forced the Plaintiff to make large, unplanned for expenditures in order to protect the health and welfare of the community it serves.

254.   The injuries suffered by Plaintiff directly result from the wrongful conduct committed by each Defendant and Defendants collectively, as described in more detail below.

## FACTUAL ALLEGATIONS

## V.   FACTS COMMON TO ALL CLAIMS[60]

### A.   Opioids and Their Effects

255.   The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy.   Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

256.   The medicinal properties of opioids have been recognized for millennia—as well as their potential for abuse and addiction. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine.

---

[60] The allegations in this Complaint are made upon information and belief, including upon information immediately available from the ARCOS database.   Plaintiff reserves the right to seek leave to amend or correct this Complaint based upon further analysis of the ARCOS, IMS Health, and other data and upon further investigation and discovery.

Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

257.    In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[61]

258.    Pharmaceutical companies tried to develop substitutes for opium and morphine that would provide the same analgesic effects without the addictive properties. In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

259.    Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the

---

[61] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago*, The Wash. Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/?utm_term=.7832633fd7ca.

same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

260.    Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the DEA since 1970.

261.    Throughout the twentieth century, pharmaceutical companies continued to develop prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content.

262.    In contrast, OxyContin, the product whose launch in 1996 ushered in the modern opioid epidemic, is pure oxycodone. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg.  The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that.

263.    Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME"). According to the CDC, doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

264.    Different opioids provide varying levels of MMEs. For example, just 33 mg of oxycodone provides 50 MME. Thus, at OxyContin's twice-daily dosing, the 50 MME/day threshold is nearly reached by a prescription of 15 mg twice daily. One 160 mg tablet of OxyContin, which Purdue took off the market in 2001, delivered 240 MME.

265.    The wide variation in the MME strength of prescription opioids renders misleading any effort to capture "market share" by the number of pills or prescriptions attributed to Purdue or other manufacturers.  Purdue, in particular, focuses its business on branded, highly potent pills,

causing it to be responsible for a significant percent of the total amount of MME in circulation, even though it currently claims to have a small percent of the market share in terms of pills or prescriptions.

266.    Fentanyl is a synthetic opioid that is 100 times stronger than morphine and 50 times stronger than heroin. First developed in 1959, fentanyl is showing up more and more often in the market for opioids created by Marketing Defendants' promotion, with particularly lethal consequences.

267.    The effects of opioids vary by duration.  Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours.  Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately four-to-six hours.  Still other short-term opioids, such as Insys's Subsys, are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer.  The Marketing Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

268.    Patients develop tolerance to the analgesic effect of opioids relatively quickly.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids—the "high."  However, opioids depress respiration, and at very high doses can and often do arrest

respiration altogether.  At higher doses, the effects of withdrawal are more severe.  Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

269.     Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms.   These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

270.     As a leading pain specialist doctor put it, the widespread, long-term use of opioids "was a de facto experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

### B.      The Resurgence of Opioid Use in the United States

#### 1.      The Sackler Family Integrated Advertising and Medicine

271.     Given the history of opioid abuse in the U.S. and the medical profession's resulting wariness, the commercial success of the Marketing Defendants' prescription opioids would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

272.     As it turned out, Purdue Pharma was uniquely positioned to execute just such a maneuver, thanks to the legacy of a man named Arthur Sackler. The Sackler family is the sole owner of Purdue and one of the wealthiest families in America, with a net worth of $13 billion as of 2016.  The company's profits go to Sackler family trusts and entities.[62] Yet the Sacklers have avoided publicly associating themselves with Purdue, letting others serve as the spokespeople for the company.

---

[62] David Armstrong, *The Man at the Center of the Secret OxyContin Files*, STAT News (May 12, 2016), https://www.statnews.com/2016/05/12/man-center-secret-oxycontin-files/.

273.    The Sackler brothers, Arthur, Mortimer, and Raymond, purchased a small patent-medicine company called the PFC in 1952. It was Arthur Sackler who created the pharmaceutical advertising industry as we know it, laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

274.    Arthur Sackler was both a psychiatrist and a marketing executive.  He pioneered both print advertising in medical journals and promotion through physician "education" in the form of seminars and continuing medical education ("CME") courses. He also understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.[63]

275.    It was Arthur Sackler who, in the 1960s, made Valium into the first $100-million drug, so popular it became known as "Mother's Little Helper."  When Arthur's client, Roche, developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"—essentially stress—and pitched Valium as the solution.[64] The campaign, for which Arthur was compensated based on volume of pills sold,[65] was a remarkable success.

276.    Arthur Sackler created not only the advertising for his clients but also the vehicle to bring their advertisements to doctors—a biweekly newspaper called the *Medical Tribune*, which was distributed for free to doctors nationwide. Arthur also conceived a company now called IMS Health Holdings Inc., which monitors prescribing practices of every doctor in the U.S. and sells

---

[63] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* 204 (2003).
[64] *Id.* at 202; *see also One Family Reaped Billions From Opioids*, WBUR On Point (Oct. 23, 2017), http://www.wbur.org/onpoint/2017/10/23/one-family-reaped-billions-from-opioids.
[65] Meier, *supra* n.18, at 201-203.

this valuable data to pharmaceutical companies like Marketing Defendants, who utilize it to target and tailor their sales pitches to individual physicians.

### 2.     Purdue and the Development of OxyContin

277.   After the Sackler brothers acquired PFC in 1952, Purdue sold products ranging from earwax remover to antiseptic, and it became a profitable business.   As an advertising executive, Arthur Sackler was not involved, on paper at least, in running Purdue, which would have been a conflict of interest.   Raymond Sackler became Purdue's head executive, while Mortimer Sackler ran Purdue's UK affiliate.

278.   In the 1980s, Purdue, through its UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine.   Purdue marketed this extended-release morphine as MS Contin, and it quickly became Purdue's bestseller.   As the patent expiration for MS Contin loomed, Purdue searched for a drug to replace it.   Around that time, Raymond's oldest son, Richard Sackler, who was also a trained physician, became more involved in the management of the company.   Richard had grand ambitions for the company; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big."[66] Richard believed Purdue should develop another use for its "Contin" timed-release system.

279.   In 1990, Purdue's Vice President of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone.   At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, a relatively weak oxycodone-acetaminophen combination pill.   MS Contin was not only approaching patent expiration but had always been limited by the stigma associated with morphine.   Oxycodone did not have that problem, and what's

---

[66] Christopher Glazek, *The Secretive Family Making Billions from the Opioid Crisis*, Esquire (Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/.

more, it was sometimes mistakenly called "oxycodeine," which also contributed to the perception of relatively lower potency, because codeine is weaker than morphine.  Purdue acknowledged using this to its advantage when it later pled guilty to criminal charges of "misbranding" in 2007, admitting that it was "well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine" and "did not want to do anything 'to make physicians think that oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique position that OxyContin'" held among physicians.[67]

280.    For Purdue and OxyContin to be "*really* big,"[68] Purdue needed to both distance its new product from the traditional view of narcotic addiction risk, and broaden the drug's uses beyond cancer pain and hospice care.  A marketing memo sent to Purdue's top sales executives in March 1995 recommended that if Purdue could show that the risk of abuse was lower with OxyContin than with traditional immediate-release narcotics, sales would increase.[69] As discussed below, Purdue did not find or generate any such evidence, but this did not stop Purdue from making that claim regardless.

281.    Armed with this and other misrepresentations about the risks and benefits of its new drug, Purdue was able to open an enormous untapped market:  patients with non-end-of-life, non-acute, everyday aches and pains.  As Dr. David Haddox, a Senior Medical Director at Purdue, declared on the "Early Show," a CBS morning talk program, "There are 50 million patients in this country who have chronic pain that's not being managed appropriately every single day.  OxyContin is one of the choices that doctors have available to them to treat that."[70]

---

[67] *Id.*
[68] *Id.*
[69] Meier, *supra* n.18, at 269.
[70] *Id.*, at 156.

282.    In pursuit of these 50 million potential customers, Purdue poured resources into OxyContin's sales force and advertising, particularly to a far broader audience of primary care physicians who treated patients with chronic pain complaints.  The graph below shows how promotional spending in the first six years following OxyContin's launch dwarfed Purdue's spending on MS Contin or Janssen's spending on Duragesic: [71]



283.    Prior to Purdue's launch of OxyContin, no drug company had ever promoted such a pure, high-strength Schedule II narcotic to so wide an audience of general practitioners.

284.    Purdue generated estimated sales of more than $35 billion from opioids since 1996, raking in more than $3 billion in 2015 alone. Remarkably, its opioid sales continued to climb even after a period of media attention and government inquiries regarding OxyContin abuse in the early

---

[71] U.S. General Accounting Office, *OxyContin Abuse and Diversion and Efforts to Address the Problem*, U.S. General Accounting Office Report to Congressional Requesters, 22 (Dec. 2003), http://www.gao.gov/new.items/d04110.pdf

2000s and a criminal investigation culminating in guilty pleas in 2007. Purdue proved itself skilled

at evading full responsibility and continued to sell through the controversy. The company's annual

opioid sales of $3 billion in 2015 represent a four-fold increase from its 2006 sales of $800 million.

285.   One might imagine that Richard Sackler's ambitions have been realized. But in the

best tradition of family patriarch Arthur Sackler, Purdue has its eyes on even greater profits. Under

the name of Mundipharma, the Sacklers are looking to new markets for their opioids—employing

the exact same playbook in South America, China, and India as they did in the United States.

286.   In May 2017, a dozen members of Congress sent a letter to the World Health

Organization, warning it of the deceptive practices Purdue is unleashing on the rest of the world

through Mundipharma:

> We write to warn the international community of the deceptive and dangerous practices of Mundipharma International—an arm of Purdue Pharmaceuticals. The greed and recklessness of one company and its partners helped spark a public health crisis in the United States that will take generations to fully repair. We urge the World Health Organization (WHO) to do everything in its power to avoid allowing the same people to begin a worldwide opioid epidemic. Please learn from our experience and do not allow Mundipharma to carry on Purdue's deadly legacy on a global stage. . . .
>
> Internal documents revealed in court proceedings now tell us that since the early development of OxyContin, Purdue was aware of the high risk of addiction it carried. Combined with the misleading and aggressive marketing of the drug by its partner, Abbott Laboratories, Purdue began the opioid crisis that has devastated American communities since the end of the 1990s. Today, Mundipharma is using many of the same deceptive and reckless practices to sell OxyContin abroad. . . .
>
> In response to the growing scrutiny and diminished U.S. sales, the Sacklers have simply moved on. On December 18, the Los Angeles Times published an extremely troubling report detailing how in spite of the scores of lawsuits against Purdue for its role in the U.S. opioid crisis, and tens of thousands of overdose deaths, Mundipharma now aggressively markets OxyContin internationally. In fact, Mundipharma uses many of the same tactics that caused the opioid

epidemic to flourish in the U.S., though now in countries with far fewer resources to devote to the fallout.[72]

287.     Purdue's recent pivot to untapped markets—after extracting substantial profits from American communities and leaving local governments to address the devastating and still growing damage the company caused—only serves to underscore that Purdue's actions have been knowing, intentional, and motivated by profits throughout this entire story.

### 3.     Other Marketing Defendants and Unnamed Related Parties Leapt at the Opioid Opportunity

288.     Purdue created a market for the use of opioids for a range of common aches and pains by misrepresenting the risks and benefits of its opioids, but it was not alone.  The other Marketing Defendants and Unnamed Related Parties, already manufacturers of prescription opioids, positioned themselves to take advantage of the opportunity Purdue created, developing both branded and generic opioids to compete with OxyContin, while, together with Purdue and each other, misrepresenting the safety and efficacy of their products. These misrepresentations are described in greater detail below.

289.     Endo, which already sold Percocet and Percodan, was the first to submit an application for a generic extended-release oxycodone to compete with OxyContin.  At the same time, Endo sought FDA approval for another potent opioid, immediate-release and extended-release oxymorphone, branded as Opana and Opana ER.  Oxymorphone, like OxyContin's active ingredient oxycodone, is not a new drug; it was first synthesized in Germany in 1914 and sold in the U.S. by Endo beginning in 1959 under the trade name Numorphan.  But Numorphan tablets proved highly susceptible to abuse. Called "blues" after the light blue color of the 10 mg pills,

---

[72] Letter from Members of Congress to Dr. Margaret Chan, Director-General, World Health Organization (May 3, 2017),   http://katherineclark.house.gov/_cache/files/a577bd3c-29ec-4bb9-bdba-1ca71c784113/mundipharma-letter-signatures.pdf

Numorphan provoked, according to some users, a more euphoric high than heroin.  As the National Institute on Drug Abuse observed in its 1974 report, "Drugs and Addict Lifestyle," Numorphan was extremely popular among addicts for its quick and sustained effect.[73] Endo withdrew oral Numorphan from the market in 1979.[74]

290.     Two decades later, however, as communities around the U.S. were first sounding the alarm about prescription opioids and Purdue executives were being called to testify before Congress about the risks of OxyContin, Endo essentially reached back into its inventory, dusted off a product it had previously shelved after widespread abuse, and pushed it into the marketplace with a new trade name, Opana.

291.     The clinical trials submitted with Endo's first application for approval of Opana were insufficient to demonstrate efficacy, and some subjects in the trials overdosed and had to be revived with naloxone. Endo then submitted new "enriched enrollment" clinical trials, in which trial subjects who do not respond to the drug are excluded from the trial, and obtained approval. Endo began marketing Opana and Opana ER in 2006.

292.     Like Numorphan, Opana ER was highly susceptible to abuse. On June 8, 2017, the FDA sought removal of Opana ER. In its press release, the FDA indicated that "[t]his is the first time the agency has taken steps to remove a currently marketed opioid pain medication from sale due to the public health consequences of abuse."[75] On July 6, 2017, Endo agreed to withdraw Opana ER from the market.[76]

---

[73] John Fauber & Kristina Fiore, *Abandoned Painkiller Makes a Comeback*, MedPage Today (May 10, 2015), https://www.medpagetoday.com/psychiatry/addictions/51448.
[74] *Id*.
[75] Press Release, U.S. Food & Drug Admin., FDA Requests Removal of Opana ER for Risks Related to Abuse (June 8, 2017). https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.
[76] *Endo Pulls Opioid as U.S. Seeks to Tackle Abuse Epidemic*, Reuters (July 6, 2017, 9:59am), https://www.reuters.com/article/us-endo-intl-opana-idUSKBN19R2II.

293.    Janssen, which already marketed the Duragesic (fentanyl) patch for severe pain, also joined Purdue in pursuit of the broader chronic pain market.  It sought to expand the use of Duragesic through, for example, advertisements proclaiming, "It's not just for end stage cancer anymore!"[77]   This claim earned Janssen a warning letter from the FDA, for representing that Duragesic was "more useful in a broader range of conditions or patients than has been demonstrated by substantial evidence."[78]

294.    Janssen also developed a new opioid compound called tapentadol in 2009, marketed as Nucynta for the treatment of moderate to severe pain. Janssen launched the extended-release version, Nucynta ER, for treatment of chronic pain in 2011.

295.    Not only did Janssen manufacture its own branded drugs, but also, its subsidiaries Tasmanian Alkaloids and Noramco were responsible for processing the active pharmaceutical ingredients ("API") for other opioid manufacturers. As a result, Janssen profited from the growth of both unbranded and branded opioids and was driven to develop the market as much as possible.

296.    Janssen had a global Active Pharmaceutical Ingredients (API) manufacturing network for opiate analgesics and antagonists. Noramco and Tasmanian Alkaloids were the primary suppliers of the active pharmaceutical ingredients provided to a number of opioid manufacturers. As stated above, eighty percent of Noramco's sales were with all 7 of the top U.S. generic companies. Companies Noramco supplied included Teva, Endo, Purdue, Mallinckrodt, and Actavis. Noramco's product portfolio includes Oxycodone (Oxycontin, Percocet, oxicodone), Hydrocodone (Vicodin, Lortab), and Morphine (MS Contin, Embeda).

297.    In 1994, Janssen's subsidiary, Tasmanian Alkaloids, established a research project "in order to develop a high thebaine poppy to meet the anticipated demand." This project resulted

---

[77] Letter from FDA to Janssen (March 30, 2000), at 2.
[78] Id.

in the development of the "Norman" poppy. It's development "coincided with the release of a slow release formulation of oxycodone in the USA."[79] The company reported:

a.  The new formulation was very successful, and there was greatly increased demand for the thebaine raw material used for its manufacture.

b.  This new poppy variety is a major turning point in alkaloid production.

c.  The high alkaloid content of the Tasmanian crop is our most important competitive advantage.

d.  Patented, high thebaine poppy was a transformational technology that enabled the growth of oxycodone.

e.  API volume growth linked to generics of branded drugs, new delivery systems & abuse prevention claims.

298.   Noramco steadily gained in the U.S. market share reporting in 2014 alone that U.S. Sales of $94MM for Oxycodone and $52MM for Hydrocodone. In five years, from 2006 – 2011 their API volume growth doubled and continued climbing resulting in the need for new capacity in 2015.  Janssen's fully integrated supply chain provided security for continued growth.

299.   Janssen fueled the opioid epidemic by providing a more potent poppy that could provide greater supply and/or profits. But, because of Noramco and Tasmanian Alkaloids, Janssen had an incentive to fraudulently market opioids with other Marketing Defendants and Unnamed Related Parties as Janssen profited not only from its own opioid products, but from the sale of its API to other manufacturers.

300.   Upon information and belief, Janssen also profited from the rising addictions and abuse of opioids by suppling API for use in Naloxone for overdose and abuse, and in Naltrexone and Buprenorphine for opioid addiction.

---

[79] A.J. Fist, *The Tasmanian Poppy Industry: A Case Study of the Application of Science and Technology*, TASMANIAN ALKALOIDS PTY. LTD., (2001), https://www.semanticscholar.org/paper/The-Tasmanian-poppy-industry%3A-a-case-study-of-the-Fist/0c52defc85cdff44be755bf91f6d6d3bc51448f9.

301.     By adding additional opioids or expanding the use of their existing opioid products, the other Marketing Defendants took advantage of the market created by Purdue's aggressive promotion of OxyContin and reaped enormous profits. For example, Opana ER alone generated more than $1 billion in revenue for Endo in 2010 and again in 2013. Janssen also passed the $1 billion mark in sales of Duragesic in 2009.

### 4.     The Marketing Defendants and Unnamed Related Parties Multi-Pronged Scheme to Change Prescriber Habits and Public Perception and Increase Demand of Opioids.

302.     Until the mid-1990s, opioids were widely thought to be too addictive for use for chronic pain conditions, which would require long-term use of the drugs at increasingly higher doses. For these conditions, the risks of addiction and other side effects outweighed any benefit from the drugs. Over the last two decades, Marketing Defendants and Unnamed Related Parties turned that consensus on its head by designing and implementing a sophisticated and deceptive market strategy that, among other things, falsely denied the risk of addiction and overstated the benefits of using opioids long-term.

303.     Lacking legitimate scientific research to support their claims, Marketing Defendants turned to the marketing techniques first pioneered by Arthur Sackler to create a series of misperceptions in the medical community and ultimately reverse the long-settled understanding of the relative risks and benefits of opioids.

304.     Through marketing that was as pervasive as it was deceptive, Marketing Defendants and Unnamed Related Parties convinced health care providers both that the risks of long-term opioid use were overblown and that the benefits, in reduced pain and improved function and quality of life, were proven.   Purdue, for example, promoted the concept that pain was undertreated, that opioids could not be abused, that the rate of addiction to opioids was less than

1%, that "old views" of opioid addiction were untrue, and that "appropriate patients" would not become addicted.

305.    The result was that by the mid-2000s, the medical community had abandoned its prior caution, and opioids were entrenched as an appropriate, and often first-line treatment, for chronic pain conditions. Marketing Defendants and Unnamed Related Parties not only marketed opioids for chronic pain conditions, but also targeted primary care physicians (along with nurse practitioners and physician assistants), who were most likely to see patients with chronic pain conditions and least likely to have the training and experience to evaluate Marketing Defendants' and Unnamed Related Parties' marketing claims.

306.    Marketing Defendants' and Unnamed Related Parties' deceptive marketing created a cadre of doctors who looked for pain and treated it with opioids, which created an even broader cohort of patients who expected and received opioids. This laid the groundwork for today's epidemic of opioid addiction, overdose, and death.

307.    The Marketing Defendants and Unnamed Related Parties promoted and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, had established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Marketing Defendants and Unnamed Related Parties of these risks. The Marketing Defendants and Unnamed Related Parties had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use, including the fact that pain patients suffered from addiction, overdose, and death in alarming numbers. More recently, the FDA and

CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' and Unnamed Related Parties' misrepresentations.

308.    The marketing scheme to increase opioid prescriptions centered around nine categories of misrepresentations, which are discussed in detail below. The Marketing Defendants and Unnamed Related Parties disseminated these misrepresentations through various channels, including through advertising, sales representatives, and purportedly independent organizations funded and controlled, "Front Groups," so-called industry "Key Opinion Leaders," and Continuing Medical Education ("CME") programs discussed subsequently below.

### a.    The Marketing Defendants and Unnamed Related Parties Promoted Multiple Falsehoods About Opioids.

309.    Marketing Defendants and Unnamed Related Parties spent hundreds of millions of dollars on promotional activities and materials, including advertising and websites that falsely denied or trivialized the risk of addiction and overstated the benefits of opioids. They relied upon unsupported and misleading information disseminated through seminars, treatment guidelines, and other publications and programs promulgated by patient advocacy groups, professional associations, and physicians that seemed independent and therefore credible, but were actually funded and controlled by Marketing Defendants and Unnamed Related Parties.

310.    These "front groups" for the opioid industry put out unbranded patient education materials and treatment guidelines that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks. In many instances, Marketing Defendants and Unnamed Related Parties posted these publications on their websites or distributed these publications to prescribers, including, upon information and belief, prescribers in Florida.

311.    For example, Purdue recruited and paid respected health care professionals to present Purdue-approved programs to other prescribers at lunch and dinner events. From 1996 to

2001, Purdue funded more than 40 national conferences, which were funded by more than 5,000 physicians, pharmacist, and nurses.  In addition to speaker programs, Purdue targeted doctors with "educational" programing and funded more than 20,000 pain-related educational programs through direct sponsorship or financial grants.

312.    Marketing Defendants and Unnamed Related Parties used "key opinion leaders" ("KOLs"), experts in the field of pain management who were especially influential because of their reputations and seeming objectivity, to deliver paid talks and continuing medical education programs (or "CMEs") that provided information about treating pain and the risks, benefits, and use of opioids. These KOLs received substantial funding and research grants from the Marketing Defendants and Unnamed Related Parties, and the CMEs were often sponsored by Defendants—giving them considerable influence over the messenger, the message, and the distribution of the program. Only doctors supportive of the use and safety of opioids for chronic pain received funding for these speaking opportunities, which were not only lucrative, but also helped doctors build their reputations and bodies of work. One notable KOL, Dr. Russell Portenoy, subsequently acknowledged that he gave lectures on opioids that reflected "misinformation" and were "clearly the wrong thing to do."[80]

313.    In addition to talks and CMEs, these KOLs served on the boards of patient advocacy groups and professional associations, such as the American Pain Foundation and the American Pain Society, which also took money directly from Marketing Defendants and Unnamed Related Parties in an organized effort to exert greater influence because of their seeming independence. According to a report issued by the U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member's Office, "many patient advocacy organizations and professional

---

[80] *See* the Dec. 17, 2012 article by Thomas Catan and Evan Perez entitled, *A Pain-Drug Champion Has Second Thoughts,* at https://www.wsj.com/articles/SB10001424127887324478304578173342657044604

societies focusing on opioids policy have promoted messages and policies favorable to opioid use while receiving millions of dollars in payments from opioid manufacturers. Through criticism of government prescribing guidelines, minimization of opioid addiction risk, and other efforts, ostensibly neutral advocacy organizations have often supported industry interests at the expense of their own constituencies."[81]

314.    These third-party, unbranded materials were not reviewed or approved by the FDA. The FDA does not regulate all conduct engaged in by these Defendants. Marketing for chronic pain is not specifically approved. Medication labels do not address the use of opioids in treating specific conditions such as lower back pain, headaches, or fibromyalgia—three conditions for which opioids are not effective, but for which these Defendants marketed their drugs. Nor do the labels approve of the concept of "pseudoaddiction" or the technique of suggesting that abuse deterrent formulations are safer. In addition, though labels contain warnings about addiction, they do not quantify the severity of the risk. Marketing Defendants and Unnamed Related Parties' asserted in branded and unbranded marketing that screening, abuse deterrent formulations, or urinalysis could adequately manage the risk of developing an addiction without evidence to support these claims.

315.    The Marketing Defendants and Unnamed Related Parties' misrepresentations generally fall into the following nine categories:

1.   The risk of addiction from chronic opioid therapy is low

2.   Signs of addictive behavior are "pseudoaddiction," requiring more opioids

3.   To the extent there is a risk of addiction, it can be easily identified and managed

4.   Opioids are safe for long term use

---

[81] U.S. S. Homeland Sec. & Governmental Aff. Comm., Ranking Members' Office, Fueling an Epidemic, (Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171 at 3 (hereinafter, "Fueling an Epidemic").

5.  Long-term opioid use improves functioning

6.  Opioid doses can be increased without limit or greater risks

7.  Alternative forms of pain relief pose greater risks than opioids

8.  OxyContin provides twelve hours of pain relief

9.  New formulations of certain opioids successfully deter abuse

316.    Each of these propositions is false. The Marketing Defendants and Unnamed Related Parties knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

317.    The categories of misrepresentations are offered to organize the numerous statements the Marketing Defendants and Unnamed Related Parties made and to explain their role in the overall marketing effort, not as a checklist for assessing each Marketing Defendant's or Unnamed Related Parties liability. The Marketing Defendants' and Unnamed Related Parties' conduct, and each misrepresentation, contributed to an overall narrative that aimed to, and did, mislead doctors, patients, and third-party payors about the risks and benefits of prescription opioids. While this Complaint endeavors to document examples of each Marketing Defendants and Unnamed Related Parties misrepresentations, and the manner in which they were disseminated, they are just that—examples. The Complaint is not, especially prior to discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Marketing Defendant or each Unnamed Related Party.

318.    Upon information and belief, all of the messages described below were disseminated to prescribers and patients in Plaintiff's Community.

**Falsehood #1: The risk of addiction from chronic opioid therapy is low**

319.    To convince prescribers and patients that opioids are safe, Marketing Defendants and Unnamed Related Parties deceptively represented that the risk of abuse and addiction is modest and manageable and limited to illegitimate patients, not those with genuine pain. This created the dangerously misleading impressions that: (1) patients receiving opioid prescriptions for chronic pain would not become addicted, (2) patients at greatest risk of addiction could be identified, and (3) all other patients could safely be prescribed opioids.

320.    Marketing Defendants and Unnamed Related Parties undermined evidence that opioids are addictive by suggesting or stating that the risk of addiction is limited to high-risk patients. These Defendants and Unnamed Related Parties also minimized the difficulty of withdrawal in their marketing material and promotional programs. For example, a 2011 non-credit educational program sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days. However, this claim is at odds with the experience of patients addicted to opioids. Most patients who are dependent upon or addicted to opioids will experience withdrawal, characterized by intense physical and psychological effects, including anxiety, nausea, headaches, and delirium, among others. This painful and arduous struggle to terminate use can leave many patients unwilling or unable to give up opioids and heightens the risk of addiction.

321.    When it launched OxyContin, Purdue knew it would need data to overcome decades of wariness regarding opioid use. It needed some sort of research to back up its messaging. But Purdue had not conducted any studies about abuse potential or addiction risk as part of its application for FDA approval for OxyContin. Purdue (and, later, the other Defendants) found this

"research" in the form of a one-paragraph letter to the editor published in the New England Journal of Medicine (NEJM) in 1980.

322.    This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids.[82] They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

323.    As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.[83]

324.    Purdue nonetheless began repeatedly citing this letter in promotional and educational materials as evidence of the low risk of addiction, while failing to disclose that its source was a letter to the editor, not a peer-reviewed paper.[84] Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of OxyContin.

325.    Purdue specifically used the Porter and Jick letter in its 1998 promotional video, "I got my life back," in which Dr. Alan Spanos says, "In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%."[85] Purdue trained its sales representatives to tell prescribers that fewer than 1% of patients who took OxyContin became addicted. (In 1999, a Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was thirteen per cent.)[86]

---

[82] Jane Porter and Herschel Jick, M.D., *Addiction Rare in Patients Treated with Narcotics*, 302(2) N Engl J Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221

[83] Meier at 174.

[84] Jane Porter & Herschel Jick, M.D.*, Addiction Rare in Patients Treated with Narcotics,* 302(2) New. Eng. J. Med. 123 (1980).

[85] OxyContin Commercial, *Our Amazing World,* PURDUE PHARMA, https://www.youtube.com/watch?v=Er78Dj5hyeI (last visited Nov. 14, 2019) (emphasis added).

[86] Patrick Radden Keefe, *The Family That Built an Empire of Pain,* NEW YORKER, (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain

326.     Other Defendants relied on and disseminated the same distorted messaging. The enormous impact of Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the Journal in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .[87]

327.     "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[88]

328.     Alongside its use of the Porter and Jick letter, Purdue also crafted its own materials and spread its deceptive message through numerous additional channels. In its 1996 press release announcing the release of OxyContin, for example, Purdue declared, "The fear of addiction is exaggerated."[89]

329.     At a hearing before the House of Representatives' Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in August 2001, Purdue emphasized "legitimate" treatment, dismissing cases of overdose and death as something that would not befall "legitimate" patients: "Virtually all of these reports involve people who are abusing the

---

[87] Pamela T.M. Leung, B.Sc. Pharm., Erin M. Macdonald, M.Sc., Matthew B. Stanbrook, M.D., Ph.D., Irfan Al Dhalla, M.D., David N. Juurlink, M.D., Ph.D., *A 1980 Letter on the Risk of Opioid Addiction*, NEW ENG. J. MED. (June 1, 2017), http://www.nejm.org/doi/full/10.1056/NEJMc1700150#t=article.

[88] *Painful words: How a 1980 letter fueled the opioid epidemic*, STAT (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic-nejm-letter/.

[89] Press Release, OxyContin, *New Hope for Millions of Americans Suffering from Persistent Pain: Long-Acting OxyContin Tablets Now Available to Relieve Pain*, L.A. TIMES (May 31, 1996, 3:47 PM), http://documents.latimes.com/oxycontin-press-release-1996/

medication, not patients with legitimate medical needs under the treatment of a healthcare professional."[90]

330.    Sales representatives marketed OxyContin as a product "to start with and to stay with."[91] Sales representatives also received training in overcoming doctors' concerns about addiction with talking points they knew to be untrue regarding the drug's abuse potential. One of Purdue's early training memos compared doctor visits to "firing at a target," declaring that "[a]s you prepare to fire your 'message,' you need to know where to aim and what you want to hit!"[92] According to the memo, the target is physician resistance based on concern about addiction: "The physician wants pain relief for these patients without addicting them to an opioid."[93]

331.    Former sales representative Steven May, who worked for Purdue from 1999 to 2005, explained to a journalist how he and his coworkers were trained to overcome doctors' objections to prescribing opioids. The most common objection he heard about prescribing OxyContin was that "it's just too addictive."[94] May and his coworkers were trained to "refocus" doctors on "legitimate" pain patients, and to represent that "legitimate" patients would not become addicted. In addition, upon information and belief, they were trained to say that the 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers than need to be taken every four hours.

---

[90] *OxyContin: Its Use and Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce*, 107th Cong. 1 (Aug. 28, 2001) (statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.gpo.gov/fdsys/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm

[91] Keefe, *Empire Of Pain*

[92] Meier, *Pain Killer*, at 102.

[93] *Id.*

[94] David Remnick, *How OxyContin Was Sold to the Masses* (Steven May interview with Patrick Radden Keefe), The New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the-masses.

332.    Purdue also heavily promoted the Joint Commission on Accreditation of Healthcare Organization's Pain as a Fifth Vital Sign, which encouraged health care providers to ask about pain and, presumably, to treat it with opioids. Purdue obtained exclusive rights to distribute Pain as a Fifth Vital Sign, and made sure that this guide, intended initially for hospital patients, was widely disseminated. Front groups supported by Marketing Defendants, particularly the University of Wisconsin Pain and Policy Study Group (PPSG), proposed the concept of Pain as a Fifth Vital Sign, which the review committee of outside physicians charged with evaluating guidelines rejected precisely because of their concern that it would result in overuse of opioids and increased addiction and overdose. JACHO nonetheless adopted the guidelines, presumably at the behest of PPSG and its supporters.

333.    Endo also falsely represented that addiction is rare in patients who are prescribed opioids.

334.    In 2010, Endo created a website that suggested its opioids weren't addictive, and stated that, "People who take opioids as prescribed usually do not become addicted."[95]

335.    Upon information and belief, Endo improperly instructed its sales representatives to diminish and distort the risk of addiction associated with Opana ER.

336.    One of the Front Groups with which Endo worked most closely was the American Pain Foundation ("APF"), described more fully below. Endo provided substantial assistance to, and exercised editorial control, over the deceptive and misleading messages that APF conveyed through its National Initiative on Pain Control ("NIPC")[96] and its website Painknowledge.com, which claimed that "[p]eople who take opioids as prescribed usually do not become addicted."

---

[95] *See* the June 4, 2015 article in Time Magazine entitled, *Why America Can't Kick Its Painkiller Problem*, by Massimo Calabresi, at https://time.com/magazine/us/3908624/june-15th-2015-vol-185-no-22-u-s/

[96] Endo was one of the APF's biggest financial supporters, providing more than half of the $10 million APF received from opioid manufacturers during its lifespan. Endo was the sole funder of NIPC and selected APF to manage NIPC.

337.     Janssen likewise misrepresented the addiction risk of opioids on its websites and print materials.  One website, Let's Talk Pain, is a coalition and collaboration between the American Pain Foundation, the American Academy of Pain Management, The American Society for Pain Management Nursing, and Janssen Pharmaceuticals, Inc., which also sponsors the coalition.[97]

338.     A Janssen unbranded website, PrescribeResponsibly.com, states that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[98]

339.     Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.[99]

340.     For example, a 2003 Cephalon-sponsored CME presentation titled Pharmacologic Management of Breakthrough or Incident Pain, posted on Medscape in February 2003, teaches:

341.     [C]hronic pain is often undertreated, particularly in the noncancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing

---

Internal Endo documents indicate that Endo was responsible for NIPC curriculum development, web posting, and workshops, developed and reviewed NIPC content, and took a substantial role in distributing NIPC and APF materials. Endo projected that it would be able to reach tens of thousands of prescribers nationwide through the distribution of NIPC materials.

[97] *See* https://www.multivu.com/assets/51908/documents/51164-Janssen-Responsibility-Fact-Sheet-original.pdf

[98] Keith Candiotti, M.D., *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/opioid-pain-managment (Last modified July 2, 2015).

[99] See the 2007 American Pain Foundation Guide for People Living with Pain, sponsored in part by Cephalon, at https://ce4less.com/Tests/Materials/E019Materials.pdf

substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[100]

342.    Through its "Learn More about customized pain control with Kadian" material, Actavis claimed that it is possible to become addicted to morphine-based drugs like Kadian, but that it is "less likely" to happen in those who "have never had an addiction problem." The piece goes on to advise that a need for a "dose adjustment" is the result of tolerance, and "not addiction."

343.    Upon information and belief, a guide for prescribers under Actavis's copyright deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids. The guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." These statements convey both that (1) Kadian does not cause euphoria and therefore is less addictive and that (2) Kadian is less prone to tampering and abuse, even though Kadian was not approved by the FDA as abuse deterrent, and, upon information and belief, Actavis had no studies to suggest it was.

344.    As described below, Mallinckrodt promoted its branded opioids Exalgo and Xartemis XR, and opioids generally, in a campaign that consistently mischaracterized the risk of

---

[100]  Michael J. Brennan, et al., Pharmacologic Management of Breakthrough or Incident Pain, Medscape, http://www.medscape.org/viewarticle/449803 (last visited November 6, 2019).

addiction. Mallinckrodt did so through its website and sales force, as well as through unbranded communications distributed through the "C.A.R.E.S. Alliance" it created and led.

345.    Mallinckrodt created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, which it describes as "a coalition of national patient safety, provider and drug diversion organizations that are focused on reducing opioid pain medication abuse and increasing responsible prescribing habits."[101] The "C.A.R.E.S. Alliance" itself is a service mark of Mallinckrodt LLC (and was previously a service mark of Mallinckrodt, Inc.) copyrighted and registered as a trademark by Covidien, its former parent company. Materials distributed by the C.A.R.E.S. Alliance, however, include unbranded publications that do not disclose a link to Mallinckrodt.

346.    Through the C.A.R.E.S. Alliance, Mallinckrodt promoted a book titled Defeat Chronic Pain Now! This book is still available online. The false claims and misrepresentations in this book include the following statements:

- "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

- "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy."

- "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

- "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

- "The bottom line: Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

---

[101] See http://phx.corporate-ir.net/phoenix.zhtml?c=251324&p=irol-newsArticle&ID=2004119

- "Here are the facts. It is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain."

- "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."

347. Mallinckrodt promoted both Exalgo (extended-release hydromorphone) and Xartemis XR (oxycodone and acetaminophen) as specifically formulated to reduce abuse. For example, Mallinckrodt's promotional materials stated that "the physical properties of EXALGO may make it difficult to extract the active ingredient using common forms of physical and chemical tampering, including chewing, crushing and dissolving."[102] One member of the FDA's Controlled Substance Staff, however, noted in 2010 that hydromorphone has "a high abuse potential comparable to oxycodone" and further stated that "we predict that Exalgo will have high levels of abuse and diversion."[103]

348. With respect to Xartemis XR, Mallinckrodt's promotional materials stated that "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients."[104] In anticipation of Xartemis XR's approval, Mallinckrodt added 150-200 sales representatives to promote it, and CEO Mark Trudeau said the drug could generate "hundreds of millions in revenue."[105]

---

[102] Press Release, Covidien, FDA Approves Mallinckrodt's EXALGO® (hydromorphone HCl) Extended-Release Tablets 32 mg (CII) for Opioid-Tolerant Patients with Moderate-to-Severe Chronic Pain (Aug. 27, 2012), http://newsroom.medtronic.com/phoneix.zhtml?c=251324&p=irol-newsArticle&ID=2004159.

[103] 2010 Meeting Materials, Anesthetic and Analgesic Drug Products Advisory Committee, at 157-58, FDA, https://wayback.archive-it.org/7993/20170403223634 https://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/AnestheticAndAnalgesicDrugProductsAdvisoryCommittee/ucm/193298.htm.

[104] Mallinckrodt, Responsible Use of Opioid Pain Medications (Mar. 7, 2014).

[105] Samantha Liss, Mallinckrodt Banks on New Painkillers for Sales, St. Louis Bus. J. (Dec. 30, 2013), http://argentcapital.com/mallinckrodt-banks-on-new-painkillers-for-sales/.

349.    Marketing Defendants' and Unnamed Related Parties' suggestions that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme but is at odds with the facts. While there are certainly patients who unlawfully obtain opioids, they are a small minority.  For example, patients who "doctor-shop," i.e., visit multiple prescribers to obtain opioid prescriptions, are responsible for roughly 2% of opioid prescriptions.[106] The epidemic of opioid addiction and abuse is overwhelmingly a problem of false marketing (and unconstrained distribution) of the drugs, not problem patients.

350.    Marketing Defendants' and Unnamed Related Parties' efforts to trivialize the risk of addiction were, and remain, unsupported by scientific evidence. Studies show that as few as 8-12%, and as many as 30-40% of long-term users of opioids experience problems with addiction. According to one study, nearly 60% of patients who used opioids for 90 days continued to use opioids five years later.[107] Addiction can result from the use of any opioid, "even at the recommended dose"[108] and the risk increases with chronic (more than three months) use. The CDC has emphasized that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[109]

**Falsehood #2: Signs of addiction are "pseudoaddiction," requiring more opioids**

351.    Marketing Defendants and Unnamed Related Parties covered up the occurrence of addiction by attributing it to a made-up condition they called "pseudoaddiction." Signs of

---

[106] See the July 17, 2013 article written by Douglas McDonald and Kenneth Carlson entitled, *Estimating the Prevalence of Opioid Diversion by "Doctor Shoppers" in the United States*, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3714248/
[107] See the June 2015 AMDG Interagency Guideline on Prescribing Opioids for Pain at, http://www.agencymeddirectors.wa.gov/Files/2015AMDGOpioidGuideline.pdf
[108] FDA announces safety labeling changes and post market study requirements for extended- release and long-acting opioid analgesics, FDA (Sept. 10, 2013); see also FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death, FDA (Mar. 22, 2016)
[109] See the March 2016 CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016, at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm

addiction, including shopping for doctors willing to newly write or refill prescriptions for opioids or seeking early refills, actually reflected undertreated pain that should be addressed with more opioids—the medical equivalent of fighting fire by adding fuel.

352.    Purdue, through its unbranded front group Partners Against Pain, promoted the concept of pseudoaddiction through at least 2013 on its website. It disseminated the Definitions Related to the Use of Opioids for the Treatment of Pain section of an American Pain Society ("APS") consensus statement through the website, where APS, who received funding from Defendants, defined pseudoaddiction in the same terms endorsed by Purdue:

> Physical dependence, tolerance, and addiction are discrete and different phenomena that are often confused . . . Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may 'clock watch,' and may otherwise seem inappropriately 'drug seeking.' Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when pain is effectively treated. . . . A patient who is physically dependent on opioids may sometimes continue to use these [medications] despite resolution of pain only to avoid withdrawal. Such use does not necessarily reflect addiction.[110]

353.    Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is undertreated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management." This website was accessible online until May 2012.

354.    Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, promoted

---

[110] *See* the 2001 article entitled *Definitions Related to the Use of Opioids for the Treatment of Pain: Consensus Statement of the American Academy of Pain Medicine, the American Pain Society, and the American Society of Addiction Medicine,* at https://www.asam.org/docs/default-source/public-policy-statements/1opioid-definitions-consensus-2-011.pdf

the concept of pseudoaddiction by teaching medical professionals that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC, an initiative run by the APF, by funding NIPC projects; developing, specifying, and reviewing its content; and distributing NIPC materials. APF internal documents show that APF viewed the NIPC as an "opportunity to generate new revenue" given Endo's funding commitment.

355.    Marketing Defendants and Unnamed Related Parties also promoted the concept of pseudoaddiction through Dr. Russell Portenoy, a leading KOL for the Marketing Defendants and Unnamed Related Parties. In doing so, he popularized the concept and falsely claimed that pseudoaddiction is substantiated by scientific evidence.

356.    The CDC Guideline for prescribing opioids for chronic pain, a "systematic review of the best available evidence" by a panel excluding experts with conflicts of interest, rejects the concept of pseudoaddiction. The Guideline nowhere recommends that opioid doses be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use,"[111] and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."[112]

**Falsehood #3: To the extent there is a risk of addiction, it can be easily identified and managed**

357.    Marketing Defendants and Unnamed Related Parties falsely instructed prescribers and patients that screening tools, patient contracts, urine drug screens, and similar strategies allow health care providers to safely prescribe opioids to patients, including patients predisposed to

---

[111] CDC Guideline at 13.
[112] *Id.* at 25.

addiction, and failed to disclose the lack of evidence that these strategies actually work to mitigate addiction risk.  Marketing Defendants and Unnamed Related Parties advised doctors that they could identify patients likely to become addicted and safely prescribe to everyone else by using screening tools.

358.     Such misrepresentations regarding safe opioid prescribing made health care providers more comfortable prescribing opioids to their patients and patients more comfortable starting chronic opioid therapy. These misrepresentations were especially insidious because the Marketing Defendants and Unnamed Related Parties aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Moreover, these misrepresentations allowed doctors to believe opioid addiction was the result of other prescribers failing to rigorously manage and weed out problem patients, rather than a risk inherent to the drugs.

359.     Marketing Defendants and Unnamed Related Parties conveyed these deceptive safe prescribing messages in nationally distributed marketing materials. On information and belief, neither the Marketing Defendants nor Unnamed Related Parties disclosed the lack of evidence for efficacy of these deceptive safe prescribing screening tools.

360.     Marketing Defendants and Unnamed Related Parties also promoted screening tools as a reliable means to manage addiction risk in CME programs and scientific conferences, which would have been attended by or were available online to, Florida prescribers.

361.     Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers' bureau (doctors paid to give talks, typically reserved for the largest prescribers) in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that

patients at high risk of addiction could safely receive chronic opioid therapy involving toxicology screens and pill counts.

362.    The CDC Guideline confirmed the deceptiveness of claims made by Marketing Defendants and Unnamed Related Parties' regarding patient screening tools and addiction risk management strategies. The CDC Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies, such as screening tools or patient contracts, "for improving outcomes related to overdose, addiction, abuse, or misuse." The CDC Guideline recognized that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counseled that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."[113]

### Falsehood #4: Opioids are safe for long-term use

363.    Upon information and belief, the profits of the Marketing Defendants and Unnamed Related Parties, depended on keeping patients on opioids on a long-term basis.

364.    To convince prescribers and patients that opioids should be used to treat chronic pain, Defendants had to persuade them of a significant upside to long-term opioid use. Assessing existing evidence, the CDC Guideline found that there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."[114] In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain management and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials $\leq 6$ weeks in duration)."[115] In fact, other treatments were equally more beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to

---

[113] CDC Guideline at 28 (emphasis added).
[114] Id. at 10.
[115] Id. at 9.

support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well controlled studies of opioids use longer than 12 weeks."[116] As a result, the CDC recommends that opioids should not be used in the first instance or for treatment of chronic pain; rather, opioids should be used only after prescribers have exhausted alternative treatments.

365.    Nevertheless, upon information and belief, Marketing Defendants and Unnamed Related Parties touted the purported benefits of long-term opioid use, while falsely and misleadingly suggesting that these benefits were supported by scientific evidence.

366.    In addition, two prominent professional medical membership organizations, the American Pain Society ("APS") and the American Academy of Pain Medicine ("AAPM"), each received substantial funding from Marketing Defendants and Unnamed Related Parties. According to a letter from U.S. Senate Committee on Finance Ranking Member Ron Wyden to Secretary Thomas Price of the U.S. Department of Health & Human Services, as recently as May 2017, the Corporate Council of AAPM included Endo, Janssen, Purdue and Teva, along with several other pharmaceutical drug companies.[117] Upon information and belief, Marketing Defendants and Unnamed Related Parties exercised considerable influence over their work on opioids. Both organizations issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. The coauthor of the statement, Dr. David Haddox, was at the time a paid speaker for Purdue and later became a senior executive for the company.

---

[116] Woodcock Letter, *supra*
[117] Letter from Ron Wyden, Ranking Member, U.S. Senate Committee on Finance, to Honorable Thomas E. Price, Secretary, U.S. Health & Human Services (May 5, 2017), https://www.finance.senate.gov/imo/media/doc/050817%20corrected%20Senator%20Wyden%20to%20Secretary%20Price%20re%20Opioid%Prescriber%20Working%20Group%20(5%20May%202017).pdf.

KOL Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011 and was only removed from AAPM's website after a doctor complained.

367.    A past president of the AAPM, Dr. Scott Fishman, who also served as a KOL for Marketing Defendants and Unnamed Related Parties, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[118]

368.    AAPM and APS issued treatment guidelines in 2009 ("AAPM/APS Guidelines") which continued to recommend the use of opioids to treat chronic pain. Treatment guidelines, like the AAPM/APS Guidelines, were particularly important to Marketing Defendants and Unnamed Related Parties in securing acceptance for chronic opioid therapy.  These guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain. Six of the twenty-one panel members who drafted the AAPM/APS Guidelines received support from Purdue, eight from Teva, nine from Janssen, and ten from Endo.

369.    The AAPM/APS Guidelines promote opioids as "safe and effective" for treating chronic pain. The panel made "strong recommendations" despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.

370.    The AAPM/APS Guidelines are still available online, were reprinted in the *Journal of Pain*, and have influenced not only treating physicians, but also the body of scientific evidence on opioids. According to Google Scholar, they have now been cited at least 1,647 times in academic literature. These Guidelines were available to Florida prescribers.

---

[118] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829

371.    Purdue also published misleading studies to enhance the perception that opioids are effective long-term for chronic pain conditions. One study asserts that OxyContin is safe and effective for the chronic pain condition osteoarthritis. The study, sponsored by Purdue, involved providing oxycodone for 30 days, and then randomizing participants and providing a placebo, an immediate release oxycodone with acetaminophen (like Percocet), or OxyContin. Only 107 of the 167 patients went on to the second phase of the study, and most who withdrew left because of adverse events (nausea, vomiting, drowsiness, dizziness, or headache) or ineffective treatment. Despite relating to a chronic condition, opioids were provided only short-term. The authors even acknowledge that the "results . . . should be confirmed in trials of longer duration to confirm the role of opioids in a chronic condition such as OA [osteoarthritis]."[119] Yet, the authors conclude that "[t]his clinical experience shows that opioids were well tolerated with only rare incidence of addiction and that tolerance to the analgesic effects was not a clinically significant problem when managing patients with opioids long-term."[120] This statement is not supported by the data, which reflects a substantial proportion of patients dropped out because of adverse effects, there was no reported data regarding addiction, and the study was not long-term.

372.    Teva deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals.

373.    Both Actiq and Fentora are extremely powerful fentanyl-based opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Teva from marketing Actiq for anything but cancer pain and refused to approve Fentora

---

[119] Jacques R. Caldwell, *et al.*, *Treatment of Osteoarthritis Pain with Controlled Release Oxycodone or Fixed Combination Oxycodone Plus Acetaminophen Added to Nonsteroidal Anti-inflammatory Drugs: A Double Blind, Randomized, Multicenter, Placebo Controlled Trial*, 266.4 Journal of Rheumatology 862-869 (1999).
[120] *Id.*

for the treatment of chronic pain because of the potential harm, including the high risks of "serious and life-threatening adverse events" and abuse—which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.[121]

374.    Despite this, Teva conducted a well-funded and deceptive campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. This campaign included the use of CMEs, speaker programs, KOLs, and journal supplements to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain, without disclosing the lack of evidence or the FDA's rejection of their use for chronic pain.

375.    Teva's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

376.    In December 2011, Teva widely disseminated a journal supplement entitled *"Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)"* to Anesthesiology News, Clinical Oncology News, and Pain Medicine News—three publications that are sent to thousands of anesthesiologists and other medical professionals nationally, including, upon information and belief. The Special Report openly promotes Fentora for "multiple causes of pain," and not just cancer pain.

---

[121] See the September 2007 News and Press Release from ASHP entitled, *FDA, Cephalon Warn of Deaths from Improper Fentora Use*, at
https://www.ashp.org/news/2007/09/13/fda__cephalon_warn_of_deaths_from_improper_fentora_use

377.    Teva's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but also were approved by the FDA for such uses.

378.    On December 28, 2011, the FDA mandated a Risk Evaluation and Mitigation Strategy (REMS) for the class of products for which Teva's Actiq and Fentora belong, Transmucosal Immediate Release Fentanyl (TIRF). The TIRF REMS programs include mandatory patient and prescriber enrollment forms, as well as certification requirements for prescribers. The forms are not comprehensive and do not, for instance, disclose that addiction can develop when the medications are used as prescribed, nor do they disclose that risks are greatest at higher doses, and patients must already be taking high doses of opioids to be prescribed Actiq and Fentora.

### Falsehood #5: Long-term opioid use improves functioning

379.    Marketing Defendants and Unnamed Related Parties also claimed, without evidence, that long-term opioid use would help patients resume their lives and jobs.

380.    Upon information and belief, Marketing Defendants and Unnamed Related Parties' distributed materials that reinforced the false message that "multiple clinical studies have shown that opioids are effective in improving" "[d]aily function" and "[o]verall health-related quality of life for people with chronic pain."

381.    Additional illustrative examples are described below:

a.  Teva, Endo, and Purdue sponsored and distributed a book entitled, Responsible Opioid Prescribing (2007), a Physicians Guide (Scott M. Fishman, M.D. ed., Waterford Life Sciences 2007), which teaches that management of persistent pain with opioids provides meaningful improvements in pain and quality of life for many patients.  The book remains for sale online.

b.  Upon information and belief, Purdue and Teva sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in May 2012.

382.    Mallinckrodt followed suit, stating on its website, in a section on "responsible use" of opioids, claims that "[t]he effective pain management offered by our medicines helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society."[122]

383.    Likewise, Marketing Defendants and Unnamed Related Parties claim that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. As noted above, there are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long-term. On the contrary, the available evidence indicates opioids are not effective to treat chronic pain and may worsen patients' health and pain. Increasing the duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization.

384.    As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[123] Studies of patients with lower back pain and migraine headaches, for example, have consistently shown that patients experienced deteriorating function over time, as measured by ability to return to work, physical activity, pain relief, rates of depression, and subjective quality-of-life measures. Analyses of workers' compensation claims have found that workers who take opioids are almost four times more likely to reach costs over

---

[122]    Mallinckrodt    Pharmaceuticals,    Responsible    Use,    http://www.mallinckrodt.com/corporate-responsibility/responsible-use

[123]    Andrea Rubinstein, *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), *available at* http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse?

$100,000, stemming from greater side effects and slower returns to work. According to these studies, receiving an opioid for more than seven days also increased patients' risk of being on work disability one year later.

385.    The FDA and other federal agencies have, for years, made clear the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[124] The CDC Guideline, following a "systematic review of the best available evidence," concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[125] According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[126]

### Falsehood #6: Alternative forms of pain relief pose greater risks than opioids

386.    The materials the Marketing Defendants and Unnamed Related Parties produced, sponsored, or controlled, omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would be more likely to choose opioids and would favor opioids over other therapies, such as over-the-counter acetaminophen or NSAIDs. None of these claims were corroborated by scientific evidence. In fact,

---

[124] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Comm'c'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that opioid manufacturer Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Comm'c'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.
[125] CDC Guideline at 2, 18.
[126] Thomas R. Frieden & Debra Houry, *Reducing the Risks of Relief−The CDC Opioid-Prescribing Guideline*, New Eng. J. Med., Apr. 21, 2016, at 1503.

several studies have shown that ibuprofen and acetaminophen taken together are better than opioids at relieving pain such as dental pain, low back pain, and moderate acute traumatic pain.[127]

387.    In addition to failing to disclose in promotional materials the risks of addiction, abuse, overdose, and death, Marketing Defendants and Unnamed Related Parties routinely ignored other risks, such as hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy,"[128] in which the patient becomes more sensitive to pain over time; experiences hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazepines, which are used to treat post-traumatic stress disorder and anxiety (conditions that often accompany chronic pain symptoms).

388.    Purdue and Teva sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.[129] The publication inaccurately attributes 10,000 to 20,000 deaths annually to NSAIDs (the actual figure is approximately 3,200—far fewer than from opioids).[130] This publication also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids.[131]

389.    Exit Wounds, a Survival Guide to Pain Management for Returning Veterans & Their Families (Derek McGinnis 2009), sponsored by  Purdue and Endo and aimed at veterans,

---

[127] Donald Teater, M.D., *Evidence for the Efficacy of Pain Medication,* National Safety Council, October 2014.
[128] *See* Martin, *supra.*
[129] See the American Pain Foundation, article entitled, *Treatment Options: A Guide for People Living with Pain*, at https://ce4less.com/Tests/Materials/E019Materials.pdf
[130] *Id.* The higher figure reflects deaths from all causes.
[131] *Id.*

omits warnings of the potentially fatal risk of interactions between opioids and benzodiazepines, a class of drug commonly prescribed to veterans with post-traumatic stress disorder. This book is for sale online at Amazon.com.

390.     Purdue and Endo sponsored a CME program, Overview of Management Options, published by the American Medical Association in 2003, 2007, 2010, and 2013, and discussed further below. The CME was edited by Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

391.     Marketing Defendants and Unnamed Related Parties frequently contrasted the lack of a ceiling dosage for opioids with the risks of NSAIDs. These Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from opioids. (See e.g., Case Challenges in Pain Management: Opioid Therapy for Chronic Pain (Endo) [describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending opioids]; Finding Relief: Pain Management for Older Adults (Janssen) [NSAIDs caused kidney or liver damage and increased risk of heart attack and stroke, versus opioids, which cause temporary "upset stomach or sleepiness" and constipation].)

392.     These omissions are significant and material to patients and prescribers. A Cochrane Collaboration review of evidence relating to the use of opioids for chronic pain found that 22.9% of patients in opioid trials dropped out before the study began because of the "adverse effects" of opioids.[132]

393.     Again, Marketing Defendants and Unnamed Related Parties misrepresentations were effective. A study of 7.8 million doctor visits nationwide between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits while NSAID and acetaminophen

---

[132] Meredith Noble M., *Long-Term Opioid Management for Chronic Noncancer Pain (Review)*, 1 COCHRANE DATABASE OF SYSTEMATIC REVIEWS 11 (2010).

prescriptions fell from 38% to 29%.[133]  The CDC reports that the quantity of opioids prescribed in the United States peaked in 2010 and then decreased each year through 2015.[134]   However, "despite reductions, the amount of opioids prescribed remains approximately three times as high as in 1999."[135]

**Falsehood #7: Opioid doses can be increased without limit or greater risks**

394.    Marketing Defendants and Unnamed Related Parties falsely claimed to prescribers and consumers that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose. This was particularly important because patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief. These Defendants and Unnamed Related Parties needed to generate a comfort level among doctors to ensure the doctors would maintain patients on the drugs even at the high doses that became necessary.

395.    Purdue-sponsored publications and CMEs available online also misleadingly suggested that higher opioid doses carried no added risk.

396.    Through at least June 2015, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor did not prescribe a sufficient dose of opioids, the patient should see different doctors until finding a doctor who would.

397.    *A Policymaker's Guide,* the 2011 publication on which, upon information and belief, Purdue collaborated with APF, taught that dose escalations are "sometimes necessary," but

---

[133] *See* the December 2014 article by Roxanne Meyer, *et al*, entitled *Prescription Opioid Abuse: A Literature Review of the Clinical and Economic Burden in the United States* at, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4273187/
[134] See the July 7, 2017 article by the CDC entitled Vital Signs: Changes in Opioid Prescribing in the United States, 2006-2015, at https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm
[135] *Id.*

it did not disclose the risks from high dose opioids. Until recently, this publication was still available online.[136]

398.    The Purdue-sponsored CME, *Overview of Management Options*, discussed above, again instructed physicians that NSAIDs (like ibuprofen) are unsafe at high doses (because of risks to patients' kidneys), but it did not disclose risks from opioids at high doses.

399.    Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until, "you are on the right dose of medication for your pain."

400.    Endo distributed a pamphlet edited by Dr. Russell Portenoy entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which appeared on Endo's website. In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."[137]

401.    Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

402.    These claims conflict with the scientific evidence. Patients receiving high doses of opioids (*e.g.*, doses greater than 100 mg morphine equivalent dose ("MED") per day) as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses.[138] As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower

---

[136] See http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last visited Aug. 17, 2018).

[137] *See* the 2004 pamphlet by Endo entitled, *Understanding Your Pain, Taking Oral Opioid Analgesics* at, http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf.

[138] See the 2010 article by Kate Dun, et al, entitled *Overdose and prescribed opioids: Associations among chronic non-cancer pain patients*, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3000551/

rate than tolerance to opioids' analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.

403.    The CDC Guideline concludes that the "[b]enefits of high-dose opioids for chronic pain are not established" while "there is an increased risk for serious harms related to long-term opioid therapy that appears to be dose-dependent."[139] That is why the CDC advises doctors to "avoid increasing doses" above 90 mg MED.[140]

**Falsehood #8: OxyContin provides twelve hours of pain relief**

404.    To convince prescribers and patients to use OxyContin, Purdue misleadingly promoted the drug as providing 12 continuous hours of pain relief with each dose. From the outset, Purdue leveraged 12-hour dosing to promote OxyContin as providing continuous, round-the-clock pain relief with the convenience of not having to wake to take a third or fourth pill. The 1996 press release for OxyContin touted 12-hour dosing as providing "smooth and sustained pain control all day and all night."[141] But the FDA has never approved such a marketing claim. To the contrary, the FDA found in 2008, in response to a Citizen Petition by the Connecticut Attorney General, that a "substantial number" of chronic pain patients taking OxyContin experienced "end of dose failure"—*i.e.,* little or no pain relief at the end of the dosing period.[142]

405.    Purdue sought that dosing frequency in order to maintain a competitive advantage over more frequently dosed opioids. Even so, Purdue has gone well beyond the label's instructions

---

[139] CDC Guideline at 19. The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

[140] CDC Guideline at 16.

[141] *See* 1996 OxyContin Press Release at, https://documents.latimes.com/oxycontin-press-release-1996/

[142] *See* the September 9, 2008 letter from the FDA to the Office for the Attorney General for the State of Connecticut at, https://www.purduepharma.com/wp-content/pdfs/fda_response_blumenthal_oxycontin.pdf

to take OxyContin every 12 hours. Purdue has affirmatively claimed in its general marketing, including, upon information and belief, to prescribers, that OxyContin lasts for 12 hours and that this is a key advantage of OxyContin, implying that most or all patients would in fact experience continuous pain relief for the full 12 hour dose period. Purdue has also failed to disclose that OxyContin fails to provide 12 hours of pain relief to many patients. These misrepresentations, which Purdue continues to make, are particularly dangerous because inadequate dosing helps fuel addiction, as explained below.

406.    End-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, has called OxyContin's 12-hour dosing "the perfect recipe for addiction."[143] Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking.

407.    Purdue has remained committed to 12-hour dosing because it is key to OxyContin's market dominance and comparatively high price; without this advantage, the drug had little to offer over less expensive, short-acting opioids. In a 2004 letter to the FDA, Purdue acknowledged that it had not pursued approval to allow more frequent dosing in the label (*e.g.,* every 8 hours) because 12-hour dosing was "a significant competitive advantage."[144]

---

[143] Harriet Ryan, *'You Want a Description of Hell?' OxyContin's 12-Hour Problem*, L.A. TIMES, (May 5, 2016), http://www.latimes.com/projects/oxyconti-part1/
[144] See Purdue's 2004 Response letter to the FDA at, https://documents.latimes.com/purdue-response-fda-2004/

408.    While Purdue's commitment to marketing opioids as a 12-hour drug made it more addictive, Purdue falsely promoted OxyContin as providing "steady state" relief and less likely than other opioids to create a cycle of crash and cravings that fueled addiction and abuse.

409.    Promotion of 12-hour dosing, without disclosing its limitations, is misleading because it implies that the pain relief supplied by each dose lasts 12 hours. FDA approval of OxyContin for 12-hour dosing does not give Purdue license to misrepresent the duration of pain relief it provides to patients; moreover, Purdue had a responsibility to correct its label to reflect appropriate dosing and to disclose to prescribers what it knew about OxyContin's actual duration, but disregarded that responsibility in its pursuit of a marketing advantage.[145]

410.    Purdue was also aware of some physicians' practice of prescribing OxyContin more frequently than 12 hours—a common occurrence. Purdue's promoted solution to this problem was to increase the dose, rather than the frequency, of prescriptions, even though higher dosing carries its own risks. According to a CDC clinical evidence review, higher opioid doses are related to increased risks of motor vehicle injury, opioid use disorder, and overdoses.[146] With higher doses, patients experience higher highs and lower lows, increasing their craving for their next pill.  Based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are taking doses greater than 60 milligrams per day—which converts to the 90 MED that the CDC Guideline urges prescribers to "avoid" or "carefully justify,"[147] doses equal to or greater than 90 MED.

---

[145] For example, Kadian, an opioid manufactured by Allergan, was designed to be taken once a day, but the label acknowledges and advises dosing of up to every 12 hours for certain patients.

[146] Mark J. Edlund, *et al.*, *The Role of Opioid Prescription in Incident Opioid Abuse and Dependence Among Individuals with Chronic Non-cancer Pain,* 30 THE CLINICAL J. OF PAIN 557‑564 (2014); Woodcock Letter, *supra*

[147] CDC Guideline at 16.

## Falsehood #9: New formulations of certain opioids successfully deter abuse

411.    Rather than take the widespread abuse and addiction to opioids as reason to cease their untruthful marketing claims and efforts, Marketing Defendants and Unnamed Related Parties seized them as a market opportunity. These companies oversold their abuse-deterrent formulations ("ADF") as a solution to prescription opioid abuse in order for doctors to continue to safely prescribe their opioids.  Marketing Defendants and Unnamed Related Parties false and misleading marketing of the benefits of ADF opioids preserved and expanded their sales and influenced prescribers to discount evidence of opioid addiction and abuse and attribute it to other, less safe opioids—thereby prolonging the opioid epidemic in the City.

412.    Reformulated ADF OxyContin was approved by the FDA in April 2010; However, it was not until 2013 that the FDA, in response to a Citizen Petition filed by Purdue, permitted reference to the abuse-deterrent properties in its label. The FDA made clear that abuse-deterrent properties do not stop tampering but only make it harder to modify the pills. ADF pills can still be snorted and injected if tampered with, and these pills are still sought after by abusers because of their high likability when snorted. Further, ADF properties do not reduce oral abuse, the most common form of abuse, in any way. When Hysingla ER (extended-release hydrocodone) launched in 2014, the product included similar abuse-deterrent properties and limitations.

413.    It is no coincidence that reformulated OxyContin was introduced shortly before generic versions of OxyContin were to become available, threatening to erode Purdue's market share and the price it could charge. Through a Citizen Petition, Purdue was able to secure a determination by the FDA in April 2013 that original OxyContin should be removed from the market as unsafe, because its lack of abuse-deterrent properties.  Thus, non-ADF generic copies

could not be sold. As a result, Purdue extended its branded exclusivity for OxyContin until the patent protection on the abuse-deterrent coating expires.

414.    Purdue nonetheless touted its introduction of ADF opioids as evidence of its good corporate citizenship and commitment to address the opioid crisis. Touting the benefits of ADF opioids, Purdue's website asserts, for instance: "we are acutely aware of the public health risks these powerful medications create . . . That's why we work with health experts, law enforcement, and government agencies on efforts to reduce the risks of opioid abuse and misuse . . . ."[148]

415.    Purdue knew or should have known that "reformulated OxyContin is not better at tamper resistance than the original OxyContin"[149] and is still regularly tampered with and abused.

416.    Websites and message boards used by drug abusers and others, such as bluelight.org and reddit.com, report a variety of ways to tamper with OxyContin and Hysingla ER, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which a tablet is dissolved. A publicly available Citizen Petition submitted to the FDA in 2016 by a drug manufacturing firm challenged Purdue's abuse-deterrent labeling based on the firm's ability to easily prepare so-called abuse deterrent OxyContin to be snorted or injected.

417.    The CDC Guideline confirms that "*[n]o* studies" support the notion that "abuse deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."[150] Tom Frieden, the Director of the CDC,

---

[148] Purdue website, *Opioids With Abuse-Deterrent Properties*, available at http://www.purduepharma.com/healthcare-professionals/responsible-use-of-opioids/opioids-with-abuse-deterrentproperties/.
[149] Hr'g Test. of Dr. Mohan Rao at 1615:7-10, In re OxyContin, No. 1:04-md-01603-SHS (SDNY Oct. 7, 2013), ECF No. 613.
[150] CDC Guideline at 22 (emphasis added).

reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or death."[151]

418.    In 2015, claiming a need to further assess its data, Purdue abruptly withdrew a supplemental new drug application related to reformulated OxyContin one day before FDA staff was to release its assessment of the application. The staff review preceded an FDA advisory committee meeting related to new studies by Purdue "evaluating the misuse and/or abuse of reformulated OxyContin" and whether those studies "have demonstrated that the reformulated OxyContin product has had a meaningful impact on abuse."[152] Upon information and belief, Purdue never presented the data to the FDA because the data would not have supported claims that OxyContin's ADF properties reduced abuse or misuse.

419.    Despite the qualifying language in Purdue's label and its own evidence, or lack of evidence, regarding the impact of its ADF opioids in reducing abuse, Dr. J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's ADF opioids are being abused in large numbers.

420.    In a strategy that closely resembled Purdue's, Endo, as the expiration of its patent exclusivity for Opana ER neared, and aware that it needed to be able to compete with other opioids, like OxyContin, that were being introduced as ADFs, also made abuse-deterrence a key to its marketing strategy.

421.    The New York Attorney General found that Endo knew, as early as 2011, that Opana ER was being abused in New York.[153]  The New York Attorney General further determined

---

[151] Matthew Perrone, *Drugmakers Push Profitable, but Unproven, Opioid Solution*, AP (Jan. 2, 2017), https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-solution.

[152] Meeting Notice, Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee; Notice of Meeting, May 25, 2015, 80 FR 30686.

[153] *See* the 2016 Assurance of Discontinuance between the Attorney General of New York and Endo, at https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf

that Endo detailed health care providers who were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 prescriptions for Opana ER (although the subsequent criminal charges at issue did not involve Opana ER).[154]

422.    In December 2011, Endo obtained approval for a new formulation of Opana ER, which added a hard coating the company claimed made it crush-resistant. Even prior to its approval, the FDA advised Endo in January 2011 that it could not market the new Opana ER as abuse-deterrent. The FDA found that such promotional claims "may provide a false sense of security since the product may be chewed and ground for subsequent abuse." In other words, Opana ER was still crushable. Indeed, in its approval package, Endo admitted that "[i]t has not been established that this new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or addiction."

423.    Nonetheless, in August of 2012, Endo submitted a confidential Citizen Petition asking the FDA for permission to change its label to indicate that Opana ER was abuse-resistant, both in that it was less able to be crushed and snorted, and that it was resistant to "aqueous extraction," or injection by syringe. Endo announced it would withdraw original Opana ER from the market and sought a determination that its decision was made for safety reasons (its lack of abuse deterrence).   This was intended to prevent generic copies of original Opana ER from competitors, such as Impax Laboratories ("Impax"), which had sought approval to sell a generic version of the drug.

424.    Endo then sued the FDA, seeking to force expedited consideration of its Citizen Petition. The court filings confirmed Endo's true motives: in a declaration submitted with its

---

[154] *Id. at 10.*

lawsuit, Endo's chief operating officer indicated that a generic version of Opana ER would decrease the company's revenue by up to $135 million per year. Endo also claimed that if the FDA did not block generic competition, $125 million, which Endo spent on developing the reformulated drug to "promote the public welfare," would be lost.[155] The FDA responded that: "Endo's true interest in expedited FDA consideration stems from business concerns rather than protection of the public health."[156]

425.    Despite Endo's purported concern with public safety, not only did Endo continue to distribute original Opana ER for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers. In fact, Endo also claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[157]

426.    In its Citizen Petition, Endo asserted that redesigned Opana ER had "safety advantages." However, in rejecting the Petition in a 2013 decision, the FDA found that "study data show that the reformulated version's extended-release features can be compromised when subjected to ... cutting, grinding, or chewing." The FDA also determined that "reformulated Opana ER" could also be "readily prepared for injection and more easily be prepared for injection[.]" In fact, the FDA warned that preliminary data, including in Endo's own studies, suggested that a higher percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation.

---

[155] Plaintiff's Opposition to Defendants' and Intervenor's Motions to Dismiss and Plaintiff's Reply in Support of Motion for Preliminary Injunction ("Endo Br."), *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 23 at 20 (D.D.C. Dec.14, 2012).

[156] Defendants' Response to the Court's November 30, 2012 Order, *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 9 at 6 (D.D.C. Dec. 3, 2012)

[157] *Id.*; Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl.) *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 18-4 (D.D.C. Dec. 9, 2012).

427.     Over time, evidence continued to mount that injection was becoming the preferred means of abusing Opana ER, making Opana ER *less safe* than the original formulation. Injection carries risks of HIV, Hepatitis C, and, in reformulated Opana ER's specific case, the blood-clotting disorder thrombotic thrombocytopenic purpura (TTP), which can cause kidney failure. In 2009, only 3% of Opana ER abuse was by intravenous means, after the reformulation, injection of Opana ER increased by more than 500%.

428.     Nevertheless, Endo continued to market the drug as tamper-resistant and abuse deterrent and did not disclose evidence that Opana was easier to abuse intravenously.

429.     In its written materials, Endo marketed Opana ER as having been *designed* to be crush resistant, knowing that this would (falsely) imply that Opana ER actually *was* crush resistant and that this crush-resistant quality would make Opana ER less likely to be abused. For example, a June 14, 2012 Endo press release announced "the completion of the company's transition of its OPANA ER franchise to the new formulation designed to be crush resistant."[158] The press release further stated that: "We firmly believe that the new formulation of OPANA ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers."[159] In September 2012, another Endo press release stressed that reformulated Opana ER employed "INTAC Technology" and continued to describe the drug as "designed to be crush-resistant."[160]

430.     Similarly, journal advertisements that appeared in April 2013 stated Opana ER was "designed to be crush resistant."

---

[158] Ex. E to Rurka Decl., *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 12-v-1936, Doc. 18-2 at 1 (D.D.C. Dec. 9, 2012).
[159] *Id.*
[160] Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl.) *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*., No. 1:12-cv-01936, Doc. 18-4 (D.D.C. Dec. 9, 2012).

431.     In a 2016 settlement with Endo, the New York Attorney General found that statements that Opana ER was "designed to be, or is crush resistant" were false and misleading because there was no difference in the ability to extract the narcotic from Opana ER.[161] The New York Attorney General also found that Endo failed to disclose its own knowledge of the crushability of redesigned Opana ER in its marketing to insurers and pharmacy benefit managers which also would have impacted the availability of Opana ER.[162]

432.     While Marketing Defendants and Unnamed Related Parties promote patented technology as the solution to opioid abuse and addiction, none of their "technology" addresses the most common form of abuse, oral ingestion, and their statements regarding abuse-deterrent formulations give the misleading impression that these reformulated opioids can be prescribed safely.

433.     In sum, none of the nine categories of misrepresentations discussed above regarding the use of opioids to treat chronic pain was supported by the scientific evidence. In addition, the misrepresentations and omissions set forth above and elsewhere in this Complaint are misleading and contrary to the Marketing Defendants and Unnamed Related Parties' products' labels.

> **b.      The Marketing Defendants and Unnamed Related Parties Disseminated Their Misleading Messages about Opioids Through Multiple Channels.**

434.     The Marketing Defendants and Unnamed Related Parties' false marketing campaign not only targeted the medical community, but also targeted patients who experience chronic pain.

---

[161] *See* the 2016 Assurance of Discontinuance between the Attorney General of New York and Endo, at https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf
[162] *Id.*

435.     The various channels utilized by the Marketing Defendants and Unnamed Related Parties to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids included: (1) "Front Groups" which had the appearance of independence from the Marketing Defendants and Unnamed Related Parties; (2) so called "key opinion leaders" ("KOLs"), that is, doctors who were paid by the Marketing Defendants and Unnamed Related Parties to promote their pro-opioid message; (3) CME programs controlled and/or funded by the Marketing Defendants and Unnamed Related Parties; (4) branded advertising; (5) unbranded advertising; (6) publications; (7) direct, targeted communications with prescribers by sales representatives or "detailers"; and (8) speakers bureaus and programs.

### c.     The Marketing Defendants and Unnamed Related Parties Directed Front Groups to Deceptively Promote Opioid Use

436.     Patient advocacy groups and professional associations became vehicles to reach prescribers, patients, and policymakers. Marketing Defendants and Unnamed Related Parties exerted influence and effective control over the messaging of these groups by providing major funding directly to them, as well as through KOLs who served on their boards. These "Front Groups" put out patient education materials, treatment guidelines and CMEs that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks.[163] Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages—often at the expense of their own constituencies.

437.     "Patient advocacy organizations and professional societies like the Front Groups 'play a significant role in shaping health policy debates, setting national guidelines for patient

---

[163] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Members' Office, February 12, 2018, https://www.hsdl.org/?abstract&did=808171 ("Fueling an Epidemic"), at p. 3.

treatment, raising disease awareness, and educating the public.'"[164] "Even small organizations—with 'their large numbers and credibility with policymakers and the public'—have 'extensive influence in specific disease areas.' Larger organizations with extensive funding and outreach capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[165] Indeed, the U.S. Senate's report, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*,[166] which arose out of a 2017 Senate investigation and, drawing on disclosures from Purdue, Janssen, and other opioid manufacturers, "provides the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of opioids policy,"[167] found that the Marketing Defendants and Unnamed Related Parties made millions of dollars of contributions to various Front Groups.

438.    The Marketing Defendants and Unnamed Related Parties also "made substantial payments to individual group executives, staff members, board members, and advisory board members" affiliated with the Front Groups subject to the Senate Committee's study.[168]

439.    As the Senate *Fueling an Epidemic* Report found, the Front Groups "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[169] They also "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for overprescribing and misbranding."[170]

---

[164] *Id.*, at 2.
[165] *Id.*
[166] *Id.*, at 1.
[167] *Id.*
[168] *Id.*, at 10.
[169] *Id.*, at 12-15.
[170] *Id.*, at 12.

440.     The Marketing Defendants and Unnamed Related Parties took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that Defendants and Unnamed Related Parties were consistently in control of their content. By funding, directing, editing, approving, and distributing these materials, Defendants and Unnamed Related Parties exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and through the Front groups, with each other to deceptively promote the use of opioids for the treatment of chronic pain.

## American Pain Foundation

441.     The most prominent of the Front Groups was the American Pain Foundation ("APF"). While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from defendants Endo, Janssen, Cephalon and Unnamed Related Parties. APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. By 2011, APF was entirely dependent on incoming grants from Defendants Cephalon, Endo, and other Unnamed Related Parties to avoid using its line of credit. Endo was APF's largest donor and provided more than half of its $10 million in funding from 2007 to 2012.

442.     For example, APF published a guide sponsored by Cephalon and Purdue titled *Treatment Options: A Guide for People Living with Pain.*  According to its 2007 annual report, they distributed 17,200 copies of this guide in one year alone.  This guide contains multiple misrepresentations regarding opioid use which are discussed below.

443.     APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website, *www.painknowledge.com.* NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management

field. NIPC published unaccredited prescriber education programs (accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies), including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan Endo submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or *www.painknowledge.org.* Endo estimated it would reach 60,000 prescribers through NIPC.

444.    APF was often called upon to provide "patient representatives" for the Marketing Defendants' promotional activities, including for Janssen's "Let's Talk Pain." Although APF presented itself as a patient advocacy organization, it functioned largely as an advocate for the interests of the Marketing Defendants and Unnamed Related Parties, not patients.

445.    In practice, APF operated in close collaboration with Defendants, submitting grant proposals seeking to fund activities and publications suggested by Defendants and assisting in marketing projects for Defendants.

446.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives. Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011. That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project. Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project. The agreement gave Purdue, but not APF, the right to end the project (and, thus, APF's

funding) for any reason.   The Agreement demonstrates APF's lack of independence and willingness to harness itself to Purdue's control and commercial interests, which would have carried across all of APF's work.

447.   APF's Board of Directors was largely comprised of doctors who were on the Marketing Defendants and Unnamed Related Parties' payrolls, either as consultants or speakers at medical events. The close relationship between APF and the Marketing Defendants and Unnamed Related Parties demonstrates APF's clear lack of independence in its finances, management, and mission.  Its willingness to allow Marketing Defendants and Unnamed Related Parties to control its activities and messages supports an inference that each Defendant and the Unnamed Related Parties that worked with APF were able to exercise editorial control over its publications, even when their messages contradicted APF's internal conclusions. For example, a roundtable convened by APF and funded by Endo also acknowledged the lack of evidence to support chronic opioid therapy. APF's formal summary of the meeting notes concluded that: "[An] important barrier[] to appropriate opioid management [is] the lack of confirmatory data about the long-term safety and efficacy of opioids in non-cancer chronic pain, amid cumulative clinical evidence."

448.   In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately." Without support from Marketing Defendants and Unnamed Related Parties, to whom APF could no longer be helpful, APF was no longer financially viable.

**American Academy of Pain Medicine and the American Pain Society**

449.    The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[171] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was Dr. Russell Portenoy, who was also a spokesperson for Purdue. The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website.

450.    AAPM's corporate council includes Purdue, Depomed, Teva and other pharmaceutical companies. AAPM's past presidents include Haddox (1998), Dr. Scott Fishman ("Fishman") (2005), Dr. Perry G. Fine ("Fine") (2011) and Dr. Lynn R. Webster ("Webster") (2013), all of whose connections to the opioid manufacturers are well-documented as set forth below.

451.    Fishman, who also served as a KOL for Marketing Defendants and Unnamed Related Parties, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[172]

452.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present

---

[171] *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), *available at* http://www.stgeorgeutah.com/wp-content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdf (as viewed August 18, 2017).

[172] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829.

educational programs at off-site dinner symposia in connection with AAPM's marquee event, its annual meeting held in Palm Springs, California, or other resort locations.

453.    AAPM describes the annual event as an "exclusive venue" for offering CMEs to doctors.  Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings.  Defendants Endo, Cephalon and other Unnamed Related Parties were members of the council and presented deceptive programs to doctors who attended this annual event. The conferences sponsored by AAPM heavily emphasized CME sessions on opioids, 37 out of roughly 40 at one conference alone.

454.    AAPM's staff understood that they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

455.    AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines").  AAPM, with the assistance, prompting, involvement, and funding of Marketing Defendants and Unnamed Related Parties, issued the treatment guidelines discussed herein, and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received support from Defendants Janssen, Cephalon, Endo and other Unnamed Related Parties.  Of these individuals, six received support from Purdue, eight from Teva, nine from Janssen, and nine from Endo.

456.    The 2009 Guidelines have been a particularly effective channel of deception. They influenced not only treating physicians, but also the scientific literature on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were disseminated during the relevant period, and were and are available online. Treatment guidelines

-113-

are especially influential with primary care physicians and family doctors to whom Marketing Defendants promoted opioids, whose lack of specialized training in pain management and opioids makes them more reliant on, and less able to evaluate, these guidelines. For that reason, the CDC has recognized that treatment guidelines can, "change prescribing practices."[173]

457.    The 2009 Guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain.

458.    The Marketing Defendants and Unnamed Related Parties widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the development of the Guidelines or their financial backing of the authors of these Guidelines. For example, a speaker presentation prepared by Endo in 2009 titled *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain* relies on the AAPM/APS Guidelines while omitting their disclaimer regarding the lack of evidence for recommending the use of opioids for chronic pain.

### Federation of State Medical Boards

459.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

460.    The FSMB finances opioid, and pain-specific programs, through grants from Defendants.

461.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled

---

[173] 2016 CDC Guideline at 2.

Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines that the pharmaceutical companies helped author taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

462.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in the Plaintiff's Community.

463.    The Marketing Defendants and Unnamed Related Parties relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

464.    The book *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including, Purdue, Endo and Cephalon. The publication also received support from the American Pain Foundation and the American Academy of Pain Medicine. The authors, Dr. Fishman and Dr. Fine, served on the FSMB Board of Advisors. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications." This book asserted that opioid

therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.

### The Alliance for Patient Access

465.    Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[174] It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[175] As of June 2017, the APA listed 30 "Associate Members and Financial Supporters." The list includes Johnson & Johnson, Endo, Mallinckrodt, Purdue and Cephalon.

466.    APA's board members also directly received substantial funding from pharmaceutical companies.[176] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu"), who practices in Kansas, received more than $800,000 between 2013 through 2015 from pharmaceutical companies, nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from defendants Endo, Cephalon and other Unnamed Related Parties. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed Subsys. Other board members include Dr. Robert A. Yapundich from North Carolina, who received $215,000 from 2013 through 2015

---

[174] *About AfPA*, The Alliance for Patient Access, https://allianceforpatientaccess.org/about-afpa/#membership (last visited Jan. 4, 2018). References herein to APA include two affiliated groups: The Global Alliance for Patient Access and the Institute for Patient Access.

[175] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access uses journalists and politicians to push Big Pharma's agenda*, Health News Review (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (hereinafter "Jaklevic, *Non-profit Alliance for Patient Access*").

[176] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, available at https://projects.propublica.org/docdollars/

from pharmaceutical companies, including payments by defendants Cephalon and Mallinckrodt; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, Mallinckrodt and Cephalon; Dr. Howard Hoffberg from Maryland, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, Mallinckrodt, Cephalon, and other Unnamed Related Parties; and Dr. Robin K. Dore from California, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

467.    Among its activities, APA issued a "white paper" titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."[177] Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> * * *
>
> In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. . . .

---

[177] *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse, Institute for Patient Access* (Oct. 2013), *available at* http://allianceforpatientaccess.org/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf

> We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[178]

468.   The white paper also purports to express concern about policies that have been enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board-certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements. . . . [I]t is not even certain that the regulations are helping prevent abuses.[179]

469.   In addition, in an echo of earlier industry efforts to push back against what they termed "opiophobia," the white paper laments the stigma associated with prescribing and taking pain medication:

> Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong—or even criminal. . . . Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management—a situation fueled by the numerous regulations and fines that surround prescription pain medications.[180]

470.   In conclusion, the white paper states that "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."[181]

471.   The APA also issued "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation

---

[178] *Id.* at 4-5 (footnote omitted).
[179] *Id. at 5-6.*
[180] *Id.* at 6.
[181] *Id.* at 7.

from unnamed donors. While the awards are ostensibly given for protecting patients' access to Medicare, and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they appear to be given to provide cover to and reward members of Congress who have supported the APA's agenda.

472.    The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 *et seq.* ("CSA" or "Controlled Substances Act").[182] The AAPM is also a signatory to this letter. An internal U.S. Department of Justice ("DOJ") memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'"[183] and, according to DEA chief administrative law judge John J. Mulrooney, the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like the defendants here, in the federal courts.[184] The law passed both houses of Congress and was signed into law in 2016.

### The U.S. Pain Foundation

473.    The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants and Unnamed Related Parties. The USPF was one of the largest recipients of contributions from the Marketing Defendants and Unnamed Related Parties, collecting nearly $3 million in payments between 2012

---

[182] Letter from Alliance for Patient Access, *et al.*, to Congressmen Tom Marino, Marsha Blackburn, Peter Welch, and Judy Chu (Jan. 26, 2015), *available at* http://www.hoparx.org/images/hopa/advocacy/advocacy-activities/FINAL_Patient_Access_Letter_of_Support_House_Bill.pdf

[183] Bill Whitaker, Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress, CBS News (Oct. 17, 2017), https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-contres/ (hereinafter, "Whitaker, Opioid Crisis Fueled by drug Industry").

[184] John J. Mulrooney, II & Katherine E. Legel, Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters, 101 Marquette L. Rev. (forthcoming Feb. 2018), https://www.documentcloud.org/dopcuments/4108121-Marquette-Law-Review-Mulrooney-Legal.html.

and 2015 alone. The USPF was also a critical component of the Marketing Defendants and Unnamed Related Parties' lobbying efforts to reduce the limits on over-prescription. The USPF advertises its ties to the Marketing Defendants and Unnamed Related Parties, listing opioid manufacturers like Pfizer, Teva, Depomed, Endo, Purdue, McNeil (*i.e.*, Janssen), and Mallinckrodt as "Platinum," "Gold," and "Basic" corporate members.[185] Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF.

## American Geriatrics Society

474. The American Geriatrics Society ("AGS") was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants and Unnamed Related Parties. AGS was a large recipient of contributions from the Marketing Defendants and Unnamed Related Parties. AGS contracted with Purdue, Endo and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (Pharmacological Management of Persistent Pain in Older Persons,[186] hereinafter "2009 AGS Guidelines"). According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009.[187] AGS's complicity in the common purpose with the Marketing Defendants and Unnamed Related Parties is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive-up front funding from drug companies, which

---

[185] *Id*. at 12; Transparency, U.S. Pain Foundation, https://uspainfoundation.org/transparency/ (last accessed on March 9, 2018).
[186] *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331, 1339, 1342 ( 2009), available at https://www.nhqualitycampaign.org/files/AmericanGeriatricSociety-PainGuidelines2009.pdf (last accessed on March 9, 2018).
[187] John Fauber & Ellen Gabler, "Narcotic Painkiller Use Booming Among Elderly," *Milwaukee J. Sentinel*, May 30, 2012.

would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.

475.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.[188] These Guidelines further recommended that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence. Nevertheless, they have been cited over 1,833 times in Google Scholar (which allows users to search scholarly publications that would be have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.

476.    Representatives of the Marketing Defendants and Unnamed Related Parties, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue. AGS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

477.    Members of AGS Board of Directors were doctors who were on the Marketing Defendants' and/or Unnamed Related Parties' payrolls, either as consultants or speakers at medical events. As described below, many of the KOLs also served in leadership positions within the AGS.

      d.    **The Marketing Defendants and Unnamed Related Parties Paid Key Opinion Leaders to Deceptively Promote Opioid Use**

478.    To falsely promote their opioids, the Marketing Defendants and Unnamed Related Parties paid and cultivated a select circle of doctors who were chosen and sponsored by the

---

[188] AGS 2009 Guidelines at 1342.

Marketing Defendants and Unnamed Related Parties for their supportive messages. As set forth below, pro-opioid doctors have been at the hub of the Marketing Defendants' and Unnamed Related Parties' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception science and legitimate medical professionals favored the wider and broader use of opioids. These doctors include Dr. Russell Portenoy and Dr. Lynn Webster, as set forth in this section, as well as Dr. Perry Fine and Dr. Scott Fishman, as set forth in further below.

479.    Although these KOLs were funded by the Marketing Defendants and Unnamed Related Parties, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals.

480.    As the Marketing Defendants and Unnamed Related Parties' false marketing scheme picked up steam, these pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles, and gave speeches and CMEs supportive of opioid therapy for chronic pain. They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain and they were placed on boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.

481.    Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Marketing Defendants and Unnamed Related Parties were able to exert control of each of these modalities through which doctors receive their information.

482.    In return for their pro-opioid advocacy, from the Marketing Defendants and Unnamed Related Parties', KOLs received money, prestige, recognition, research funding, and

avenues to publish. For example, Dr. Webster has received funding from Endo, Purdue and Cephalon. Dr. Fine has received funding from Janssen, Cephalon, Purdue and Endo.

483.    The Marketing Defendants and Unnamed Related Parties carefully vetted KOLs to ensure that they were likely to remain on-message and supportive of the Marketing Defendants' and Unnamed Related Parties' agenda. The Marketing Defendants and Unnamed Related Parties also kept close tabs on the content of the materials published by these KOLs. And, of course, the Marketing Defendants and Unnamed Related Parties kept these KOLs well-funded to enable them to push the Marketing Defendants' and Unnamed Related Parties' deceptive message out to the medical community.

484.    Once the Marketing Defendants and Unnamed Related Parties identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Marketing Defendants and Unnamed Related Parties' false position that opioids were safe and effective for treatment of chronic pain, the Marketing Defendants and Unnamed Related Parties poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescription of opioids for chronic pain. The Marketing Defendants and Unnamed Related Parties cited to, distributed, and marketed the studies and articles by their KOLs as if they were independent medical literature so that it would be well-received by the medical community. By contrast, the Marketing Defendants and Unnamed Related Parties did not support, acknowledge, or disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.

485.    In their promotion of the use of opioids to treat chronic pain, the Marketing Defendants' and the Unnamed Related Parties' KOLs knew that their statements were false and

misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and the Marketing Defendants and Unnamed Related Parties.

### Dr. Russell Portenoy

486.    In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[189]

487.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs. This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.[190]

---

[189] R. Portenoy & K. Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25(2) Pain 171 (1986).

[190] R. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).

488.     According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[191]

489.     Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up becoming a spokesperson for the Marketing Defendants and Unnamed Related Parties, promoting the use of prescription opioids and minimizing their risks. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, cofounder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure. The megaphone for Portenoy is Purdue, which flies people to resorts to hear him speak. It was a compelling message: 'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'"[192]

490.     As one organizer of CME seminars who worked with Portenoy pointed out, "Had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified."[193]

491.     Dr. Portenoy was also a critical component of the Marketing Defendants and Unnamed Related Parties' control over their Front Groups. Specifically, Dr. Portenoy sat as a Director on the board of the APF. He was also the President of the APS.

492.     In recent years, some of the Marketing Defendants and Unnamed Related Parties' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or

---

[191] *Id.*

[192] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* 314 (Bloomsbury Press 2015).

[193] *Id.,* at 136.

support in the scientific literature.[194] Dr. Portenoy has now admitted that he minimized the risks of opioids, and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[195] He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, against the standards of 2012, I guess I did . . . ."[196]

493.    In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, none of which represented real evidence, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they Hadn't before. In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.[197]

494.    Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct: "It was pseudoscience. I guess I'm going to have always to live with that one."[198]

---

[194] *See, e.g.*, John Fauber, *Painkiller boom fueled by networking*, Journal Sentinel (Feb. 18, 2012), http://archive.jsonline.com/watchdog/watchdogreports/ppainkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/ (reporting that a key Endo KOL acknowledged that opioid marketing went too far).

[195] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal (Dec. 17, 2012, 11:36am), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[196] *Id.*

[197] Jacobs, *One-paragraph letter*; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.

[198] Meier at 277.

### Dr. Lynn Webster

495.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy. He is a Senior Editor of *Pain Medicine*, the same journal that published Endo's special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon and Endo. At the same time, Dr. Webster was receiving significant funding from Marketing Defendants and Unnamed Related Parties.

496.    Dr. Webster created and promoted the Opioid Risk Tool ("ORT"), a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to presort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry supported guidelines. Versions of Dr. Webster's ORT appear on, or are linked to, websites run by Endo and Janssen.

497.    Dr. Webster was himself tied to numerous overdose deaths. He and the Lifetree Clinic were investigated by the DEA for overprescribing opioids after twenty patients died from overdoses.[199] In keeping with the Marketing Defendants and Unnamed Related Parties' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids: he prescribed staggering quantities of pills.

---

[199] *See* 2013 Article in the Milwaukee Wisconsin Journal Sentinel entitled, *Top pain physician acknowledges patients' fatal overdoses*, at http://archive.jsonline.com/watchdog/watchdogreports/top-pain-physician-acknowledges-patients-fatal-overdoses-o78m2jb-191945161.html/

498. A 2006 Journal of Pain Article found: "Many patients with chronic pain experience breakthrough pain (BTP); no currently available pharmacologic agent is optimal for management BTP… Fentanyl effervescent buccal tablets (FEBT) are designed to enhance the rate and efficiency of fentanyl absorption through the buccal mucosa… 73% of patients preferred FEBT to their previous supplemental opioids…[200]

499. Cephalon sponsored a CME written by Dr. Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

### Dr. Perry Fine

500. Dr. Perry Fine's ties to the Marketing Defendants and Unnamed Related Parties are well documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescription for non-cancer patients. He has provided medical legal consulting for Janssen, and participated in CME activities for Endo, along with serving in these capacities for several other drug companies. He co-chaired the APS/AAPM Opioid Guideline Panel, served as treasurer of the AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was on the board of directors of APF.

501. Multiple videos feature Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death.

---

[200] Lynn Webster, et al, *Open-label study of fentanyl effervescent buccal tablets in patients with noncancer pain and breakthrough pain: Patient preference assessment*, The Journal of Pain, April 2006.

502.     He has also acknowledged having failed to disclose numerous conflicts of interest. For example, Dr. Fine failed to fully disclose payments received as required by his employer, the University of Utah—telling the university that he had received under $5,000 in 2010 from Johnson & Johnson for providing "educational" services, but Johnson & Johnson's website states that the company paid him $32,017 for consulting, promotional talks, meals and travel that year.

503.     Dr. Fine and Dr. Portenoy co-wrote *A Clinical Guide to Opioid Analgesia*, in which they downplayed the risks of opioid treatment, such as respiratory depression and addiction:

> At clinically appropriate doses, . . . respiratory rate typically does not decline. Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk. Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (ie, for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.[201]

504.     In November 2010, Dr. Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study."[202] In that article, Dr. Fine explained that the 18-month "open-label" study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for noncancer pain." The article acknowledged that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic noncancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence and

---

[201] Perry G. Fine, MD and Russell K. Portenoy, MD, *A Clinical Guide to Opioid Analgesia* 20 and 34, McGraw-Hill Companies (2004), http://www.thblack.com/links/RSD/OpioidHandbook.pdf.
[202] Perry G. Fine, et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).

consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[203]

505.    The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."[204]

506.    Multiple videos feature Dr. Fine delivering educational talks about the drugs. In one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain.[205]   He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*." The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[206]

---

[203] *Id.*

[204] Perry G. Fine, et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).

[205]    Perry    A.    Fine,    Safe    and    Effective    Opioid    Rotation,    YouTube    (Nov.    8,    2012), https://www.youtube.com/watch?v=_G3II9yqgXI.

[206] *Id.*

### Dr. Scott Fishman

507.     Dr. Scott Fishman is a physician whose ties to the opioid drug industry are legion. He served as an APF board member, as president of the AAPM, and participated yearly in numerous CME activities for which he received, "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Marketing Defendants and Unnamed Related Parties. He also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[207]

508.     In 2007, Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled *Responsible Opioid Prescribing*, which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

509.     In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.[208]

---

[207] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011, 2:14 PM), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry (hereinafter "Weber, *Two Leaders in Pain*").
[208] Scott M. Fishman, *Responsible Opioid Prescribing: A Guide for Michigan Clinicians*, 10-11, Waterford Life Sciences (2012).

510.    The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and noncancer origins."[209]

511.    In another guide by Dr. Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[210] The guide also presents symptoms of addiction as symptoms of "pseudoaddiction."

c.    **The Marketing Defendants and Unnamed Related Parties Disseminated Their Misrepresentations Through Continuing Medical Education Programs**

512.    Now that the Marketing Defendants and Unnamed Related Parties had a group of physician promoters and a false body of "literature."   They needed to make sure their false marketing message was widely distributed.

513.    One way the Marketing Defendants and Unnamed Related Parties aggressively distributed their false message was through thousands of Continuing Medical Education courses ("CMEs").

514.    A CME is a professional education program provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences online, and through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs typically are

---

[209] *Id.*
[210] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication,* 45, Oxford University Press (2012)

taught by KOLs who are highly respected in their fields and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

515.    The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid re-education. As one target, Defendants aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Marketing Defendants and Unnamed Related Parties' deceptions.

516.    The Marketing Defendants and Unnamed Related Parties sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects.

517.    Cephalon sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

518.    One Cephalon-sponsored CME presentation titled *Breakthrough Pain: Treatment Rationale with Opioids* was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who treated "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non-time-dependent continuum that requires a balanced analgesia approach using "targeted

-133-

pharmacotherapeutics to affect multiple points in the pain-signaling pathway."[211] The doctor lists fentanyl as one of the most effective opioids available for treating breakthrough pain, describing its use as an expected and normal part of the pain management process. Nowhere in the CME is cancer or cancer-related pain even mentioned, despite FDA restrictions that fentanyl use be limited to cancer-related pain.

519.    Upon information and belief, Teva paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

520.    *Responsible Opioid Prescribing* was sponsored by Purdue, Endo and Teva. The FSMB website described it as the "leading continuing medical education (CME) activity for prescribers of opioid medications." Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Scott Fishman.

521.    In all, more than 163,000 copies of *Responsible Opioid Prescribing* were distributed nationally.

522.    The American Medical Association ("AMA") recognized the impropriety that pharmaceutical company-funded CMEs created, stating that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible,

---

[211]    Daniel S. Bennett, *Breakthrough Pain: Treatment Rationale With Opioids*, Medscape, http://www.medscape.org/viewarticle/461612 (last visited Oct. 10, 2017).

CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[212]

523.     Physicians attended or reviewed CMEs sponsored by the Marketing Defendants and Unnamed Related Parties during the relevant time period and were misled by them.

524.     By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Marketing Defendants and Unnamed Related Parties counted on instructors to deliver messages favorable to them, as these organizations were dependent on the Marketing Defendants and Unnamed Related Parties for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Marketing Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and the Marketing Defendants both measured the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

e.     **The Marketing Defendants and Unnamed Related Parties Used "Branded" Advertising to Promote their Products to Doctors and Consumers**

525.     The Marketing Defendants and Unnamed Related Parties engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Marketing Defendants and Unnamed Related Parties published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*. The Marketing Defendants and Unnamed Related Parties collectively spent more than $14 million on the medical journal advertising of opioids in 2011, nearly triple what they spent in

---

[212] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011).

2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

526.    The Marketing Defendants and Unnamed Related Parties also targeted consumers in their advertising. They knew that physicians are more likely to prescribe a drug if a patient specifically requests it.[213] They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved.[214] Endo's research, for example, also found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Marketing Defendants and Unnamed Related Parties thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physician's office.

> **f.    The Marketing Defendants and Unnamed Related Parties Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain Without FDA Review**

527.    The Marketing Defendants and Unnamed Related Parties also aggressively promoted opioids through "unbranded advertising" to generally tout the benefits of opioids without specifically naming a particular brand-name opioid drug.  Unbranded advertising is usually framed as, "disease awareness," encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product and, therefore, without providing balanced disclosures about the product's limits and risks. In contrast, a pharmaceutical company's "branded" advertisement that identifies a specific medication and its indication (i.e., the condition which the drug is approved to treat) must also include possible side effects and contraindications,

---

[213] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay *et al.*, *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).
[214] *Id.*

what the FDA Guidance on pharmaceutical advertising refers to as "fair balance." Branded advertising is also subject to FDA review for consistency with the drug's FDA-approved label. Through unbranded materials, the Marketing Defendants and Unnamed Related Parties expanded the overall acceptance of and demand for chronic opioid therapy without the restrictions imposed by regulations on branded advertising.

528.    Many of the Marketing Defendants and Unnamed Related Parties utilized unbranded websites to promote opioid use without promoting a specific branded drug, such as Purdue's pain-management website, *www.inthefaceofpain.com*. The website contained testimonials from several dozen "advocates," including health care providers, urging more pain treatment. The website presented the advocates as neutral and unbiased, but an investigation by the New York Attorney General later revealed that Purdue paid the advocates hundreds of thousands of dollars.

> **g.     The Marketing Defendants and Unnamed Related Parties Funded, Edited and Distributed Publications That Supported Their Misrepresentations**

529.    The Marketing Defendants and Unnamed Related Parties created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was likely to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

530.    To accomplish their goal, the Marketing Defendants and Unnamed Related Parties, sometimes through third-party consultants and/or Front Groups, commissioned, edited, and arranged for the placement of favorable articles in academic journals.

531.    The Marketing Defendants and Unnamed Related Parties' plans for these materials did not originate in the departments with the organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in the Marketing Defendants and Unnamed Related Parties' marketing departments.

532.    The Marketing Defendants and Unnamed Related Parties made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Marketing Defendants and Unnamed Related Parties knew that the articles distorted the significance or meaning of the underlying study, as with the Porter & Jick letter.[215]  Marketing Defendants and Unnamed Related Parties frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

533.    The Marketing Defendants and Unnamed Related Parties published or commissioned deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy.

534.    For example, in 2007 Cephalon sponsored the publication of an article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[216] published in the nationally circulated journal *Pain Medicine*, to support its effort to expand the use of its branded fentanyl products. The article's authors (including Dr. Lynn Webster, discussed above) stated that

---

[215] *See* the 1980 letter titled *Addiction Rare in Patients Treated with Narcotics*, by Jane Porter and Hershel Jick, M.D., published in the New Eng. J. of Med. at https://www.nejm.org/doi/10.1056/NEJM198001103020221.
[216] Donald R. Taylor*, et al., Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (November 2007).

the "OTFC [fentanyl] has been shown to relieve BTP more rapidly than conventional oral, normal release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of noncancer pain patients." The number one diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Portenoy and recommends fentanyl for non-cancer BTP patients:

> In summary, BTP appears to be a clinically important condition in patients with chronic noncancer pain and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP and the potential benefits of BTP-specific therapy suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[217]

### h. The Marketing Defendants and Unnamed Related Parties Used Detailing to Directly Disseminate Their Misrepresentations to Prescribers

535.     The Marketing Defendants' and Unnamed Related Parties' sales representatives (also called "detailers) executed carefully crafted marketing tactics, developed at the highest rungs of their corporate ladders, to reach targeted doctors with centrally orchestrated messages. The Marketing Defendants' and Unnamed Related Parties' sales representatives also distributed deceptive third-party marketing material to their target audience.

536.     Each Marketing Defendant and Unnamed Related Party promoted opioids through sales representatives and, upon information and belief, small group speaker programs to reach out to individual prescribers. By establishing close relationships with doctors, the Marketing Defendants and Unnamed Related Parties were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

---

[217] *Id.*

537.    In accordance with common industry practice, the Marketing Defendants and Unnamed Related Parties, purchase and closely analyze prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management and analytics corporation. This data allows them to track precisely the rates of initial and renewal prescribing by individual doctors, which allows them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above.

538.    Marketing Defendants and Unnamed Related Parties devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, Marketing Defendants and Unnamed Related Parties spent $166 million on detailing branded opioids to doctors. This amount is twice as much as Marketing Defendants and Unnamed Related Parties spent on detailing in 2000. The amount includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo.

539.    Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a peak, coinciding with the launch of Fentora, of more than $27 million in 2007.

540.    Endo's quarterly spending went from the $2 million to $4 million range in 2000-2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year).

541.    Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011).

542.    Purdue's quarterly spending notably decreased from 2000 to 2007, as Purdue came under investigation by the Department of Justice, but then spiked to above $25 million in 2011 (for a total of $110 million that year).

543.    For its opioid, Actiq, Cephalon also engaged in direct marketing in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

544.    Thousands of prescribers attended Cephalon speaking programs. Cephalon tracked the impact that these programs had on prescribing in the three months following the event and concluded that doctors' prescribing of Fentora often increased.

### i.    Marketing Defendants and Unnamed Related Parties Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages.

545.    In addition to making sales calls, detailers also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by the Marketing Defendants and Unnamed Related Parties. These speaker programs and associated speaker trainings serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; to qualify to be selected a forum in which to further market to the speaker himself or herself; and an opportunity to market to the speaker's peers. The Marketing Defendants and Unnamed Related Parties grade their speakers, and future opportunities are based on speaking performance, post-program sales, and product usage. Purdue, Janssen, Endo, Cephalon, and Mallinckrodt each made thousands of payments to physicians nationwide, for activities including participating on speakers' bureaus, providing consulting services, and other services.

**j.      The Marketing Defendants and Unnamed Related Parties Had
an Obligation to Educate Doctors to Prevent Future Harm**

546.      Even in the face of growing evidence of the overuse, abuse, addition to, and
overdose from opioids, Marketing Defendants and Unnamed Related Parties failed to take
appropriate actions to protect public health and safety. Responsible companies marketing and
selling highly addictive controlled substances would have, among other steps: (1) pulled in their
marketing to avoid the overuse and oversupply of opioids; (2) ramped up efforts to detect, prevent,
and address diversion and indications of improper or over-prescribing and dispensing; (3) ensured
that doctors, pharmacists, and patients understood the appropriate use of opioids and accurately
conveyed the risks and benefits of their drugs, correcting their years of misinformation. Using
language identical to that approved by the FDA with respect to the brand-name labels, Marketing
Defendants and Unnamed Related Parties could have used the same mechanisms used to
disseminate their fraudulent marketing, including CMEs, speaker programs, sales representatives,
among others, to stop the near-literal bleeding their promotional efforts had caused, and would
continue to cause.

547.      Instead of taking these steps, Marketing Defendants and Unnamed Related Parties
participated in an industry effort to water down a federally mandated a Risk Evaluation and
Mitigation Strategy Program or REMS.

**k.      The Marketing Defendants and Unnamed Related Parties
Scheme Succeeded in Creating a Public Health Epidemic**

548.      Marketing Defendants and Unnamed Related Parties' dramatically expanded
opioid prescribing and use.

549.      The Marketing Defendants and Unnamed Related Parties necessarily expected a
return on the enormous investment they made in their deceptive marketing scheme and worked to

measure and expand their success. Studies also show that by influencing prescribers and increasing prescriptions, they fueled an epidemic of addiction and abuse.

550.    Upon information and belief, Endo, for example. directed the majority of its marketing budget to sales representatives, with good results: 84% of its prescriptions were from the doctors they detailed. Moreover, as of 2008, cancer and post-operative pain accounted for only 10% of Opana ER's uses; virtually all of Endo's opioid sales, and profits, were from a market that did not exist ten years earlier.

551.    Cephalon also recognized the return of its efforts to market Actiq and Fentora off label for chronic pain. In 2000, Actiq generated $15 million in sales. By 2002, Actiq sales had increased by 92%, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[218] Actiq became Cephalon's second best-selling drug. By the end of 2006, Actiq's sales had exceeded $500 million. Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[219]

552.    Upon information and belief, each of the Marketing Defendants and Unnamed Related Parties tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs. The Marketing Defendants and Unnamed Related Parties purchased prescribing and survey data, that allowed them to closely monitor these trends, and they actively monitored them. They monitored doctors' prescribing before and after

---

[218] Cephalon, Inc. Annual Report (Form 10-K) at 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873365/000104746903011137/a2105971z10-k.htm.
[219] https://archive.sltrib.com/story.php?ref=/news/ci_4892730

detailing visits, and at various levels of detailing intensity, and before and after speaker programs, for instance. Defendants and Unnamed Related Parties continued and, in many cases, expanded and refined their aggressive and deceptive marketing for one reason: it worked. As described in this Complaint, both in specific instances (e.g., the low abuse potential of various Defendants' opioids), and more generally, Defendants' marketing changed prescribers' willingness to prescribe opioids, lead them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids or to switch to "safer" opioids, such as ADF.

553.    This success would have come as no surprise. Drug company marketing materially impacts doctors' prescribing behavior. The effects of sales calls on prescribers' behavior is well documented in the literature, including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers.[220]

554.    Marketing Defendants and Unnamed Related Parties spent millions of dollars to market their drugs to prescribers and patients and meticulously tracked their return on that investment. In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using prescription opioids for chronic non-cancer pain.[221] These results are directly due to the Marketing Defendants and Unnamed Related Parties' fraudulent marketing campaign focused on deception and misrepresentations.

---

[220] https://www.cmu.edu/news/stories/archives/2017/may/marketing-and-prescribing-behavior.html
[221] https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/1984247

555.     Thus, both independent studies and Defendants' and Unnamed Related Parties own tracking confirm that their schemes dramatically increased their sales.

### l.     Marketing Defendants and Unnamed Related Parties' deception in expanding their market created and fueled the opioid epidemic.

556.     Independent research demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[222] It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

557.     There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[223] The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[224]

558.     In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[225] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[226]

---

[222] Theodore J. Cicero *et al. Relationship Between therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban* Locations in the United States, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007).
[223] Richard C. Dart, *et al. Trends in opioid analgesic abuse and mortality in the United States.* 372 NEW ENG J MED. 241-248 (2015), https://www.nejm.org/doi/full/10.1056/NEJMsa1406143
[224] See https://www.nejm.org/doi/full/10.1056/NEJMsr1601307
[225] See https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm, citing https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6043a4.htm
[226] *Id.*

5.    **The National Retail Pharmacies Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids**

559.    The Supply Chain Defendants and National Pharmacies facilitated the supply of far more opioids that could have been justified to serve the legal and appropriate market. The failure of the Supply Chain Defendants and National Pharmacies to maintain effective controls, and of the Supply Chain Defendants to investigate, report, and take steps to halt orders that they knew or should have known were suspicious, breached both their statutory and common law duties.

560.    For over a decade, the Supply Chain Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  Rather, as described below, Supply Chain Defendants are subject to various duties to prevent oversupply and diversion into the illicit market.

561.    Supply Chain Defendants and National Pharmacies are all required to register as manufacturers, distributors, or dispensers pursuant to 21 U.S.C. § 823, 21 C.F.R. §§ 1301.11, and 1301.71.

562.    As facilitated and caused by Supply Chain Defendants' and National Pharmacies' actions, the sale of prescription opioids has skyrocketed. According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015 nationally.[227]

563.    Multiple sources impose duties on the Supply Chain Defendants and National Pharmacies to maintain effective controls against diversion.

---

[227] See the July 7, 2017 article by the CDC entitled Vital Signs: Changes in Opioid Prescribing in the United States, 2006-2015 at, https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm

564.    First, under the common law, the Supply Chain Defendants had a duty to exercise reasonable care in manufacturing and distributing dangerous narcotic substances. National Pharmacies further had a duty to exercise reasonable care in supervising the sale of such drugs. By flooding Florida, including the Plaintiff's city, with opioids and failing to effectively prevent diversion, by failing to monitor for red flags, Supply Chain Defendants and National Pharmacies breached their duties. By filling and failing to report or halt orders that they knew or should have realized were likely being diverted for illicit uses, Supply Chain Defendants further breached their duties. These breaches by the Supply Chain Defendants and National Pharmacies both created and failed to prevent a foreseeable risk of harm to the Plaintiff's Community.

565.    Second, each of the Supply Chain Defendants and National Pharmacies was required to register with the DEA to manufacture and/or distribute and/or dispense controlled substances.  See 21 U.S.C. § 823(a)-(b), (e); and 28 C.F.R. § 0.100.  As registrants, Supply Chain Defendants and National Pharmacies were required to "maintain effective controls and procedures" against diversion. *See* 21 C.F.R. § 1301.71; Supply Chain Defendants and National Pharmacies have violated their duties arising from this federal law.

566.    Third, Supply Chain Defendants and National Pharmacies also had, and violated, substantially similar duties under applicable Florida state laws.

567.    Fourth, each of the Supply Chain Defendants and National Pharmacies assumed a duty, when speaking publicly about opioids and their efforts and commitment to combat diversion of prescription opioids, to speak accurately and truthfully.

**6.  As Registrants Under the Controlled Substances Act, Supply Chain Defendants and National Pharmacies Have a Duty to Maintain Effective Controls Against Diversion and Supply Chain Defendants Have a Duty to Detect, Report, and Halt Suspicious Orders.**

568.  Congress was concerned about the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."

569.  Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970. The CSA and its implementing regulations created a closed system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.

570.  The main objectives of the CSA are to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels. To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. The CSA categorizes all controlled substances into five schedules. The drugs are grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body. Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, and use of the substances listed therein. The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping.[228]

---

[228] *Gonzales v. Raich*, 545 U.S. 1, 12–14 (2005) (internal citations omitted).

571.    The Supply Chain Defendants' and National Pharmacies' legal duties with respect to controlled substances are set out under federal statutes, federal regulations, Florida state law (which incorporates federal law), and DEA guidance.

572.    The Controlled Substances Act ("CSA") and its implementing regulations create restrictions on the distribution and dispensing of controlled substances.[229]

573.    The CSA authorizes the DEA to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit market.[230] Any entity that seeks to become involved in the production or chain of distribution of controlled substances must first register with the DEA.[231]

574.    Supply Chain Defendants owe a duty to maintain effective controls and procedures against the diversion of prescription opiates into the illicit market.[232]

a.    "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic."[233]

b.    The CSA provides for control by the Justice Department of problems related to drug abuse through registration of manufacturers, wholesalers, retailers, and all others in the legitimate distribution chain, and makes transactions outside the legitimate distribution chain illegal.[234]

---

[229] See 21 U.S.C. §§ 801–971 (2006); 21 C.F.R. §§ 1300–1321 (2009).
[230] H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970); *see* 21 U.S.C. § 801(2); 21 U.S.C. §§ 821-824, 827, 880.
[231] 21 U.S.C. § 822; 21 C.F.R. § 1301.11.
[232] 21 U.S.C.A. § 823(b)(1); 21 U.S.C. § 802(10); 21 U.S.C. § 822(a)(2)); and 21 C.F.R. § 1301.71.
[233] *United States v. Moore*, 423 U.S. 122, 135 (1975).
[234] 1970 U.S.C.C.A.N. 4566, 4569 (emphasis added).

c. The CSA is "[d]esigned to improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing for a 'closed' system of drug distribution for legitimate handlers of such drugs. Such a closed system is intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control."[235]

### i.     Federal Regulatory Duty

575.    Supply Chain Defendants and National Pharmacies owe a regulatory duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances"[236] by, *inter alia*, developing and implementing a system to identify and report suspicious prescriptions based on known red flags, such as pattern prescriptions like the same types of drugs in the same quantities from the same prescriber.[237]

576.    Supply Chain Defendants must also "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the DEA in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[238] This nonexclusive definition of "suspicious order" has been

---

[235] 1970 U.S.C.C.A.N. 4566, 4571-72
[236] 21 C.F.R. § 1301.71(a).
[237] *See, e.g., Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195;* Decision and Order, 77 FR 62316-01, 62323 (Oct. 12, 2012) (noting that certain red flags, such as "the red flags presented by the circumstances of patients travelling from Kentucky or Tennessee to South Florida to obtain prescriptions, including for a schedule II narcotic, which by definition has the highest potential for abuse of any drug that may be prescribed lawfully, see 21 U.S.C. 812(b)(2), and then travelling to Respondents to fill them, are so obvious that only those who are deliberately ignorant would fill these prescriptions.")
[238] 21 C.F.R. § 1301.74(b) [1971].

codified in the CSA.[239] Other red flags indicating suspicion may include, for example, "[o]rdering the same controlled substance from multiple distributors."[240]

577.    These criteria for identifying suspicious orders are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter, and the order should be reported as suspicious. Likewise, a registrant need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

578.    This regulatory duty has been defined to include the following obligations:

> The "*security requirement*" at the heart of this case mandates that distributors "design and operate a system" to identify "suspicious orders of controlled substances" and report those orders to DEA (the ***Reporting Requirement***). 21 C.F.R. § 1301.74(b). The Reporting Requirement is a relatively modest one: It requires only that a distributor [or other registrant] provide basic information about certain orders to DEA, so that DEA "investigators in the field" can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out "potential illegal activity." *Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007). Once a distributor [or other registrant] has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some "due diligence" and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order (the ***Shipping Requirement***).[241]

---

[239] 21. U.S.C. § 802. Definitions, 21 USCA § 802
[240] 21 C.F.R. § 1301.74(b) [1971].
[241] *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212–13 (D.C. Cir. 2017) (emphasis added).

Of course, a registrant's due diligence efforts must be thorough: "the investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order nonsuspicious and exempt it from the requirement that the distributor 'inform' the Agency about the order. Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed."[242] Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them "without performing adequate due diligence."[243]

## ii.      DEA Guidance

579.    The DEA has repeatedly reminded the Supply Chain and National Pharmacy Defendants of their regulatory obligations. For example, in responding to the proliferation of pharmacies operating on the internet that arranged illicit sales of enormous volumes of opioids to drug dealers and customers, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses by educating them on their duties to report and decline to fill suspicious orders. Since 2007, the DEA has hosted at least five conferences that provided registrants with updated information about diversion trends and regulatory changes. Many of the Manufacturer Defendants and Unnamed Related Parties and the majority of the Distributor Defendants, if not all of them, attended at least one of these conferences. The DEA also briefed wholesalers regarding legal, regulatory, and due diligence responsibilities since 2006. During these

---

[242] *Masters Pharmaceuticals, Inc.*, Decision and Order, 80 Fed. Reg. 55418-01 at *55477 (DEA Sept. 15, 2015).
[243] *Masters Pharmaceuticals*, 861 F.3d at 212. "The *Decision and Order* was a final order entered by the DEA revoking Masters Pharmaceutical's certificate of registration, without which Masters Pharmaceutical could not sell controlled substances. In *Masters Pharmaceutical*, the D.C. Circuit Court of Appeals denied a petition for review, leaving intact the DEA's analysis and conclusion in the *Decision and Order*."

briefings, the DEA pointed out the red flags wholesale distributors should look for to identify potential diversion.

580.    In a September 27, 2006 letter, the DEA reminded every commercial entity registered to distribute controlled substances that they are to exercise due diligence to avoid filling suspicious orders that might be diverted.[244]  The DEA's September 27, 2006 letter also provided examples of circumstances that might be indicative of controlled substance diversion and offered several suggested questions that distributors could ask pharmacy customers as they try to determine whether or not the customer is engaged in drug diversion.[245]

581.    The DEA then sent another letter to distributors on February 7, 2007 reiterating the legal requirements they must follow.[246]

582.    Finally, the DEA sent a letter to all entities registered to manufacture or distribute controlled substances on December 27, 2007, reminding them that, as registered manufacturers and distributors of controlled substances, they share, and must each abide by, statutory and regulatory duties to "design and operate a suspicious order monitoring system and that suspicious orders must be reported to local DEA officers when discovered.[247]

583.    The DEA emphasized that manufacturers have a duty to report suspicious orders, as plainly stated in the statutes and regulations. This duty was recently reaffirmed when, in 2017, Mallinckrodt was fined $35 million for failing to report suspicious orders of controlled substances

---

[244] See the May 4, 2018 letter from the U.S. House of Representatives Committee on Energy and Commerce sent to the Subcommittee on Oversight and Investigations at https://docs.house.gov/meetings/IF/IF02/20180508/108260/HHRG-115-IF02-20180508-SD002.pdf, citing Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, U.S. Drug Enforcement Admin. to DEA Registrants, Sept. 27, 2006, (On file with the Committee).
[245] Id.
[246] Id. Citing a letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, U.S. Drug Enforcement Admin. to DEA Registrants, Feb. 7, 2007, (On file with the Committee).
[247] Id. Citing a letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, U.S. Drug Enforcement Admin. to DEA Registrants, Dec. 20, 2007, (On file with the Committee).

and for violating recordkeeping requirements. In the press release accompanying the settlement, the Department of Justice stated that Mallinckrodt "did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances" and noted that "[m]anufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands."[248]

584.   The DEA repeatedly emphasized that retail pharmacies, including the National Pharmacies, are required to implement systems that detect and prevent diversion and must monitor for red flags of diversion. For example, in a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as: large numbers of customers who: receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.[249] The DEA has also conducted meetings with retail pharmacies, including the National Pharmacies.

### a.   Supply Chain Defendants and National Pharmacies Have a Duty to Apply their Specialized Knowledge of the Market to Prevent Diversion.

585.   As set forth above, Supply Chain Defendants and National Pharmacies have several responsibilities under state and federal law with respect to control of the supply chain of opioids. First, they must design and operate a system that detects and stops suspicious transactions by, among other things, reviewing and analyzing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion. Further, with regard to Supply Chain Defendants, all suspicious orders must be reported to relevant

---

[248] See the DEA press release dated July 11, 2017 at https://www.dea.gov/press-releases/2017/07/11/mallinckrodt-agrees-pay-35-million-settlement.
[249] See the 2016 DEA presentation to the American Pharmacists Association on March 7, 2016 at https://aphameeting.pharmacist.com/sites/default/files/slides/APhA2016%20DEA%20update_0.pdf.

enforcement authorities and shipment of any order which is flagged as suspicious must be stopped. Supply Chain Defendants can only ship orders which were flagged as potentially suspicious if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

586.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent registrants would not fall. Together, these laws and industry guidelines make clear that all Supply Chain Defendants and National Pharmacies possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

587.    Further, these laws and industry guidelines make clear that the Supply Chain Defendants and National Pharmacies have a duty and responsibility to exercise the specialized and sophisticated knowledge, information, skill, and understanding they possess by virtue of their role in the supply chain to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

588.    For example, because distributors handle such large volumes of controlled substances, and because they are "uniquely positioned," based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, a distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

589.    The FTC recognized the unique role of distributors. Since their inception, distributors have continued to integrate vertically by acquiring businesses that are related to the distribution of pharmaceutical products and health care supplies. In addition to the actual distribution of pharmaceuticals, as wholesalers, distributors also offer their pharmacy, or dispensing, customers a broad range of added services. For example, distributors offer their pharmacies sophisticated ordering systems and access to an inventory management system and distribution facility that allows customers to reduce inventory carrying costs. Distributors are also able to use the combined purchase volume of their customers to negotiate the cost of goods with manufacturers and offer services that include software assistance and other database management support.[250] As a result of their acquisition of a diverse assortment of related businesses within the pharmaceutical industry, as well as the assortment of additional services they offer, distributors have a unique insight into the ordering patterns and activities of their dispensing customers.

590.    Manufacturer Defendants and Unnamed Related Parties also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from the data they purchase from commercial sources, such as IMS Health (now IQVIA). Their extensive boots-on-the-ground through their sales force, allows Manufacturer Defendants and Unnamed Related Parties to observe the signs of suspicious prescribing and dispensing discussed elsewhere in the Complaint, including but not limited to lines of seemingly healthy patients, a parking lot with out-of-state license plates, and cash transactions.

---

[250] *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998) (granting the FTC's motion for preliminary injunction and holding that the potential benefits to customers did not outweigh the potential anticompetitive effect of a proposed merger between Cardinal Health, Inc. and Bergen Brunswig Corp.).

591.     In addition, Manufacturer Defendants and Unnamed Related Parties regularly mine data, including, upon information and belief, chargeback data, that allows them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing, that would have alerted them, independent of their sales representatives, to suspicious prescribing. Manufacturers also have access to significant data through their procurement of "chargeback data," as discussed further herein. These information points give Manufacturer Defendants and Unnamed Related Parties insight into prescribing and dispensing conduct that enables them to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

592.     In connection with its recent 2017 settlement with the DEA, Mallinckrodt stated that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and agreed that it would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product." Mallinckrodt specifically agreed "to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[251]

593.     Moreover, Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from the direct customer sales of controlled substances to 'downstream' registrants."[252] This exchange of information, upon information, and belief, would have opened channels providing for the exchange

---

[251] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC at 5 (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA").
[252] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC at 5 (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA").

of information revealing suspicious orders as well. The practice of obtaining "chargeback" data should have enabled Mallinckrodt not only to see red flags in the orders it filled itself as a wholesaler, but also additional red flags from the added data it received from its distributor customers.

594.    As part of the settlement, Mallinckrodt agreed that it could and would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[253]

595.    The DEA repeatedly affirmed the obligations of National Pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[254] Not only do National Pharmacies often have firsthand knowledge of dispensing red flags, but also, the National Pharmacies have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. Like the Distributor Defendants, Manufacturer Defendants and Unnamed Related Parties, these information points give the National Pharmacies insight into prescribing and dispensing conduct that enables them to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

596.    The DEA has provided extensive guidance to National Pharmacies concerning their duties to the public. In particular, the guidance advises how to identify red flags and other evidence of diversion.

---

[253] *Id.*
[254] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (Dep't of Justice Oct. 27, 2010) (affirmance of suspension order); Holiday CVS, L.L.C. v. Holder, 839 F.Supp.2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (Dep't of Justice Feb. 19, 1998) (revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (Dep't of Justice July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (Dep't of Justice April 11, 2011) (revocation of registration); Medicine Shoppe Jonesborough; 73 Fed. Reg. 363 (Dep't of Justice Jan. 2, 2008) (revocation of registration).

597.    For example, DEA guidance instructed pharmacies to monitor for red flags that include: prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area and prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by National Pharmacies' diversion control systems.

598.    Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the National Pharmacies. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

599.    According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

      **b.**      **Supply Chain Defendants and National Pharmacies Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders**

600.    The reason for the reporting rules is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

601.    Supply Chain Defendants and National Pharmacies were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

602.    Trade organizations to which the Supply Chain Defendants and National Pharmacies belong have acknowledged the importance of maintaining systems to prevent

diversion, including, with respect to Supply Chain Defendants, systems to identify, halt, and report suspicious orders.[255] The Healthcare Distribution Alliance ("HDA")[256] a trade association of pharmaceutical distributors that also includes affiliate manufacturer members, and the National Association of Chain Drug Stores ("NACDS")[257], have both long taken the position that these Defendants have the responsibility to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society." Guidelines established by the HDA also explain that distributors, "[a]t the center of a sophisticated supply chain . . . are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."

603.    As discussed above, the DEA has also repeatedly reminded the Supply Chain Defendants of their obligations to report and decline to fill suspicious orders.

604.    Supply Chain Defendants were well aware of their duty to be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

c.    **Supply Chain Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers**

605.    The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. The data

---

[255] *See* Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharmaceuticals, Inc. v. Drug Enforcement Administration*, 2012 WL 1321983, at *4 (D.C. Cir. Apr. 4, 2016) (stating that regulations "in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA . . .") (emphasis omitted).

[256] From 2001 to 2016, the HDA was known as the Healthcare Distribution Management Association ("HDMA"). Prior to 2001, HDMA was named the National Wholesale Druggists' Association ("NWDA").

[257] NACDS is a trade organization whose members include "over 80 chain member companies," including regional chains with a minimum of four stores and national companies. NACDS members also include more than 900 supplier partners. NACDS's current Board includes Walgreens, CVS, Rite Aid, and Kroger. *See* National Association of Chain Drug Stores, "Leadership," *available at* https://www.nacds.org/.

necessary to identify with specificity the transactions that were suspicious is also in possession of the Supply Chain Defendants but has not been disclosed to the public.

606.    Publicly available information confirms that Distributor Defendants, Manufacturer Defendants and Unnamed Related Parties, funneled far more opioids into communities across the United States than could have been expected to serve legitimate medical needs and ignored red flags of diversion. This information, along with the information known only to the Supply Chain Defendants, should have alerted them to potentially suspicious orders of opioids.

607.    This information includes the following facts:

a.    Distributors and manufacturers have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

b.    Manufacturers make use of that data to target their marketing and, for that purpose, regularly monitor the activity of doctors and pharmacies;

c.    Manufacturers and distributors regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of diversion;

d.    Distributor Defendants account for approximately 90% of all revenues from prescription drug distribution in the United States, and each Distributor Defendant plays such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area;

e.    Manufacturer Defendants and Unnamed Related Parties purchased chargeback data (in return for discounts to Distributor Defendants) that allowed them to monitor the combined flow of opioids into a pharmacy or geographic area; and

f.    National Pharmacy Defendants developed and maintained extensive data on the opioids they distributed and dispensed. The National Pharmacies would provide other Defendants with this data in exchange for rebates or other forms of consideration or would sell this data to companies such as IMS Health.

608.   The conclusion that the Supply Chain Defendants and National Pharmacies were on notice of the problems of abuse and diversion follows inescapably from the fact that they flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids.

609.   At all relevant times, the Supply Chain Defendants and National Pharmacies were in possession of national, regional, state, and local prescriber-and patient-level data that allowed them to track prescribing patterns over time. They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

610.   The Supply Chain Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the Supply Chain Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[258] The "know your customer" questionnaires informed the Distributor Defendants of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

---

[258] *Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances*, Drug Enforcement Admin. Diversion Control Div. (April 12, 2011), https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levin1_ques.pdf. Richard Widup, Jr. & Kathleen H. Dooley, Esq., *Pharmaceutical Production Diversion: Beyond the PDMA,* Purdue Pharma and McGuireWoods LLC (Oct. 2010), https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

611.    Supply Chain Defendants purchased nationwide, regional, state, local prescriber, and patient level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. The Data Vendors' information purchased by the Supply Chain Defendants allowed them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.[259]

612.    IMS Health, for example, provided Supply Chain Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[260]

613.    Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by McKesson (Source) and Cardinal Health (ArcLight), provided the Supply Chain Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs, and analyzed the market share of those drugs.[261]

614.    This information allowed the Supply Chain Defendants to track and identify instances of overprescribing. In fact, one Data Vendor expert testified that the Data Vendors' information could be used to track, identify, report and halt suspicious orders of controlled substances.[262]

615.    The National Pharmacies also maintained extensive data on the opioids they distributed and dispensed and sold such data to companies such as IMS Health. In describing the

---

[259] A Verispan representative testified that the Supply Chain Defendants use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 661712, *9-10 (Feb. 22, 2011).

[260] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How We Turned a Mountain of Data into a Few Information-Rich Molehills*, (accessed on October 31, 2019), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf, Figure 2 at p. 3.

[261] Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 705207, *467-471 (Feb. 22, 2011).

[262] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vendor, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health*, No. 10-779, 2011 WL 687134, at *204 (Feb. 22, 2011)

type of information IMS would purchase from National Pharmacies such as "a CVS or Rite Aid," one IMS employee testified:

> We collect prescription information that includes basically on each prescription that we receive the drug that was dispensed, the day that it was dispensed and the amount that's being given to a patient some information about the prescribers that like their name and as well as the locations of the pharmacy. So that's the basic information that we collect.[263]

616.    The IMS employee further explained that, after purchasing this data, IMS Health would sell it to "pharmaceutical companies, biotechnology companies, financial institutions, wholesalers, retailers, in some case payors."[264]

617.    Relatedly, CVS Caremark's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors included IMS Health, Verispan, and Walters Kluwers and that CVS used the vendors for "analysis and aggregation of data" and "some consulting services." He also testified that CVS would provide the vendors with "prescriber level data, drug level data, plane level data, [and] de-identified patient data."[265]

618.    On information and belief, the National Pharmacies would often provide other Supply Chain Defendants with data they had collected regarding, inter alia, individual doctors in exchange for rebates or other forms of consideration.

619.    Because of the data they gathered, consolidated, and analyzed, the National Retail Pharmacy Defendants had knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country and in the Plaintiff's Community.

---

[263] Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 687134 (U.S.) *133-134 (Feb. 22, 2011).
[264] *Id.*
[265] *Id.* at 246-247 (Feb. 22, 2011).

620.    The Supply Chain Defendants and National Pharmacies were, therefore, collectively aware of the suspicious orders that flowed daily from their manufacturing and distribution facilities.

621.    Supply Chain Defendants and National Pharmacies refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings. As described in detail below, Supply Chain Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[266] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders, all for failure to report suspicious orders.[267]

622.    The Supply Chain Defendants' obligation to report suspicious prescribing ran head on into their marketing strategy. Defendants identified doctors who were their most prolific prescribers, in order to market to them, not to report them.

623.    Distributor Defendants purchased data from IMS Health (now IQVIA) or other proprietary sources to identify doctors to target for marketing and to monitor their own and competitors' sales. Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits.

624.    The focus on marketing to the highest prescribers had two impacts. First, it demonstrates that Defendants and Unnamed Related Parties were keenly aware of the doctors who

---

[266] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* *6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[267] *Id.*

were writing large quantities of opioids. Second, it demonstrated that instead of investigating or reporting those doctors, Defendants and Unnamed Related Parties were singularly focused on maintaining, capturing, or increasing their sales.

625.     Whenever examples of opioid diversion and abuse have drawn media attention, Defendants and Unnamed Related Parties have consistently blamed "bad actors." For example, in 2001, during a Congressional hearing, Purdue's attorney Howard Udell answered pointed questions about how it was that Purdue could utilize IMS Health data to assess their marketing efforts but not notice a particularly egregious pill mill in Pennsylvania run by a doctor named Richard Paolino. Udell asserted that Purdue was "fooled" by the doctor: "The picture that is painted in the newspaper [of Dr. Paolino] is of a horrible, bad actor, someone who preyed upon this community, who caused untold suffering. And he fooled us all. He fooled law enforcement. He fooled the DEA. He fooled local law enforcement. He fooled us."[268]

626.     But given the closeness with which Supply Chain Defendants monitored prescribing patterns through IMS Health data, it is highly improbable that they were "fooled." In fact, a local pharmacist had noticed the volume of prescriptions coming from Paolino's clinic and alerted authorities. Purdue had the prescribing data from the clinic and alerted no one.

627.     For example, Endo knew that Opana ER was being widely abused. Yet, the New York Attorney General revealed, based on information obtained in an investigation into Endo, that Endo sales representatives were not aware that they had a duty to report suspicious activity and were not trained on the company's policies or duties to report suspicious activity.[269] In addition,

---

[268] See the transcript of the Subcommittee on Oversight and Investigations dated August 28, 2001, at https://www.govinfo.gov/content/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm
[269] See Assurance of Discontinuance Under Executive Law entered into in March 2016 between the Office of The Attorney General of New York and Endo at, https://ag.ny.gov/pds/Endo_AOD_030116-Fully_Executed.pdf.

Endo paid bonuses to sales representatives for detailing prescribers who were subsequently arrested for illegal prescribing.[270]

628.   Sales representatives making in-person visits to such clinics were likewise not fooled. But as pill mills were lucrative for the manufacturers and individual sales representatives alike, Manufacturer Defendants and Unnamed Related Parties, their employees and Unnamed Related Parties turned a collective blind eye, allowing certain clinics to dispense staggering quantities of potent opioids and feigning surprise when the most egregious examples eventually made the nightly news.

### d.   Despite Repeated Admonitions, Supply Chain Defendants Continued to Violate their Legal Obligations, Breach their legal duties and Fail to Act to Prevent Diversion.

629.   In a *60 Minutes* interview last fall, former DEA agent Joe Rannazzisi described Distributor Defendants' industry as "out of control," stating that "[w]hat they wanna do, is do what they wanna do, and not worry about what the law is. And if they don't follow the law in drug supply, people die. That's just it. People die. "[271] He further explained that:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control probably 85 or 90 percent of the drugs going downstream.

> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping drugs into American communities that were killing people.

> JOE RANNAZZISI: That's not an implication, that's a fact. That's exactly what they did.[272]

630.   Another DEA veteran similarly stated that these companies failed to make even a "good faith effort" to "do the right thing."[273] He further explained that "I can tell you with 100

---

[270] *Id.*

[271] Bill Whitaker, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and* Congress, CBS News (Oct. 17, 1017), https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-Congress.

[272] *Id.*

[273] *Id.*

percent accuracy that we were in there on multiple occasions trying to get them to change their behavior. And they just flat out ignored us."[274]

631.   A number of Defendants and Unnamed Related Parties have faced repeated enforcement actions for their failure to comply with their obligations to report and decline suspicious orders, making clear both that they were repeatedly reminded of their duties, and that they frequently failed to meet them.

632.   Supply Chain Defendants failed to prevent diversion, or otherwise control the supply of opioids flowing into communities across the United States, including in Plaintiff's Community. Supply Chain Defendants failed to report and halt shipment of suspicious orders. Despite the notice described above, Supply Chain Defendants and National Pharmacies continued to pump massive quantities of prescription opioids into Plaintiff's Community despite their obligations to control the supply, prevent diversion, report and halt suspicious orders.

633.   Supply Chain Defendants had a duty to maintain effective control against diversion of prescription opioids into the illicit market. Supply Chain Defendants had a duty to "design and operate a system to disclose . . . suspicious orders of controlled substances," including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Because National Pharmacies were also distributors, they too had a duty to report and halt suspicious orders.

634.   Supply Chain Defendants breached their above stated duties under federal and state law when they failed to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; (d) halt shipments of opioids they knew or should have known were quantities that could not be justified and were indicative of serious problems of overuse of opioids; and/or (e) perform

---

[274] *Id.*

due diligence on orders which Supply Chain Defendants had reason to believe were suspicious, instead of shipping those orders without reviewing the account.

635.   An overview of settlements entered into by the Supply Chain Defendants are discussed below:

## McKesson

636.   On May 2, 2008, McKesson Corporation entered into a Settlement and Administrative Memorandum of Agreement with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program."[275]  McKesson agreed to pay a civil penalty in the amount of $13,250,000.[276]

637.   In short, McKesson, was "neither rehabilitated nor deterred by the 2008 [agreement],'" as a DEA official working on the case noted.[277] Quite the opposite, "their bad acts continued and escalated to a level of egregiousness not seen before."[278] According to statements of "DEA investigators, agents and supervisors who worked on the McKesson case" reported in the *Washington Post*, "the company paid little or no attention to the unusually large and frequent orders placed by pharmacies, some of them knowingly supplying the drug rings."[279] "Instead, the DEA officials said, the company raised its own self-imposed limits, known as thresholds, on orders from

---

[275] Settlement Agreement and Release between the U.S. and McKesson Corp. (May 2, 2008), at https://www.dea.gov/sites/default/files/2018-06/Pharmaceutical%20Agreements%20-%20McKesson%20-%202008_0.pdf

[276] *Id.*

[277] Lenny Bernstein and Scott Higham, "*We Feel Like Our System Was Hijacked": DEA Agents Say a Huge Opioid Case Ended in a Whimper*, Washington Post (Dec. 17, 2017), https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14ab50ad0e-db5b-11e7-bla8-62589434a581_story_html?utm_term=.d6e92f349f47.

[278] *Id.* (quoting a March 30, 2015 DEA memo).

[279] *Id.*

pharmacies and continued to ship increasing amounts of drugs in the face of numerous red flags."[280]

638.    Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between Defendant McKesson and the DEA in January 2017, McKesson admitted that it breached its duties to monitor, report, and prevent suspicious orders and that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017), it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[281]

639.    Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[282] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distribution Centers."[283]

---

[280] *Id.*
[281] Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter "2017 Settlement Agreement and Release"] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), available at https://www.justice.gov/opa/press-release/file/928471/download.
[282] *Id.* at 4.
[283] *Id.*

640.     As the *Washington Post* and *60 Minutes* recently reported, DEA staff recommended a much larger penalty, as much as a billion dollars, and delicensing of certain facilities.[284] A DEA memo outlining the investigative findings in connection with the administrative case against 12 McKesson distribution centers included in the 2017 Settlement stated that McKesson "[s]upplied controlled substances in support of criminal diversion activities"; "[i]gnored blatant diversion"; had a "[p]attern of raising thresholds arbitrarily"; "[f]ailed to review orders or suspicious activity"; and "[i]gnored [the company's] own procedures designed to prevent diversion."[285] Investigators found certain warehouses "were knowingly supplying pharmacies that sold to criminal drug rings."[286]

641.     Even the record-breaking civil penalty against McKesson of a $150 million did not stop McKesson from complying with the CSA. In addition to the monetary penalty, the DOJ required McKesson to suspend sales of controlled substances from distribution centers in four different states. Though this penalty too, was far less severe than investigators had recommended, as the DOJ explained, these "staged suspensions" are nevertheless "among the most severe sanctions ever agreed to by a [Drug Enforcement Administration] registered distributor."[287]

## **Mallinckrodt**

642.     Mallinckrodt recently paid $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[288] In a

---

[284] Lenny Bernstein and Scott Higham, "*We Feel Like Our System Was Hijacked": DEA Agents Say a Huge Opioid Case Ended in a Whimper*, Washington Post (Dec. 17, 2017).
[285] *Id.*
[286] *Id.*
[287] Department of Justice, "McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs, (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.
[288] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

2017 agreement with the DEA, Mallinckrodt admitted in a settlement that "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA."[289]

643.    In the press release accompanying the settlement, the Department of Justice stated: "Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . ."[290]

644.    Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances—orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[291]

645.    The 2017 Mallinckrodt MOA further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

---

[289] See the 2017 Administrative Memorandum of Agreement between the United States Department of Justice, Drug Enforcement Agency and Mallinckrodt at, https://www.justice.gov/usao-edmi/press-release/file/986026/download.
[290] See Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.
[291] Id.

With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes, but is not limited to Mallinckrodt's alleged failure to:

    i.       conduct adequate due diligence of its customers;

    ii.      detect and report to the DEA orders of unusual size and frequency;

    iii.    detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:

        1.    orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,

        2.    orders that purchased a disproportionate amount of a substance which is most often abused compared to other products, and

        3.    orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

    ii.      use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

    iii.    take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[292]

646.    Mallinckrodt acknowledged that at certain times prior to January 1, 2012, "certain aspects of Mallinckrodt's system to monitor and detect suspicious orders did not meet the standards outlined in letter from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[293]

---

[292] 2017 Mallinckrodt MOA at 2-3.
[293] *Id.* at 3-4.

647.    Mallinckrodt also agreed that it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[294]

### AmerisourceBergen

648.    AmerisourceBergen distributed an extraordinary amount of prescription opioids into Plaintiff's Community, which was made possible by, and is evidence of, AmerisourceBergen's failure to comply with its duties under state and federal law, including the CSA.

649.    AmerisourceBergen failed to meet its suspicious order monitoring requirements, by failing to identify suspicious orders, failing to stop shipment on suspicious orders, and failing to effectively prevent diversion, in breach of its duties under state and federal law.  These breaches contributed substantially to the public nuisance and harms alleged in the Plaintiff's Community.

650.    AmerisourceBergen's breach of its duties has persisted for many years, dating back to before 2007, when the DEA shut down one of AmerisourceBergen's distribution centers as part of an enforcement action.

651.    The 2007 enforcement action by the DEA was based on AmerisourceBergen filling and shipping orders from pharmacies, which according to the DEA, AmerisourceBergen knew to be suspicious.[295] The enforcement action shut down AmerisourceBergen's Orlando distribution center. According to the April 2007 Order to Show Cause and Immediate Suspension of Registration issued by the DEA, AmerisourceBergen distributed 3.8 million dosage units of

---

[294] *Id.* at 5.
[295] See the April 2007 press release by the Drug Enforcement Administration regarding the suspension of AmerisourceBergen's Orlando distribution center at,
https://www.dea.gov/sites/default/files/divisions/mia/2007/mia042407p.html

hydrocodone products between January 1, 2006 and January 31, 2007 to rogue pharmacies.[296] On June 22, 2007, AmerisourceBergen and the DEA reached a settlement agreement.

652.    Upon information and belief, after 2007, AmerisourceBergen still failed to design and operate an adequate system to identify and halt suspicious orders.

653.    In fact, AmerisourceBergen put the onus on the DEA, the State Board of Pharmacy, the state Board of Medicine, and law enforcement at all levels for failing in it their duties to enforce regulations.[297]  But in January 2017, AmerisourceBergen agreed to pay $16 million to settle a West Virginia lawsuit that alleged the company helped fuel the prescription opioid problem statewide, while continuing to deny any wrongdoing.[298]

## **Cardinal Health**

654.    Cardinal Health failed to meet its suspicious order monitoring requirements, by failing to identify suspicious orders, stop shipment on suspicious orders, and failing to effectively prevent diversion, in breach of its duties under state and federal law.  These breaches contributed substantially to the public nuisance and harms alleged in the Plaintiff's Community.

655.    As a DEA registrant and wholesale distributor, Cardinal Health was required by the CSA to maintain effective control against diversion of prescription opiates to identify, halt shipment of and report suspicious orders. Cardinal Health blatantly failed in each of these duties resulting in the widespread diversion of prescription opioids.

656.    In 2007 the DEA initiated a prosecution of multiple Cardinal Health distribution centers due to Cardinal Health's failure to operate an adequate suspicious order monitoring systems (SOMS) and other violations of the CSA. In an October of 2008 settlement agreement

---

[296] *Id.*
[297] https://www.wvgazettemail.com/news/health/drug-firm-seeks-to-dismiss-mcdowell-pain-pill-suit/article_ed15b697-0ca0-518b-b4d7-8c44008e2514.html
[298] *Id.*

between Cardinal Health and seven U.S. Attorney's Offices the DEA found that Cardinal Health failed to "maintain adequate controls against the diversion of controlled substances on or prior to September 30, 2008, at all distribution facilities" operated, owned, or controlled by Cardinal Health in the United States. This encompassed all 27 of Cardinal Health's distribution facilities.[299] Cardinal Health agreed to pay a civil penalty of $34,000,000.[300]

657.    In December of 2016, Cardinal Health entered another settlement with the DEA to resolve allegations that Cardinal Health violated the CSA in Maryland, Florida and New York by failing to report suspicious orders of controlled substances to the DEA, by pharmacies located in those states.[301] Cardinal Health agreed to pay a civil penalty in the amount of $44,000.000.[302]

658.    A month later, in January of 2017, Cardinal Health reached a settlement with the State of Florida for failing to maintain adequate controls to prevent the diversion of prescription pain killers.[303] Cardinal Health agreed to pay Florida $20,000,000 to settle the lawsuit.[304]

659.    Despite their legal obligations as registrants under the state and federal law, the National Pharmacies allowed widespread diversion to occur, and they did so knowingly.  The National Pharmacy Defendants failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

---

[299] https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html
[300] *Id.*
[301] https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act
[302] *Id.*
[303] https://www.modernhealthcare.com/article/20170109/NEWS/170109919/cardinal-health-paying-20-million-in-west-virginia-settlement
[304] *Id.*

660.    The National Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

661.    The National Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

662.    The National Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

663.    Numerous regulatory actions reveal the National Pharmacies' systemic failures to fulfill their duties under state and federal law with respect to maintaining effective systems to prevent diversion and reporting and halting suspicious orders of controlled substances. The following is a merely a sampling:

## CVS

664.    On March 28, 2013, CVS Pharmacy, Inc. and Oklahoma CVS Pharmacy L.L.C. entered into a Settlement Agreement with the United States Department of Justice, Drug Enforcement Agency to resolve claims that CVS violated the CSA by : (1) filling prescriptions for certain prescribers whose DEA registration numbers were not current or valid; (2) entering and maintaining invalid DEA registration numbers on CVS dispensing records for certain

prescriptions, which were at times provided to state prescription drug monitoring programs; and (3) entering and maintaining CVS dispensing records including prescription vial labels that identify a non-prescribing provider as the prescribing provider for certain prescriptions. CVS paid a fine of $11,000,000.[305]

665.    On September 2, 2014, CVS Pharmacy, Inc. entered into a Settlement Agreement with the DEA to resolve claims against CVS for filling (from April 1, 2012 to July 31, 2012) 153 prescriptions at eight (8) different pharmacies, written by a physician who did not have a valid Texas Department of Public Safety Controlled Substances registration. CVS paid a $1,912,500 fine.[306]

666.    On May 12, 2015, CVS Health entered into a Settlement Agreement with the DEA, which resolved claims that CVS failed "to fulfill its corresponding responsibility to ensure that CVS dispensed controlled substances only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 CF.R. §1306.64." The Settlement also covered CVS's "Florida Distribution Center[s] failure to maintain effective controls against the diversion of controlled substances" and failure to timely detect and report suspicious orders of controlled substances. CVS's conduct complained of is set forth in the February 2, 2012 Orders to Show Cause and Immediate Suspension Orders issued to CVS stores 219 and 5195. CVS paid a fine of $22,000,000.[307]

---

[305] *See* the 2013 Press Release from the United States Department of Justice, U.S. Attorney's Office, Western District of Oklahoma at, https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled

[306] *See* the 2014 articles in the Houston Chronicle by Michelle Iracheta entitled, *HEB, CVS pay more than $2 million in drug penalties*, at https://www.houstonchronicle.com/news/houston-texas/houston/article/HEB-CVS-pay-more-than-2-million-in-drug-5736550.php

[307] *See* the 2015 Press Release from the Department of Justice, U.S. Attorney's Office, Middle District of Florida at, https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution

667.    On August 7, 2015, CVS Health entered into a Settlement Agreement with the DEA. The Settlement resolved claims that between March 3, 2010 and August, 2015 CVS stores in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, filled prescriptions for controlled substances written by psychiatric nurse practitioners who were not authorized under state law or by terms of their DEA registration to issue such prescriptions, and entering, creating, or maintaining CVS dispensing records in which the DEA registration numbers of non-prescribing practitioners, were substituted for the DEA registration numbers of prescribing practitioners.[308]

668.    On December 31, 2015, the DEA issued a Letter of Admonition for violations in distributing HCPs at the CVS Indiana distribution center. This DEA finding was the result of the 2013 investigation. The DEA found that CVS violated the Controlled Substances Act because of a: "[f]ailure to design and maintain a system to detect suspicious and report suspicious orders for Schedule III-V Controlled Substances as required by Title 21 United States Code (USC) 821, Title 21 USC 823(e)(1), and Title 21 Code of Federal Regulations (CFR) 1301.74(b) in violation of Title 21 USC 842(a)(5) in that CVS failed to detect orders that should have been identified as suspicious for retail locations in Vincennes and Kokomo, Indiana.

669.    On February 12, 2016, CVS Pharmacy, Inc. entered into a Settlement Agreement with the DEA. In the Settlement, CVS acknowledged that between 2008 and 2012, "certain CVS/pharmacy retail stores in Maryland did dispense certain controlled substances in a manner not fully consistent with their compliance obligations under the CSA…." CVS paid a fine of $8,000,000.[309]

---

[308] *See* the 2015 Press Release from the DEA at, https://www.dea.gov/press-releases/2015/08/10/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil

[309] *See* the 2016 Press Release from the DEA at, https://www.dea.gov/press-releases/2016/02/12/dea-reaches-8-million-settlement-agreement-cvs-unlawful-distribution

670. On June 30, 2016, CVS Pharmacy, Inc. entered into a Settlement Agreement with the DEA. The Settlement resolved claims that between 2011 and 2014 CVS pharmacies in Massachusetts had filled hundreds of forged opioid prescriptions. CVS entered into a multi-year compliance agreement and paid a fine of $3,500,000.[310]

671. On July 5, 2017, CVS Pharmacy, Inc. entered into a Settlement Agreement with the DEA as a result of a DEA investigation showing an increase in the number of thefts and unexplained losses of Hydrocodone at numerous Eastern District of California CVS retail stores. The Settlement resolved claims for failure to provide effective controls and procedures to guard against theft and diversion of controlled substances, failure to notify the DEA of certain thefts or significant losses of controlled substances within one business day of the discovery, failure to maintain schedule 3-5 invoices, failure to maintain Schedule 3-5 records separate from non-controlled substance records, failure to conduct a Biennial Inventory on one specific day, failure to maintain complete and accurate records, failure to record the date of acquisition of controlled substances, failure to record the amount received on Schedule 3-5 invoices, failure to record the amount received and the date received on DEA 222 forms, failure to maintain DEA-222 forms, and failure to maintain DEA-222 forms separate from other records. CVS admitted that between April 30, 2011 and April 30, 2013 the retail stores violated their recordkeeping obligations, but it denied that the recordkeeping obligations caused any diversion. CVS paid a fine of $5,000,000.[311]

---

[310] *See* the 2016 Press Release from the Department of Justice, U.S. Attorney's Office, District of Massachusetts at, https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions
[311] *See* the 2016 Press Release from the Department of Justice, U.S. Attorney's Office, Eastern District of California at https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act

**Walgreens**

672.    In May 2006, the DEA sent Walgreens a Letter of Admonition citing Walgreens for recordkeeping inadequacies and security deficiencies at its Perrysburg Distribution Center. Specifically, the DEA found that the "formulation utilized by the firm for reporting suspicious ordering of controlled substances was insufficient."[312]

673.    In 2008, Walgreens entered into a Corporate Integrity Agreement related to its noncompliant dispensing practices.[313] The allegations in the OTSC and ISO were exacerbated by the fact that over a year earlier, on April 7, 2011, Walgreens had entered into a prior Administrative memorandum of Agreement with DEA regarding allegations of non-compliance with the Controlled Substance Act wherein Walgreens agreed to "maintain a compliance program to detect and prevent diversion of controlled substances."[314]

674.    On September 13, 2012, the DEA issued an Order to Show Cause (OTCS) and Immediate Suspension of Registration (ISO) regarding the Walgreens Jupiter, Florida Distribution Center, because such registration constituted "an imminent danger to the public health and safety" and ordered that Jupiter controlled substance vault be sealed.[315] The DEA alleged that Walgreens's Jupiter Distribution Center failed to comply with DEA regulations that required Walgreens to conduct adequate due diligence of its retail stores, design and operate a system to disclose suspicious orders, and report suspicious orders of controlled substances to the DEA.  Further, the

---

[312] Letter from Robert L. Corso, Special Agent in Charge, Detroit Field Division, U.S. Dep't of Justice, DEA, to Todd Polarolo, Distrib. Ctr. Manger, Walgreen Co. (May 17, 2006) (on file with DEA), https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-328-Correspondence/ohnd-1:2017-md-02804-01965-010

[313] Corporate Integrity Agreement between the Office of Inspector Gen., Dep't of Health and Human Services, and Walgreen Co. (Sept. 16, 2008), http://www.pharmacomplianceforum.org/docs/resources/WalgreenCIA.pdf

[314] Administrative Memorandum of Agreement between United States Dep't of Justice, DEA, and Walgreen Co., (Mar. 28, 2011), https://www.dea.gov/sites/default/files/divisions/mia/2013/mia061113_appendixa.pdf.

[315] *In re* Walgreen Co., United States Dep't of Justice, DEA, Order to Show Cause and Immediate Suspension of Registration (Sept. 13, 2012), https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-335-Order-to-Show-Cause/ohnd-1:2017-md-02804-01965-017.

DEA alleged that Walgreens's failure to sufficiently report suspicious orders was a systemic practice that resulted in at least tens of thousands of violations and allowed Walgreens' retail pharmacies to order and receive at least three times the Florida average for drugs such as oxycodone.[316]

675.    In February 2013, the DEA issued similar Subpoenas and Warrant of Inspection on the Perrysburg Distribution Center.[317] Walgreens decided to "discontinue distribution of controlled substances from the Perrysburg facility" in order to "eliminate any immediate need for further DEA administrative action" regarding the Perrysburg facility.[318]

676.    On June 11, 2013 Walgreens entered into a Settlement and Memorandum of Agreement ("MOA") with the DEA to resolve outstanding allegations involving the Walgreens' Jupiter Distribution Center and pending actions concerning six Walgreens retail pharmacies located in Florida. Walgreens agreed to pay $80 million in civil penalties, the largest settlement in DEA history at that time, to resolve the DEA's claims that Walgreens negligently allowed controlled substances, including oxycodone and other prescription painkillers, to be diverted into the black market.[319] In addition to the $80 million civil penalty, Walgreens agreed to surrender its Jupiter DC's registration to distribute or dispense controlled substances listed in Schedules II – V for two years from issuance of the Jupiter ISO, ending in 2014. As part of the MOA, Walgreens admitted that Walgreens's "suspicious order reporting for distribution to certain pharmacies did

---

[316] *Id.*

[317] *In re* Walgreen Corp., Case No.: 17-13-2042, United States Dep't of Justice, DEA, Subpoena No.: 17-13-340710 (Feb. 4, 2013), https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-336-Subpoena/ohnd-1:2017-md-02804-01965-018

[318] Letter from Latham & Watkins LLP, to C. Lee Reeves, II and Scott Lawson, Diversion and Regulatory Litigation Section, Office of the Chief Counsel, DEA, and Wayne Groves, Diversion Investigator, DEA (Feb. 20, 2013), https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-36/ohnd-1:2017-md-02804-02205-036

[319] See the 2013 Press Release from the Department of Justice, U.S. Attorney's Office, Southern District of Florida at, https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled

not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007 and December 27, 2007."[320]

**7.      Defendants' Violations in Other Jurisdictions Further Exacerbated the Flood of Opioids into the Plaintiff's Community**.

677.      As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

678.      First, prescriptions written in one state may, under some circumstances, be filled in a different state. But even more significantly, individuals transported opioids from one jurisdiction to another specifically to sell them.

679.      When authorities in states such as Ohio, Kentucky and Florida cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of the TriStates would simply drive to Florida, stock up on pills from a pill mill, and transport them back home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."[321]

680.      The route from Florida and Georgia to the Tri-State area of Kentucky, Ohio, and Florida was so well traveled that it became known as the Blue Highway, a reference to the color of the 30mg roxicodone pills manufactured by Mallinckrodt.[322] Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75 and I-95, the prescription tourists

---

[320] https://www.justice.gov/sites/default/files/usao-sdfl/legacy/2013/06/19/130611-01.WalgreensMOA%26Addendum.pdf
[321] https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html.
[322] *Id.*

adapted. They rented cars just over the Georgia state line to avoid the telltale out-of-state tag. If they were visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid the risk of being caught with multiple prescriptions if pulled over. Or they avoided the roads altogether.  One airline, which offered several flights between Appalachia and Florida, was so popular with drug couriers that it was nicknamed the "Oxy Express."[323]

681.    Abundant evidence, thus, establishes that prescription opioids migrated between cities, counties, and states, including into the Tri-States from places like Florida. As a result, prescription data from any one jurisdiction does not capture the full scope of the misuse, oversupply and diversion problem in that specific area.  If prescription opioid pills were hard to get in one area, patients migrated to another. The manufacturers, distributors, and dispensers were fully aware of this phenomenon and profited from it.

### 8.    Defendants and Unnamed Related Parties Worked Together to Sustain their Market and Boost their Profits.

#### a.  Defendants Worked Together to Inflate Quotas.

682.    Finding it impossible to legally achieve their ever-increasing sales ambitions within the confines of their quotas, Defendants and the Unnamed Related Parties engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids.

683.    The CSA requires manufacturers and distributors of prescription opioids to: (a) limit sales within a quota set by the DEA for the overall production of opioids; (b) register to manufacture or distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) design and operate a system to

---

[323] *Id.*

identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

684.    Central to the closed system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to limit diversion by preventing the accumulation of controlled substances in amounts exceeding legitimate need.[324]

685.    It is unlawful to manufacture a controlled substance in Schedule II, like prescription opioids, in excess of a quota assigned to that class of controlled substances by the DEA.[325]

686.    Distributor Defendants had close financial relationships with both Manufacturing Defendants, Unnamed Related Parties, and customers, for whom they provide a broad range of value-added services that render them uniquely positioned to obtain information and control against diversion. These services often otherwise would not be provided by manufacturers to their dispensing customers and would be difficult and costly for the dispenser to reproduce. For example, "[w]holesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock." *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998). Through their generic source programs, wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers." Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

687.    Upon information and belief, Distributor Defendants had financial incentives from the Manufacturer Defendants and Unnamed Related Parties to distribute higher volumes, and thus

---

[324] 21 C.F.R. §1303
[325] *Id.*

to refrain from reporting or declining to fill suspicious orders. Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost. Discounts and rebates from this cost may be offered by manufacturers based on market share and volume. As a result, higher volumes may decrease the cost per pill to distributors. Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit. Either way, the increased sales volumes result in increased profits.

688.    The Manufacturer Defendants and Unnamed Related Parties engaged in the practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids as a way to help them boost sales. The *Washington Post* has described the practice as industry-wide, and the HDA includes a "Contracts and Chargebacks Working Group,"[326] suggesting a standard practice. Further, in a recent settlement with the DEA, Mallinckrodt, a prescription opioid manufacturer, acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors)."[327] The transaction information contains data relating to the direct customer sales of controlled substances to 'downstream' registrants," meaning pharmacies or other dispensaries, such as hospitals. This exchange of information, upon information, and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

---

[326] https://www.hda.org/resources/hdma-guidelines-for-optimizing-the-contract-administration-and-chargeback-process.

[327] *See* the 2017 Administrative Memorandum of Agreement between the United States Department of Justice, Drug Enforcement Agency and Mallinckrodt at, https://www.justice.gov/usao-edmi/press-release/file/986026/download.

### b.  Defendants Worked Together to Shape State and Federal Policy

689.  Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the HDA.

690.  The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

691.  The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[328] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[329]

692.  The Defendants who stood to profit from expanded prescription opioid use are members of and/or participants in the PCF. In 2012, membership and participating organizations included Actavis. Each of the Manufacturer Defendants and Unnamed Related Parties worked together through the PCF. But the Manufacturer Defendants and Unnamed Related Parties were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[330] The Distributor Defendants participated directly in the PCF as well.

---

[328] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echochamber-shaped-policy-amid-drugepidemic. (last updated Dec. 15, 2016, 9:09 AM) (emphasis added).
[329] *Id.*
[330] *Id*; The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Executive Vice President and Group President, for

693.    The HDA led to the formation of interpersonal relationships and an organization among the Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants and Unnamed Related Parties were members of the HDA. The HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants and Unnamed Related Parties by advocating for the many benefits of members, including "strengthen[ing] . . . alliances."[331]

694.    Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "network with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[332] Clearly, the HAD, the Defendants and the Unnamed Related Parties believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the Manufacturer Defendants and Unnamed Related Parties and the Distributor Defendants.

695.    The HDA application for manufacturer membership indicates the level of connection among the Defendants and the level of insight they had into each other's businesses.[333]

---

AmerisourceBergen Corporation, and the President, Pharmaceutical Solutions & Services for McKesson Corporation. *Executive Committee*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/executive-committee. (last accessed October 31, 2019).
[331] *Manufacturer Membership*, Healthcare Distribution Alliance, https://healthcaredistribution.org/about/membership/manufacturer (last accessed October 31, 2019).
[332] *Id.*
[333] *Manufacturer Membership Application*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

696.    The HDA application requests that the manufacturer identify its current distribution information, including the facility name and contact information. Manufacturer members were also asked to identify their "most recent year end net sales" through wholesale distributors, including the Distributor Defendants AmerisourceBergen, Cardinal Health, and McKesson and their subsidiaries.[334]

697.    The closed meetings of HDA's councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together confidentially, to develop and further the common purpose and interests of the enterprise.

698.    The HDA offered a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants and Unnamed Related Parties as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[335] The conferences gave the Manufacturer and Distributor Defendants the opportunity to meet one-on-one with their, "most highly-valued business partners – all in one place and at one time."[336] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. It is clear that the Manufacturer Defendants and Unnamed Related Parties embraced this opportunity by attending and sponsoring these events.

699.    After becoming members of HDA, Defendants were eligible to participate on councils, committees, task forces and working groups, including:

---

[334] *Id.*
[335] *Business and Leadership Conference – Information for Manufacturers*, Healthcare Distribution Alliance, https://www.hda.org/events/2019-business-and-leadership-conference.
[336] *Id.*

a.   Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

b.   Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributor and manufacturer members.

c.   Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributor and manufacturer members.

d.   Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.

e.   Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes manufacturer and distributor members.[337]

700.   The Distributor Defendants, Manufacturer Defendants and Unnamed Related Parties also participated, through the HDA, in Webinars and other meetings designed to exchange detailed information regarding prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[338] For example, on April 27, 2011, the HDA offered a Webinar to "accurately and effectively exchange business transactions between distributors and manufacturers …."[339]

---

[337] *Councils and Committees*, Healthcare Distribution Alliance, https://www.hda.org/about/councils-and-committees.
[338] *Webinar Leveraging EDI: Order-to-Cash Transactions CD Box Set*, Healthcare Distribution Alliance, (Apr. 27, 2011), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.
[339] *Id.*

701.    Taken together, the interaction and length of the relationships between and among the Manufacturer Defendants, Distributor Defendants and Unnamed Related Parties reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer Defendants, Distributor Defendants and Unnamed Related Parties were not separate groups operating in isolation or groups forced to work together in a closed system. Defendants and Unnamed Related Parties operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

702.    The HDA and the PCF are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the Defendants were in communication and cooperation.

703.    Publications and guidelines issued by the HDA confirm that the Defendants and Unnamed Related Parties utilized their membership in the HDA to form agreements. Specifically, in the fall of 2008, the HDA published the Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (the "Industry Compliance Guidelines") regarding diversion. As the HDA explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.[340]

704.    This statement by the HDA and the Industry Compliance Guidelines support the allegation that Distributor Defendants utilized the HDA to form agreements about their approach to their duties under the CSA. As John M. Gray, President/CEO of the HDA stated to the Energy and Commerce Subcommittee on Health in April 2014, is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately

---

[340] Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., Cardinal Health, Inc., v. U.S. Dep't of Justice, No. 12-5061, 2012 WL 1637016, at *5 (D.C. Cir. May 24, 2012).

192

prescribed and dispensed medications."[341] Here, it is apparent that all of the Defendants, and the Unnamed Related Parties, found the same balance – an overwhelming pattern and practice of failing to identify, report or halt suspicious orders, and failure to prevent diversion.

705.    The Manufacturer Defendants and Unnamed Related Parties worked together to control the state and federal government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

706.    The Defendants and the Unnamed Related Parties worked together to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution. The Manufacturer Defendants and Unnamed Related Parties, and the Distributor Defendants did this through their participation in the PCF and HDA.

707.    The Defendants and the Unnamed Related Parties  also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

708.    The Defendants and the Unnamed Related Parties had reciprocal obligations under the CSA to report suspicious orders of other parties if they became aware of them. Defendants and the Unnamed Related Parties were thus collectively responsible for each other's compliance with their reporting obligations.

---

[341] See Statement from John M. Gray, President and CEO Healthcare Distribution Management Association for the U.S. House of Representatives Energy and Commerce Committee, Subcommittee on Health April 7, 2014 at, https://docs.house.gov/meetings/IF/IF14/20140407/102093/HHR-113-IF14-Wstate-GrayJ-20140407.pdf.

709.    The Defendants and the Unnamed Related Parties knew that their conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders could be brought to the DEA's attention. As a result, Defendants and Unnamed Related Parties had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

710.    The desired consistency was achieved. None of the Defendants or Unnamed Related Parties reported suspicious orders and the flow of opioids continued unimpeded.

### 9.    Distributor Defendants Marketed Manufacturers' Opioid Products

711.    Not only did the Distributor Defendants distribute, supply, and sell prescription opioids without fulfilling their duties to maintain effective controls against diversion, but also, the Distributor Defendants further increased the flood of opioids into Plaintiff's Community by actively assisting manufacturers in marketing their opioid products.

712.    Distributors' efforts to assist manufacturers in increasing opioid prescriptions date back decades. For example, a 1991 article entitled "New Spirit of Partnering Rejuvenates Wholesalers" described efforts by the National Wholesale Druggists Association ("NWDA"), the predecessor entity to the HDMA/HDA, to work collaboratively with wholesalers, noting how "wholesalers and manufacturers showed their optimism about the future of wholesale drugs," in light of a "spirit of intercompany teamwork open[ing] up new opportunities for everyone involved…."[342] Outgoing NWDA chairman Joseph Polastri was also quoted as stating that "suppliers and wholesalers have a common economic incentive to work more closely together."[343]

713.    In 1991, the NWDA organized official, high-level meetings between wholesalers and manufacturers. These visits, which were reported to have prompted discussions about using

---

[342] Val Cardinale, *New Spirit of Partnering Rejuvenates Wholesalers*, 135 Drug Topics 23 (Dec. 16, 1991).
[343] *Id.*

wholesaler sales representatives "to pass along technical product information to pharmacists, hospitals, third-party payers and perhaps even to selected doctors," and several manufacturers also expressed interest "in tapping into wholesaler telemarketing capabilities."[344]

714.    Manufacturer Defendants and Unnamed Related Parties worked with Distributor Defendants to develop marketing activities and paid Distributor Defendants for their efforts.

715.    As the marketing activities Defendants and Unnamed Related Parties drove dramatic increases in opioid prescriptions, Distributor Defendants continued to distribute unconscionable quantities of opioids and the Distributor Defendants, Manufacturer Defendants and Unnamed Related Parties ignored their obligations to monitor, report, and stop suspicious orders. Distributors acted as more than middlemen or mere delivery services; on the contrary, they inserted themselves directly into doctor-patient relationships. The Distributor Defendants marketed opioids directly to patients, including for off label and unsafe uses, and Distributor Defendants also consulted with patients about using opioids. Together, the Supply Chain Defendants worked to overcome insurers' resistance to covering opioids outside of the uses for which they had been approved. Like PBM Defendants, Distributor Defendants engaged in marketing efforts by providing discount cards to induce consumers to purchase opioids produced by Manufacturer Defendants and Unnamed Related Parties.

716.    The Defendants, and the Unnamed Related Parties, also had reciprocal obligations under the CSA to report suspicious orders of other parties if they became aware of them. Defendants and Unnamed Related Parties were thus collectively responsible for each other's compliance with their reporting obligations.

---

[344] NWDA Senior Management Teams Will Visit 30 Drug Companies By End Of Year; Wholesaler-Only Advisory Boards Have Been Established By 14 Drug Firms, The Pink Sheet (Nov. 25, 1991).

717.    The Defendants, and the Unnamed Related Parties, knew that their conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

718.    The desired consistency was achieved. All of the Supply Chain Defendants repeatedly failed to report suspicious orders and the flow of opioids continued unimpeded.

**10.    The PBM Defendants Further Exacerbated the Flood of Opioids into the Market**

719.    Pharmacy Benefit Managers (PBMs) are companies that administer prescription drug plans for entities that include insurers, self-insured employers, and state and federal government agencies (collectively, these entities are referred to as "plan sponsors"). PBMs review and pay claims; PBMs also review and decide "which medications are most effective for each therapeutic use."[345] In effect, a PBM's plan can determine what medications will (or will not) be available, at what quantity, and how difficult it may be for a prescriber to receive that medication (e.g., by requiring pre-authorization).

720.    Together, the PBM Defendants control nearly 76 percent of all prescription claims.[346]

721.    In essence, because PBMs choose which drugs appear on their formularies, they wield significant influence over which drugs are disseminated throughout Plaintiff's Community and how those drugs are paid for.

---

[345] http://www.americanhealthpolicy.org/Content/documents/resources/December%202015_AHPI%20Study_Understanding_the_Pharma_Black_Box.pdf.
[346] See Top PBMs by market share dated May 30th, 2019 at, https://www.beckershospitalreview.com/pharmacy/top-pbms-by-market-share.html

722.    Upon information and belief, PBM Defendants colluded with Manufacturer Defendants and Unnamed Related Parties to offer financial incentives, such as rebates and administrative fees, in exchange for benefit plan design, formulary placement, and drug utilization management that would result in more opioids entering the marketplace.

723.    "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And, most of these rebates directly benefited the PBM."[347] Because of this, "PBMs earnings are enhanced when manufacturers charge high list prices, but then pay large rebates and discounts to lower the actual transaction prices…"[348]

724.    In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

725.    PBMs require and receive incentives from Manufacturer Defendants and Unnamed Related Parties, to keep certain drugs on and off formularies.

726.    These incentives include the payment of rebates by Manufacturer Defendants and Unnamed Related Parties to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

727.    Upon information and belief, when PBMs were asked by their clients to implement greater safeguards that limited access to opioids, PBMs refused. Instead, the PBMs opted to receive

---

[347] Wayne Winegarden, *To Improve Pharmaceutical Pricing, Reform PBMs and Fix Health Cares Systemic Problems*, Forbes (April 4, 2017), *available at* https://www.forbes.com/sites/econostats/2017/04/04to-improve-pharmaceutical-pricing-reform-pbms-and-fix-health-cares-systemic-problems/#991a9b533228
[348] *Id.*

lucrative rebates from drug manufacturers in exchange for making the manufacturers' prescription opioids as available and accessible as possible.

728.   By placing prescription opioids on their formularies and declining to impose appropriate limits on approval for its use, the PBM Defendants facilitated the proliferation and subsequent diversion of prescription opioids throughout Florida and within the Plaintiff's Community.

729.   For example, in 2001, when officials in the Florida state employee health plan sought to have OxyContin require pre-authorization, Purdue used the financial quid pro quo it had with the Florida PBM, Merck Medco (now Express Scripts) to prevent insurers from limiting access to the drug.

730.   According to a former Purdue official responsible for ensuring favorable treatment for OxyContin, the strategy to pay Merck Medco extended to other big pharmacy benefit managers: "That was a national contract . . . . We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."[349]

731.   Upon information and belief, this practice was prevalent for all PBM Defendants, Manufacturer Defendants and Unnamed Related Parties. Manufacturer Defendants and Unnamed Related Parties provide financial incentives and, in return, the PBM Defendants agreed to make certain prescription opioids available without prior authorization and with low copayments.

732.   PBMs' complicity in the overall fraudulent scheme is knowing and purposeful. Manufacturer Defendants and Unnamed Related Parties compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to

---

[349] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic.* STAT (October 26, 2016), *available at* https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/

avoid pre-authorization requirements and other hurdles that would slow down flow. Upon information and belief, the defendant PBM formularies include the majority of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

733.    Moreover, at the same time that PBMs made it easier to obtain prescription opioids, they made it more difficult to receive treatment for addiction.

## VI.    FACTS PERTAINING TO CONSPIRACY CLAIMS

### A.    The Opioid Marketing Enterprise

#### 1.    The Common Purpose and Scheme of the Opioid Marketing Enterprise

734.    Knowing that their products were highly addictive, ineffective, and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, the Marketing Defendants[350] and Unnamed Related Parties formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

735.    In order to unlawfully increase the demand for opioids, the Marketing Defendants formed an association-in-fact enterprise (the "Opioid Marketing Enterprise") with the Front Groups and KOLs described above.  Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose.  The Marketing Defendants' and Unnamed Related Parties' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioid-friendly messaging, fueled the U.S. opioid epidemic.[351]

---

[350] The Marketing Defendants referred to in this section are Teva, Janssen, Endo, Mallinckrodt and the Unnamed Related Parties.
[351] *Fueling an Epidemic*, supra.

-198-

736.    The Marketing Defendants and Unnamed Related Parties, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use.  The misleading statements included: (a) that addiction is rare among patients taking opioids for pain; (b) that addiction risk can be effectively managed; (c) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Marketing Defendants named "pseudoaddiction"; (d) that withdrawal is easily managed; (e) that increased dosing presents no significant risks; (f) that long-term use of opioids improves function; (g) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (h) that use of time-released dosing prevents addiction; and (i) that ADF provide a solution to opioid abuse.

737.    The scheme devised, implemented and conducted by the Marketing Defendants and Unnamed Related Parties was a common course of conduct designed to ensure that the Marketing Defendants and Unnamed Related Parties unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Marketing Defendants' drugs.  The Marketing Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

738.    There was regular communication between the Marketing Defendants, Front Groups, and KOLs, in which information was shared, misrepresentations were coordinated, and payments were exchanged.   Typically, the coordination, communication, and payment that occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the Marketing Defendants, Unnamed Related Parties, Front Groups, and KOLs share

information regarding overcoming objections and resistance to the use of prescription opioids for chronic pain.  The Marketing Defendants, Unnamed Related Parties, Front Groups, and KOLs functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed, and took actions, to hide the scheme and continue its existence.

739.    At all relevant times, the Front Groups were aware of the Marketing Defendants' and Unnamed Related Parties' conduct, and were knowing and willing participants and beneficiaries of that conduct.  Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and Plaintiff.  But for the Opioid Marketing Enterprise's unlawful fraud, the Front Groups would have had incentive to disclose the deceit by the Marketing Defendants and the Opioid Marketing Enterprise to their members and constituents.  By failing to disclose this information, Front Groups perpetuated the Opioid Marketing Enterprise's scheme and common purpose, and reaped substantial benefits.

740.    The Marketing Defendants and Unnamed Related Parties selected KOLs solely because they favored the aggressive treatment of chronic pain with prescription opioids.  The Marketing Defendants' and Unnamed Related Parties' support helped the KOLs become respected industry experts.  And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying the Marketing Defendants and Unnamed Related Parties by advancing their marketing goals.  But for the Opioid Marketing Enterprise's unlawful conduct, the KOLs would have had incentive to disclose the deceit by the Marketing Defendants and Unnamed Related Parties and the Opioid Marketing Enterprise, and to protect their patients and the patients

person

of other physicians.  By failing to disclose this information, KOLs furthered the Opioid Marketing Enterprise's scheme and common purpose, and reaped substantial benefits.

741.    As public scrutiny and media coverage focused on how opioids ravaged communities in Florida and throughout the United States, the Front Groups and KOLS did not challenge the Marketing Defendants' or Unnamed Related Parties' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using prescription opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

742.    The Marketing Defendants, Unnamed Related Parties, Front Groups, and KOLs engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise.  As described herein, the Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved: (a) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (b) lobbying to defeat measures to restrict over-prescription; (c) efforts to criticize or undermine CDC Guideline; and (d) efforts to limit prescriber accountability.

743.    In addition to disseminating misrepresentations about the risks and benefits of opioids, the Opioid Marketing Enterprise also furthered its common purpose by criticizing or undermining CDC Guideline.  Members of the Opioid Marketing Enterprise criticized or undermined the CDC Guideline which represented "an important step,—and perhaps the first major step from the federal government—toward limiting opioid prescriptions for chronic pain."[352]

---

[352] https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf

744.     Several Front Groups, the AAPM, criticized the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."[353]

745.     The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."[354]

746.     The Marketing Defendants and Unnamed Related Parties could not have accomplished the purpose of the Opioid Marketing Enterprise without the assistance of the Front Groups and KOLs, who were perceived as "neutral" and more "scientific" than the Marketing Defendants themselves.   Without the work of the Front Groups and KOLs in spreading misrepresentations about opioids, the Opioid Marketing Enterprise could not have achieved its common purpose.

747.     The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, the prescription opioids continue to be prescribed and used for chronic pain throughout the area of Orlando, and the epidemic continues to injure Plaintiff, and consume the resources of Plaintiff's health care and law enforcement systems.

748.     As a result, it is clear that the Marketing Defendants, Unnamed Related Parties, the Front Groups, and the KOLs were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

---

[353] *Id.*
[354] *Id.*

### 2.     The Conduct of the Opioid Marketing Enterprise Violated Civil Conspiracy Laws

749.    From approximately the late 1990's to the present, each of the Marketing Defendants and Unnamed Related Parties exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.     creating and providing a body of deceptive, misleading, and unsupported electronic and print advertisements about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.     creating and providing a body of deceptive, misleading, and unsupported sales and promotional training materials about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c.     creating and providing a body of deceptive, misleading, and unsupported CMEs and speaker presentations about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d.     selecting, cultivating, promoting, and paying KOLs based solely on their willingness to communicate and distribute the Marketing Defendants' and Unnamed Related Parties messages about the use of prescription opioids for chronic pain;

e.     providing substantial opportunities for KOLs to participate in research studies on topics the Marketing Defendants and Unnamed Related Parties suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

f.     paying KOLs to serve as consultants or on the Marketing Defendants' and Unnamed Related Parties' advisory boards, on the advisory boards, and in leadership positions on Front Groups, and to give talks or present CMEs, typically over meals or at conferences;

g.     selecting, cultivating, promoting, creating, and paying Front Groups based solely on their willingness to communicate and distribute the Marketing

Defendants' and Unnamed Related Parties' messages about the use of prescription opioids for chronic pain;

h.    providing substantial opportunities for Front Groups to participate in and/or publish research studies on topics the Marketing Defendants and Unnamed Related Parties suggested or chose (and paid for), with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

i.    paying significant amounts of money to the leaders and individuals associated with Front Groups;

j.    donating to Front Groups to support talks or CMEs, that were typically presented over meals or at conferences;

k.    disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

l.    sponsoring CME programs put on by Front Groups that focused exclusively on the use of prescription opioids for chronic pain;

m.    developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters, and the help of the Front Groups as publishers and supporters;

n.    encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Marketing Defendants and Unnamed Related Parties, such as veterans and the elderly, and then funding that distribution;

o.    concealing their relationship to and control of Front Groups and KOLs from Plaintiff and the public at large; and

p.    intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities, promotional and other materials that claimed prescription opioids could be safely used for chronic pain.

750.    The Opioid Marketing Enterprise had a hierarchical decision-making structure that was headed by the Marketing Defendants and Unnamed Related Parties, and corroborated by the KOLs and Front Groups.  The Marketing Defendants and Unnamed Related Parties controlled representations made about their prescription opioids, doled out funds to PBMs and payments to KOLs, and ensured that representations made by KOLs, Front Groups, and the Marketing Defendants' and Unnamed Related Parties' sales detailers were consistent with the Marketing

Defendants' and Unnamed Related Parties' messaging throughout the United States and Florida. The Front Groups and KOLS in the Opioid Marketing Enterprise were dependent on the Marketing Defendants and Unnamed Related Parties for their financial structure and for career development and promotion opportunities.

751.    The Front Groups also conducted and participated in the conduct of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

  a.    the Front Groups promised to, and did, make representations regarding prescription opioids that were consistent with the Marketing Defendants' and Unnamed Related Parties' messages;

  b.    the Front Groups distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that prescription opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using prescription opioids for chronic pain outweighed the risks;

  c.    the Front Groups echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of the Marketing Defendants and Unnamed Related Parties;

  d.    the Front Groups issued guidelines and policies minimizing the risk of opioid addiction and promoting prescription opioids for chronic pain;

  e.    the Front Groups strongly criticized the 2016 guidelines from CDC that recommended limits on opioid prescriptions for chronic pain; and

  f.    the Front Groups concealed their connections to the KOLs and the Marketing Defendants and Unnamed Related Parties.

752.    The Marketing Defendants, Unnamed Related Parties, and Front Groups, "with their large numbers and credibility with policymakers and the public, have 'extensive influence in specific disease areas.'"   The larger Front Groups "likely have a substantial effect on policies relevant to their industry sponsors."[355]   "By aligning medical culture with industry goals in this

---

[355] *Id.* at 2.

way, many of the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioid epidemic."[356]

753.    The KOLs also participated in the conduct of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

     a.     the KOLs promised to, and did, make representations regarding prescription opioids that were consistent with the Marketing Defendants' and Unnamed Related Parties' messages themselves;

     b.     the KOLs distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that prescription opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using prescription opioids for chronic pain outweighed the risks;

     c.     the KOLs echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of the Marketing Defendants and Unnamed Related Parties;

     d.     the KOLs issued guidelines and policies minimizing the risk of prescription opioid addiction and promoting opioids for chronic pain;

     e.     the KOLs strongly criticized the 2016 guidelines from the Center for Disease Control and Prevention (CDC) that recommended limits on prescription opioid prescriptions for chronic pain; and

     f.     the KOLs concealed their connections to the Front Groups and their sponsorship by the Marketing Defendants and Unnamed Related Parties.

754.    The scheme devised and implemented by the Marketing Defendants, Unnamed Related Parties, and members of the Opioid Marketing Enterprise, amounted to a common course of conduct intended to increase the Marketing Defendants' and Unnamed Related Parties' sales from prescription opioids by encouraging the prescribing and use of prescription opioids for long-term chronic pain.  The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

---

[356] *Id.*

3. **The Marketing Defendants and Unnamed Related Parties Controlled and Paid Front Groups and KOLs to Promote and Maximize Prescription Opioid Use**

755.     As discussed in detail above, the Marketing Defendants and Unnamed Related Parties funded and controlled the various Front Groups, including APF, AAPM/APS, FSMB, APA, USPF, and AGS.  The Front Groups, which appeared to be independent, but were not, transmitted the Marketing Defendants' and Unnamed Related Parties' misrepresentations. The Marketing Defendants, Unnamed Related Parties, and the Front Groups thus worked together to promote the goals of the Opioid Marketing Enterprise.

756.     The Marketing Defendants and Unnamed Related Parties worked together with each other through the Front Groups, that they jointly funded, and through which they collaborated on the joint promotional materials described above.

757.     Similarly, as discussed in detail above, the Marketing Defendants and Unnamed Related Parties paid KOLs, including Drs. Portenoy, Fine, Fishman, and Webster, to spread their misrepresentations and promote their products.  The Marketing Defendants, Unnamed Related Parties and the KOLs thus worked together to promote the goals of the Opioid Marketing Enterprise.

B.     **The Opioid Supply Chain Enterprise**

758.     Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort to "a categorical denial of any criminal behavior or intent."[357]  Defendants' actions went far beyond what could be considered ordinary business conduct.  For more than a decade, certain Defendants and Unnamed Related

---

[357] *McKesson Responds to Recent 60 Minutes Story About January 2017 Settlement With the Federal Government*, McKesson, http://www.mckesson.com/about-mckesson/fighting-opioid-abuse/60-minutes-response (last visited, Apr. 21, 2018).

Parties, the Supply Chain Defendants (Teva, Endo, Mallinckrodt, Actavis, McKesson, Cardinal Health, and AmerisourceBergen) worked together in an illicit enterprise, and engaged in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

759.   Knowing that dangerous drugs have a limited place in our society, and that their dissemination and use must be vigilantly monitored and policed to prevent the harm that drug abuse and addiction causes to individuals, society, and governments, Congress enacted the Controlled Substances Act.  Specifically, through the CSA, which created a closed system of distribution for controlled substances, Congress established an enterprise for good.  The CSA imposes a reporting duty that cuts across company lines.  Regulations adopted under the CSA require that companies who are entrusted with permission to operate within this system cannot simply operate as competitive in an "anything goes" profit-maximizing market.  Instead, the statute tasks them to watch over each other with a careful eye for suspicious activity.  Driven by greed, Defendants and Unnamed Related Parties betrayed that trust and subverted the constraints of the CSA's closed system to conduct their own enterprise for evil.

760.   As "registrants" under the CSA, the Supply Chain Defendants and Unnamed Related Parties are duty bound to identify and report "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[358]   Critically, these Defendants' and Unnamed Related Parties' responsibilities do not end with the products they manufacture or distribute—there is no such limitation in the law because their duties cut across company lines.  Thus, when these Defendants and Unnamed Related Parties obtained information

---

[358] 21 C.F.R. 1301.74(b).

about the sales and distribution of other companies' opioid products, as they did through data mining companies like IMS Health, they were legally obligated to report that activity to the DEA.

761.    If morality and the law did not suffice, competition dictates that the Supply Chain Defendants and Unnamed Related Parties would turn in their rivals when they had reason to suspect suspicious activity.  Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so.  Under the CSA this whistleblower or watchdog function is not only a protected choice, but a statutory mandate. Unfortunately, however, that is not what happened.  Instead, knowing that investigations into potential diversion would only lead to shrinking markets.  The Supply Chain Defendants and Unnamed Related Parties elected to operate in a conspiracy of silence, in violation of both state and federal laws.

762.    The Supply Chain Defendants' and Unnamed Related Parties' scheme required the participation of all.  If any member broke rank, its compliance activities would highlight deficiencies of the others, and the artificially high quotas they maintained through their scheme would crumble.  But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the DEA to go after any one of them.  Accordingly, through the connections they made as a result of their participation in the HDA, the Supply Chain Defendants and Unnamed Related Parties chose to flout the closed system designed to protect Plaintiff. Publicly, in 2008, the HDA announced their formulation of Industry Compliance Guidelines.  But, privately, the Supply Chain Defendants and Unnamed Related Parties refused to act and through their lobbying efforts, they collectively sought to undermine the impact of the CSA.  Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize these Defendants'

and Unnamed Related Parties' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied with the guidelines.  John Gray, President and CEO of the HDA said to Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."[359]  Yet, the Supply Chain Defendants and Unnamed Related Parties apparently all found the same profit-maximizing balance -- intentionally remaining silent to ensure the largest possible financial return.

763.    As described above, at all relevant times, the Supply Chain Defendants and Unnamed Related Parties operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by the DEA that would allow them to collectively benefit from a greater pool of prescription opioids to manufacture and distribute.  In support of this common purpose and fraudulent scheme, the Supply Chain Defendants and Unnamed Related Parties jointly agreed to disregard their statutory duties to identify, investigate, halt, and report suspicious orders of prescription opioids and prevent diversion of their prescription opioids into the illicit market, so that those orders would not result in a decrease, or prevent an increase in, the necessary quotas.

764.    At all relevant times, as described above, the Supply Chain Defendants and Unnamed Related Parties exerted control over, conducted and/or participated in the Opioid Supply Chain Enterprise by fraudulently claiming that they were complying with their duties under the CSA to identify, investigate and report suspicious orders of prescription opioids in order to prevent

---

[359] See the April 7, 2014 statement from John Gray, President and CEO of the HDMA, formerly HDA, in front of the U.S. House of Representatives Energy and Commerce Committee, Subcommitte on Health at https://docs.house.gov/meetings/IF/IF14/20140407/102093/HHRG-113-IF14-Wstate-GrayJ-20140407.pdf

diversion of those highly addictive substances into the illicit market, and to halt such unlawful sales, so as to increase production quotas and generate unlawful profits, as follows:

765.    The Supply Chain Defendants and Unnamed Related Parties disseminated false and misleading statements to state and federal regulators claiming that:

      a.    the quotas for prescription opioids should be increased;

      b.    they were complying with their obligations to maintain effective controls against diversion of their prescription opioids;

      c.    they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

      d.    they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids; and

      e.    they did not have the capability to identify suspicious orders of controlled substances.

766.    Defendants and Unnamed Related Parties applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[360]

767.    The CSA and the Code of Federal Regulations, require the Supply Chain Defendants and Unnamed Related Parties to report to the DEA any suspicious orders identified through the design and operation of their system to disclose suspicious orders.  The failure to report

---

[360]    *HDMA is Now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/ (Last updated July 6, 2016); Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

suspicious orders as required by the CSA and Code of Federal Regulations amounts to a criminal violation of the statute.

768.    The Supply Chain Defendants and Unnamed Related Parties knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records, and other documents required to be filed with the DEA, including the Marketing Defendants' and Unnamed Related Parties' applications for production quotas.   Specifically, the Supply Chain Defendants and Unnamed Related Parties were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

769.    The Supply Chain Defendants and Unnamed Related Parties used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

770.    In devising and executing the illegal scheme, the Supply Chain Defendants and Unnamed Related Parties devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

     **C.**    **Effect of Opioid Marketing Enterprise and Opioid Supply Chain Enterprise on Orlando**

771.    As described herein, Defendants and Unnamed Related Parties engaged in a pattern of related and continuous predicate acts for years.   The predicate acts constituted a variety of

unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from consumers, based on their misrepresentations and omissions.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.  The predicate acts all had the purpose of generating significant revenue and profits for Defendants and Unnamed Related Parties, at the expense of Orlando.  The predicate acts were committed or caused to be committed by Defendants and Unnamed Related Parties through their participation in the enterprise, and in furtherance of their fraudulent scheme were interrelated in that they involved obtaining Plaintiff's and its residents' funds.

772.    As fully alleged herein, Plaintiff, along with scores of other counties and municipalities, relied upon representations and omissions that were made or caused to be made by Defendants and Unnamed Related Parties.  Plaintiff's reliance is evidenced by the fact that it purchased opioids, which never should have been introduced into the U.S. stream of commerce, and the use of which has now caused a nationwide epidemic of addiction and overdose.

773.    Plaintiff's injuries, and those of other consumers, were proximately caused by Defendants' and Unnamed Related Parties' activity, which directly caused the over-prescription, over-purchase, and over-consumption of prescription opioids.  But for Defendants' and Unnamed Related Parties' misstatements and omissions, and the scheme employed by the Opioid Marketing Enterprise and the Opioid Supply Chain Enterprise, Plaintiff would not have paid for opioid prescriptions for chronic pain and would not be bearing the costs of its current opioid epidemic.

774.    By reason of, and as a result of the conduct of each of the Defendants and Unnamed Related Parties, and in particular, their pattern of illegal activity, Plaintiff has been injured in its business and property in multiple ways, including, but not limited to, suffering increased law

enforcement and public works expenditures, judicial proceedings, and prisons, increased expenditures for overtime, mental health treatment, and workers' compensation for its employees, increased emergency and treatment services and autopsies, damage to emergency equipment and vehicles, the processing and payment of fraudulent prescriptions, and lost productivity, economic opportunity, and tax revenue.

775.    Defendants' and Unnamed Related Parties' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff, and the Plaintiff is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c).

### D.    Statutes of Limitations Are Tolled and Defendants Are Estopped from Asserting Statutes of Limitations As Defenses

#### 1.    Continuing Conduct

776.    Plaintiff contends that it continues to suffer harm from the unlawful actions by the Defendants and Unnamed Related Parties.

777.    The continued tortious and unlawful conduct by the Defendants and Unnamed Related Parties has caused a repeated or continuous injury. The damages did not occur all at once but are continuing to occur as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.[361] The wrongdoing and unlawful activity by Defendants and Unnamed Related Parties has not ceased. The public nuisance remains unabated. The conduct causing the damages remains unabated.

#### 2.    Equitable Estoppel and Fraudulent Concealment

778.    Defendants and Unnamed Related Parties are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiff and to

---

[361] See *Graham v. Beverage*, 566 S.E.2d 603 (2002).

purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, and Plaintiff's Community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State and Plaintiff's Community, that they are working to curb the opioid epidemic.[362]

779.    The Defendants and Unnamed Related Parties were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

780.    As set forth herein, the Marketing Defendants and the Unnamed Related Parties deliberately worked through Front Groups purporting to be patient advocacy and professional organizations, through public relations companies hired to work with the Front Groups and through paid KOLs to secretly control messaging, influence prescribing practices and drive sales. The Marketing Defendants and Unnamed Related Parties concealed their role in shaping, editing, and approving the content of prescribing guidelines, informational brochures, KOL presentations and other false and misleading materials addressing pain management and prescription opioids that were widely disseminated to regulators, prescribers and the public at large.

781.    Marketing Defendants and Unnamed Related Parties concealed the addictive nature and dangers associated with opioid use and denied blame for the epidemic attributing it instead solely to abuse and inappropriate prescribing. They manipulated scientific literature and promotional materials to make it appear that misleading statements about the risks, safety and

---

[362] See *Merrill v. Florida Dept. of Health and Human Resources,* 632 S.E.2d 307 (2006).

superiority of opioids were actually accurate, truthful, and supported by substantial scientific evidence. Through their public statements, omissions, marketing, and advertising, the Marketing Defendants' and Unnamed Related Parties' deceptions deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

782.    Defendants and Unnamed Related Parties also concealed from Plaintiffs the existence of Plaintiff's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that their legal duties to report suspicious orders had been satisfied through public assurances that they were working to curb the opioid epidemic. Marketing Defendants and Unnamed Related Parties publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations misled regulators, prescribers and the public, including Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

783.    The Plaintiffs did not discover the nature, scope and magnitude of Defendants' and Unnamed Related Parties' misconduct, and its full impact on Plaintiffs, and Plaintiffs could not have acquired such knowledge earlier through the exercise of reasonable diligence.

784.    The Marketing Defendants' and Unnamed Related Parties' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively marketing in Florida and in Plaintiffs Communities, deceived the medical community and consumers.

785.    Defendants and Unnamed Related Parties intended that their actions and omissions would be relied upon, including by Plaintiff's Community.  The Plaintiff's did not know and did

not have the means to know the truth, due to Defendants' and Unnamed Related Parties' actions and omissions.

786.    The Plaintiff's Community reasonably relied on Defendants' and Unnamed Related Parties' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### E.    Facts Pertaining to Punitive Damages

787.    As set forth above, Defendants and Unnamed Related Parties acted deliberately to increase sales of, and profits from, prescription opioid drugs. The Marketing Defendants and Unnamed Related Parties knew there was no support for their claims that addiction was rare, that addiction risk could be effectively managed, that signs of addiction were merely "pseudoaddiction," that withdrawal is easily managed, that higher doses pose no significant additional risks, that long-term use of opioids improves function, or that time-release or abuse-deterrent formulations would prevent addiction or abuse. Nonetheless, they knowingly promoted these falsehoods in order to increase the market for their addictive prescription opioids.

788.    All of the Defendants, and the Unnamed Related Parties, moreover, knew that large and suspicious quantities of prescription opioids were being poured into communities throughout the United States, yet, despite this knowledge, took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion. As described above, Defendants, and the Unnamed Related Parties, acted in concert to maintain high levels of quotas for their prescription opioids and to ensure that suspicious orders would not be reported to regulators.

789.    Defendants' and Unnamed Related Parties' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments, and regulatory agencies. Defendants, and Unnamed Related Parties, paid fines, made promises to do better, and continued on with their marketing and supply schemes. This

ongoing course of conduct knowingly, deliberately and repeatedly threatened and accomplished harm and risk of harm to public health and safety, resulting in large-scale economic loss to Plaintiff's Community.

790.   Defendants' and Unnamed Related Parties' actions demonstrated malice and aggravated and egregious fraud. Defendants and Unnamed Related Parties engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm. Marketing Defendants and Unnamed Related Parties acts and omissions did in fact cause substantial harm and constituted acts of fraud, gross negligence and/or willful conduct

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF

### Violation of Florida Deceptive and Unfair Trade Practices Act
### (Against All Defendants)

791.   Plaintiff incorporates by reference paragraphs 1-790 of this Complaint as if fully set forth herein.

792.   The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUTPA") prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. §501.204(1).

793.   Plaintiff is a "consumer" and an "[i]nterested party or person within the meaning of Fla. Stat. §501.203(6) and a "person" as envisioned in Fla. Stat. §501.211.

794.   All Defendants engaged in "[t]rade or commerce" within the meaning of Fla. Stat. §501.203(8), during the relevant time periods, as detailed further herein.

795.   During the relevant periods and as detailed further herein, the Marketing Defendants each engaged in unconscionable, unfair, and/or deceptive acts or practices in

commerce in violation of the FDUTPA by actively promoting and marketing the use of opioids for indications not federally approved, and circulating false and misleading information concerning opioids' safety and efficacy. The Marketing Defendants' large-scale acts of deception were successful, as these acts and practices were likely to mislead customers acting reasonably under the circumstances both to grossly underestimate the risks associated with the Marketing Defendants' opioid products as well as overestimate the products' efficacy.

796.    Each of the Marketing Defendants also engaged in unconscionable, unfair, and/or deceptive acts or practices in commerce in violation of the FDUTPA by downplaying or omitting the risk of addiction arising from the use of their prescription opioids and omitting the lack of clinical evidence to substantiate their claims of efficacy and safety.

797.    Each of the Distributor Defendants engaged in unconscionable and unfair acts or practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required of "registrants" by the federal CSA, 21 C.F.R. §1301.74(b), which is incorporated into Florida law by the Florida Drug and Cosmetic Act (Fla. Stat. §499, *et seq.*), including Fla. Stat. §499.0121.  The CSA defines "registrant" as any person who is registered pursuant to 21 U.S.C. §823.  21 C.F.R. §1300.02(b).  Section 823(a)-(b) requires manufacturers and distributors of Schedule II controlled substances to register.

798.    All Defendants' unconscionable, unfair, or deceptive acts or practices in violation of the FDUTPA offend Florida's public policy, are immoral, unethical, oppressive, and unscrupulous, as well as malicious, wanton, and manifesting of ill will, and caused substantial injury to Plaintiff.  The Plaintiff suffered irreparable injury as a result of all Defendants' acts, misrepresentations, and omissions in violation of the FDUTPA, and these violations present a

continuing risk to the Plaintiff, as well as to the general public.  The Plaintiff is likely to suffer increased risk of future harm due to the widespread overuse, abuse, addiction, overdose and death caused by Defendants' acts and practices and widespread manipulation of the medical profession.

799.    All Defendants' acts and practices in violation of the FDUTPA offend Florida public policy, are immoral, unethical, oppressive, or unscrupulous, as well as malicious, wanton, and manifesting ill will; caused and continue to cause substantial injury to Plaintiff and its inhabitants; and put the Plaintiff at increased risk of future harm due to the widespread overuse, abuse, addiction, overdose and death caused by Defendants' acts and practices.

800.    As a direct and proximate result of all Defendants' violations of the FDUTPA, Plaintiff has suffered and continues to suffer losses constituting injury-in-fact.  Plaintiff is entitled, and does hereby seek, to recover its actual damages under Fla. Stat. §501.211(2) and its attorneys' fees and costs under Fla. Stat. §501.2105(1).

801.    Plaintiff has been seriously aggrieved by all Defendants' violations of the FDUTPA and is therefore entitled to, and does hereby, seek an order under Fla. Stat. §501.211(1) declaring all Defendants' acts and practices unlawful under and in violation of the FDUTPA and enjoining all Defendants' unfair, unconscionable, and/or deceptive acts or practices, and awarding attorneys' fees, costs, and any other just and proper relief available under the FDUTPA.

## SECOND CLAIM FOR RELIEF

### Public Nuisance (Against All Defendants)

802.    Plaintiff incorporates by reference paragraphs 1-790 of this Complaint as if fully set forth herein.

803.    All Defendants, individually and acting through their employees and agents created and continue to perpetuate and maintain a public nuisance to the citizens of the Plaintiff's

community through the massive distribution of millions of doses of highly addictive, commonly abused prescription opioids.

804.    Each of the Marketing Defendants subverted the public order, decency, and morals of, and caused inconvenience and damage to, Plaintiff and its residents by, among other things, promoting and marketing the use of opioids for indications not federally approved, circulating false and misleading information concerning their safety and efficacy, and/or downplaying or omitting the risk of addiction and death arising from their use.   In so doing, the Marketing Defendants acted unreasonably and with actual malice.

805.    Each of the Distributor Defendants subverted the public order, decency, and morals of, and caused inconvenience and damage to Plaintiff by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances, by filling those suspicious orders and by failing to report suspicious orders of opioids as required by the federal CSA, 21 C.F.R. §1301.74(b), which is incorporated into Florida law by Florida Drug and Cosmetic Act (Fla. Stat. §499, *et seq.*), including Fla. Stat. §499.0121.   In so doing, all of the Distributor Defendants acted unreasonably and with actual malice.

806.    As detailed herein, all of the Defendants' conduct has interfered, and continues to interfere, with rights common to the general public of Plaintiff and has caused the Plaintiff to sustain damages, special and particular, of a kind not sustained by the general public, including, but not limited to, increased healthcare expenditures, law enforcement and judicial expenditures, increased prison and public works expenditures, increased substance abuse treatment and diversion plan expenditures, increased emergency and medical care services expenditures, and increased medical examiner expenditures, costs associated with extensive clean-up of public parks, public spaces, and facilities of hypodermic needles and other debris and detritus associated with and

related to opioid addiction, the costs of processing and paying for fraudulent prescriptions, and lost economic opportunity.

807.     Plaintiff, acting on its own behalf and on behalf of its inhabitants, seeks monetary and injunctive relief to halt the threat of future harm.

## THIRD CLAIM FOR RELIEF

### Negligence (Against all Defendants)

808.     Plaintiff incorporates by reference paragraphs 1-790 of this Complaint as if fully set forth herein.

809.     The federal mandates incorporated into Florida law require that the Defendants must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."[363] These federal regulations impose a non-delegable duty upon both manufacturers and distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor or manufacturer] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[364]

810.     In addition to reporting all suspicious orders, Defendants had a duty stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.[365] Regardless, all flagged orders must be reported.[366]

---

[363] 21 U.S.C. §§ 823(a)(1), (b)(1)
[364] 21 C.F.R. § 1301.74(b).
[365] *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017)
[366] *Id.*

811.    Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm.

812.    Defendants engaged in conduct, the foreseeable result of which, was to cause harm to Plaintiff.

813.    Florida recognizes that, "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *McCain v. Florida Power Corp.,* 593 So.2d 500, 503, 17 Fla. L. Weekly S64 (1992); citing *Stevens v. Jefferson,* 408 So.2d 634 (Fla. 5th DCA 1991).

814.    Defendants engaged in affirmative acts, which resulted in the creation of an illegal, secondary prescription opioid market when Defendants failed to exercise adequate control over the marketing, distribution and sale of their prescription opioids.

815.    The information available to Defendants, including their individual salespeople, enabled Defendants to predict this opioid epidemic. Instead, Defendants disguised their acts as lawful behavior, influenced the medical decision making of prescribers, and failed to exercise the legal duty of care owed to Plaintiff.

816.    Defendants owed a duty to Plaintiff to use reasonable care in the marketing, sale, and distribution of prescription opioids, due to the inherent high risks associated with opioid use. The sheer dangerousness of prescription opioids, including the known substantial threat of abuse, addiction, overdose, and death, created a legal duty owed to the Plaintiff by Defendants to use reasonable care in the marketing, sale, and distribution of prescription opioids into Plaintiffs' Communities.

817.     Each Defendant owed a duty of care to the Plaintiff, based on the unique role each Defendant held as the most knowledgeable party regarding addiction rates of the drugs they marketed and distributed to the Plaintiff's community.  Due to their unique roles, the Defendants had a duty of care to ensure that the quantities of prescription opioids distributed to the Plaintiff's Community were legitimate and would not be diverted when compared to national statistics regarding opioid use and population comparison.

818.     Defendants had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in manufacturing, advertising, marketing, selling, distributing, and or facilitating the sale of prescription opioids.

819.     Defendants had a duty not to breach the standard of care established under the CSA to report suspicious orders and to maintain systems to detect and report suspicious orders.[367]

820.     Defendants had a duty to maintain systems to effectively identify and prevent diversion pursuant to the standard of care established under the CSA.[368]

821.     Defendants negligently failed to ensure their conduct conformed to the CSA.

822.     Industry standards require these Defendants to:

    a.      know its customers,

    b.      know its customer base,

    c.      know the population base served by a particular pharmacy or drug store,

    d.      know the average prescriptions filled each day,

    e.      know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases,

    f.      have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and

---

[367] 21 U.S.C. §§ 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)
[368] *Id.*

g.   know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribers.

823.   The degree of care the CSA requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in marketing, distributing, selling, and facilitating the sale of dangerously addictive drugs requires a high degree of care and places them in a position of great trust and responsibility vis a vis the Plaintiff. The Defendants' duty cannot be delegated.

824.   Each Defendant knew, or should have known, that the dangerous qualities of their prescription opioids bore a direct relationship to the volume of opioids being prescribed and ordered by pharmacies and prescribers in the Plaintiff's community.  Each Defendant knew or should have known that a significant number of the prescription opioids were being misused, abused, and diverted across the country, including into Florida and the Plaintiff's Community.

825.   Each Defendant knew or should have known, of the unreasonably dangerous qualities of their prescription opioids and that said drugs were highly addictive and highly susceptible to abuse and diversion.

826.   Each Defendant knew or should have known, of the reasonable foreseeability of injury and damage to the Plaintiff's community, caused by the known and/or foreseeable misuse, overuse, abuse, and diversion of the prescription opioid drugs in their control.

827.   Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in marketing, selling, and distributing dangerous controlled substances.

828.   Defendants breached their duty of care to Plaintiffs by, *inter alia*:

a.   Distributing and selling prescription opioids in ways that facilitated and encouraged the flow of prescription opioids into the illegal, secondary market;

b.    Distributing and selling prescription opioids without maintaining effective controls against the diversion of said prescription opioids;

c.     Choosing not to effectively monitor for suspicious orders;

d.    Choosing not to investigate suspicious orders;

e.    Choosing not to report suspicious orders;

f.    Choosing not to stop or suspend shipments of suspicious orders;

g.    Distributing and selling prescription opioids to "pill mills" when Defendants knew or should have known the prescription opioids were being prescribed by "pill mills;"

h.    Negligently marketing their prescription opioids in the Plaintiffs' Communities;

i.    Misrepresenting the addiction, abuse, overdose, and diversion potential and rates associated with their drugs;

j.    Publishing misleading information regarding the benefits of long-term prescription opioid use while understating the lack of evidence supporting long-term prescription opioid use and the risks associated with same;

k.    Trivializing the serious risks associated with long-term prescription opioid use, including addiction, abuse, diversion, overdose, and death;

l.    Publishing false and misleading information overstating the superiority of long-term prescription opioid use when compared to alternative treatment methods including conservative treatment and non-opioid treatment;

m.    Misleading prescribers, consumers, and Plaintiff's community regarding addiction rates, difficulties associated with withdrawal, and prevalence of withdrawal symptoms;

n.    Marketing prescription opioids for unintended use, and publishing false and misleading information;

o.    Failing to implement reasonable controls and safeguards to identify and prevent or reduce the misuse, abuse, and diversion of their prescription opioids;

p.    Failing to comply with reporting requirements;

q.    Acting with conscious disregard toward suspicious orders and suspicious order reporting;

r.    Negligently raising quotas and/or thresholds for distribution of prescription opioids where there could be no legitimate use for the prescription opioids being ordered;

s.    Negligently raising quotas and/or thresholds for distribution of prescription opioids where the ratio of dose per person in the relevant community, including the Plaintiffs' Communities, exceeded any national norm or average of prescription opioid usage;

t.    Acting with conscious disregard toward the consumers and communities, including the Plaintiff's Community, with the sole goal of maximizing market potential and profits.

829.    The Defendants breached their duty of care owed to Plaintiff by deceptively marketing prescription opioids, including minimizing the risks of abuse, addiction, overdose and death, and exaggerating the purported benefits of long-term use of prescription opioids for the treatment of chronic pain.

830.    A reasonably prudent opioid manufacturer, distributor, pharmacy or PBM should have anticipated an injury to Plaintiff as a probable result of marketing, distributing, selling, and facilitating the sale of prescription opioids in this manner.

831.    It was reasonably foreseeable that Defendants' actions and omissions would result in harm to Plaintiff.

832.    Defendants had control over their conduct in Plaintiff's community. Defendants controlled their deceptive advertising and efforts to mislead the public, including their acts and omissions in detailing by their sales representatives, online communications, publications, Continuing Medical Education programs, other speaking events, and other means described in this Complaint. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Each of the Defendants had control over the systems they developed to prevent diversion, including the criteria and process they used to identify suspicious orders, whether and to what extent they trained their employees to report and

halt shipment of suspicious orders, and whether Defendants filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

833.    Because of the Defendants' deceptive marketing of prescription opioids and because of each of the Defendants' special position within the closed system of prescription opioid sales and distribution, without Defendants' actions, prescription opioid use and abuse would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin use, abuse, addiction, overdose, and death that now exists, would have been averted.

834.    Defendants misleadingly portrayed themselves as cooperating with law enforcement and actively working to combat the opioid epidemic when, in reality, Defendants failed to satisfy even their minimum, legally required obligation to report suspicious orders. Defendants voluntarily undertook duties, as evidenced by statements to the media, state and federal regulatory agencies, and the public at large, to take all reasonable precautions to prevent diversion of prescription opioids.

835.    Reasonably prudent manufacturers, distributors, and dispensers of prescription opioids would have anticipated the havoc opioid addiction would wreak on communities, and the significant direct and indirect expenses which would necessarily be thrust upon the governmental entities associated with the communities devastated by the opioid epidemic.

836.    Defendants knew or should have known, that their affirmative misconduct in engaging in aggressive, widespread, and misleading campaigns to market prescription opioids created an unreasonable risk of harm to Plaintiff. The Defendants' sales data, reports from sales representatives, and internal documents, should have put Defendants on notice that such harm was not only foreseeable, but was in fact actually occurring. Defendants nevertheless chose to

deceptively withhold information about the dangers of prescription opioids from Plaintiff, physicians, patients, and the public.

837.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and will continue to suffer economic damages for numerous services including, but not limited to, law enforcement, prosecutors and prosecutions, courts and court personnel, drug courts and drug court personnel, corrections and correctional facilities, probation and parole, public welfare and service agencies, emergency, healthcare and medical services and drug abuse education and treatment, public utilities, nuisance abatement, property damage repair, and code enforcement.

838.    As a direct and proximate result of Defendants' negligence, Plaintiff has lost, and continues to lose, tax revenue and has incurred both direct and indirect costs and expenses as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse.

839.    As a direct and proximate result of Defendants' negligent, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, there is now a national opioid epidemic that has caused enormous harm and injury to the Plaintiff's community.

840.    Defendants' misconduct alleged in this case is ongoing and persistent.

841.    Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

842.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

843.    The tortious conduct of each Defendant was and is a substantial factor in producing harm to Plaintiff.

844.     Defendants acted with actual malice where Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions, had and continue to have, a great probability of causing substantial harm.

845.     Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, including but not limited to attorneys' fees and costs, and pre and post-judgment interest.

### FOURTH CLAIM FOR RELIEF

### Unjust Enrichment (Against All Defendants)

846.     Plaintiff incorporates by reference paragraphs 1-790 of this Complaint as if fully set forth herein.

847.     Unjust enrichment is established where the Plaintiff alleges: (a) a benefit conferred upon the defendant by the Plaintiff; (b) an appreciation or knowledge by the Defendant of the benefit; and (c) the acceptance or retention by the Defendant of the benefit under such circumstances as to make it inequitable for the Defendant to retain the benefit without the payment of its value.

848.     Plaintiff, acting on its own behalf and on behalf of its inhabitants, conferred on each Marketing Defendant a benefit, including, *inter alia*, payments for prescription opioids manufactured by the Marketing Defendants for sale in Plaintiff's community, which benefit was known to and accepted by each Marketing Defendant, which inured to the profits of each Marketing Defendant and for which retention of such benefit is inequitable based on the Marketing Defendants' false and misleading marketing and omissions of and failure to state material facts in connection with marketing opioids, as set forth herein.  The Marketing Defendants have thus been

unjustly enriched by sales due to their deceptive marketing, contributing to Plaintiff's current opioid epidemic.

849.    Plaintiff, acting on its own behalf and on behalf of its inhabitants, conferred on each Distributor Defendant a benefit, including, *inter alia*, payments for opioids distributed or filled by each Distributor Defendant for sale in Plaintiff's community, which benefit was known to and accepted by each Distributor Defendant, which inured to the profits of each Supply Chain and for which retention of such benefit is inequitable based on the Distributor Defendants' failure to operate a system to report suspicious orders as required by law and failure to exercise the required care in filling suspicious orders.  The Distributor Defendants have thus been unjustly enriched by neglecting their duty to distribute drugs only for proper medical purposes, contributing to Plaintiff's current opioid epidemic.

850.    The unprecedented opioid addiction and overdose epidemic experienced in Plaintiff's Community has resulted in substantial costs in health insurance, treatment services, autopsies, emergency room visits, medical care, medical treatment for related illnesses and accidents, payments for fraudulent prescriptions, law enforcement, and lost productivity to Plaintiff's workforce.

851.    The unjust enrichment of all Defendants is directly related to the damage, loss, and detriment to Plaintff, caused by Defendants' false marketing and failure to report suspicious sales.  It would be inequitable under these circumstances for any of the Defendants to retain this benefit without compensating Plaintiff for its value.  Plaintiff seeks recovery of the amounts all Defendants were enriched as a result of said Defendants' inequitable conduct.

## FIFTH CLAIM FOR RELIEF

### Fraud (Against All Defendants)

852.    Plaintiff incorporates by reference paragraphs 1-790 of this Complaint as if fully set forth herein.

853.    At all relevant times, all Defendants, intentionally, willfully, and/or recklessly, with the intent to deceive, fraudulently concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of their respective prescription opioid drugs or both.

854.    Distributor Defendants failed to disclose the prevalence of diversion of controlled substances, including prescription opioids within Plaintiff's community.

855.    At all relevant times, all Defendants misrepresented to and/or concealed material facts concerning the addictive and dangerous nature of their prescription opioid drugs, from reasonable consumers, doctors and prescribers, insurers, pharmacies, and others with the knowledge of the falsity of their misrepresentations and/or concealments.

856.    At all relevant times, upon information and belief, the misrepresentations and concealments concerning prescription opioid drugs that were manufactured, distributed, promoted, and/or sold by all Defendants include, but are not limited to, the following:

  a. all Defendants intentionally misrepresented the truth about how use of prescription opioids lead to addiction;

  b. all Defendants knowingly misrepresented that prescription opioids improve function;

  c. all Defendants misrepresented that addiction risk can be easily managed;

  d. all Defendants misled doctors, patients, and payors about the risk of addiction to prescription opioids through the use of misleading terms like "pseudoaddiction";

e.     all Defendants falsely claimed that withdrawal from prescription opioids can be simply managed;

f.     all Defendants misrepresented that increased doses of prescription opioids pose no significant additional risks; and

g.     all Defendants falsely omitted or minimized the adverse effects of prescription opioids and overstated the risks of alternative forms of pain treatment. Defendants used artifice to conceal material facts regarding the safety and efficacy of prescription opioids in a way that affirmatively suppressed the truth. Defendants' failure to be truthful was tantamount to supplying false information and/or failing to disclose material facts in order to induce a false belief that use of prescription opioids were safe and effective for chronic and/or long-term treatment.

857.    At all relevant times, Defendants actively, knowingly, and intentionally concealed and misrepresented these material facts with the intent to deceive the public, and with the intent that physicians would prescribe, pharmacies would dispense, and reasonable consumers would purchase and use their prescription opioid drugs.

858.    At all relevant times, physicians would not have prescribed, pharmacies would not have dispensed, and the consuming public would not otherwise have purchased or used these addictive and dangerous prescription opioids for long-term chronic pain management had they been truthfully informed of the risks associated with the use of these prescription opioids.

859.    At all relevant times, Plaintiff's employees, City taxpayers, City residents, visitors to Orlando, and/or the public at large relied upon Defendants' misrepresentations concerning the safety and efficacy of these prescription opioid drugs, and such reliance was reasonably justified.

860.    As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiff has incurred and continues to incur costs for opioid prescriptions in excess of those they would have otherwise incurred, including but not limited to payments for their employees' treatment for opioid addiction, and payments for emergency hospital visits for their employees, and payment of sick leave used by their employees.

861. Marketing Defendants' misrepresentations regarding the safety and efficacy of long-term opioid use proximately caused injury to Plaintiff.

862. Each Defendant knew or should have known these and other material facts should be disclosed.

863. Each Defendant knew its concealment of or failure to disclose these material facts would induce Plaintiff to act, specifically to purchase prescription opioids.

864. Each Defendant had a duty to disclose the material facts, as alleged more fully above.

865. It was unreasonable for Defendants to rely on doctors and other learned intermediaries to fully and adequately transmit warnings to end users about the dangerous and deadly nature of prescription opioids when Defendants withheld or concealed material facts from doctors and other learned intermediaries because the material facts would render the prescription opioids a less valuable treatment option and would provide an incentive to the doctors and other learned intermediaries to reduce or withhold prescription opioid treatment from the consumer. The Manufacturer Defendants did not adequately convey the danger associated with prescription opioid use to doctors and other learned intermediaries or take steps to ensure that doctors and learned intermediaries would know or adequately warn the end user, that prescription opioids are extraordinarily dangerous.

866. Plaintiff, acting on its own behalf and on behalf of its residents and visitors, relied to its detriment on the misinformation and has suffered, and continues to suffer, both injuries and pecuniary losses as a result of this reliance. Among other things, Plaintiff has experienced an unprecedented opioid addiction and overdose epidemic costing millions in health insurance, treatment services, autopsies, emergency room visits, medical care, treatment for related illnesses

and accidents, payments for fraudulent or medically unnecessary prescriptions, and lost productivity to Plaintiff's workforce.

867.    Plaintiff's detrimental reliance can be inferred from the widespread, pervasive, misleading, and effective prescription opioid marketing campaign orchestrated and carried out by Defendants.

868.    At all relevant times, Defendants actively, knowingly, and intentionally agreed and conspired to conceal and misrepresent these material facts to the consuming public with the intent to deceive the public, and with the intent that consumers would purchase and use their prescription opioid drugs.

869.    At all relevant times, the consuming public would not otherwise have purchased or used these addictive and dangerous prescription opioid  for long-term chronic pain management had they been properly and accurately informed of the risks associated with the use of prescription opioids.

870.    At all relevant times, Plaintiff's employees, City taxpayers, City residents, visitors to Orlando, and/or the public at large relied upon Defendants' misrepresentations and/or silence or concealments concerning the safety and efficacy of these prescription opioid, and such reliance was reasonably justified.

871.    As a direct and foreseeable consequence of Defendants' conspiracy to commit wrongful conduct, Plaintiff has incurred and continues to incur costs for prescription opioid in excess of those Plaintiff would have otherwise incurred, payments for Plaintiff's employees' treatment for opioid addiction, and payments for emergency hospital visits for Plaintiff's employees.

872.    The Marketing Defendants' conspiracy regarding misrepresentations about the safety and efficacy of long-term prescriptionopioid use directly and proximately caused injury to Plaintiff.

## SIXTH CLAIM FOR RELIEF

### Civil Conspiracy (Against All Defendants)

873.    Plaintiff incorporates by reference paragraphs 1-790 of this Complaint as if fully set forth herein.

874.    All Defendants conspired together as more fully alleged in the above causes of action.

875.    In pursuance of the conspiracy, all Defendants committed the following overt act(s):

a.    All Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of prescription opioids into and around Plaintiff's community.

b.    Through an express or implied agreement among them, all Defendants were involved in a concerted action to perpetrate a fraud on Plaintiff by the unlawful distribution and diversion of prescription opioids into and around Plaintiff's community.

c.    All Defendants acted in furtherance of their agreement which was a concerted action between and among Defendants.

d.    Specifically, Marketing Defendants led a nationwide conspiracy to bribe medical practitioners to unnecessarily prescribe opioids.

e.    All Defendants acted with malice, purposefully, unlawfully, and without reasonable excuse.

f.    All Defendants' conspiracy to bribe practitioners generated substantial profits for Defendants, Defendants' companies, and Defendants' co-conspirators.

g.    The purpose of the concerted action was to accomplish a criminal or unlawful goal or to accomplish a lawful purpose by the use of criminal or unlawful means.

h.  All Defendants unlawfully failed to act to prevent the fraud and failed to monitor, report, and prevent suspicious orders of prescription opioids.

i.  All Defendants acted with a common understanding and design to commit unlawful acts as alleged, and acted purposefully, without reasonable or lawful excuse, to create injuries alleged herein.

j.  All Defendants knew of, or acquiesced in, this wrongful and fraudulent conduct.

876.  All Defendants' conspiracy, actions, and omissions in furtherance thereof caused Plaintiff to incur foreseeable losses.

877.  All Defendants' conspiracy and acts are also alleged in greater detail throughout this Complaint, and are incorporated herein.

878.  Plaintiff was damaged as a result of Defendants' conspiracy to commit fraud.

879.  All Defendants benefited by this wrongful and fraudulent conduct.

880.  All Defendants committed tortious acts in concert with each other and any co-conspirator.

881.  As a direct and proximate result of all Defendants' conspiracy and illegal, wrongful or tortious conduct, Plaintiff has been damaged.  Plaintiff, acting on its own behalf and on behalf of its residents and visitors, suffered injuries and pecuniary losses as a result of the acts performed pursuant to the conspiracy.  Among other things, Plaintiff experienced an unprecedented opioid addiction and overdose epidemic costing millions in health insurance, treatment services, autopsies, emergency room visits, medical care, treatment for related illnesses and accidents, payments for fraudulent or medically unnecessary prescriptions, and lost productivity to Plaintiff's workforce.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff The City of Orlando, Florida, acting on behalf of itself and on behalf of its residents and visitors, prays that the Court grant the following relief:

A.     Enjoin the Marketing Defendants from violating Fla. Stat. §501.021, *et seq.*, by making any further false or misleading statements or omissions related to opioids;

B.     Enjoin the Distributor Defendants from failing to report suspicious orders as required by the CSA and as incorporated by the Florida Drug and Cosmetic Act;

C.     Order all Defendants to pay costs, losses, and damages, in excess of $75,000, for injuries sustained by Plaintiff, acting on its own behalf and on behalf of its residents and visitors, as a proximate result of Defendants' unlawful conduct as set forth herein; and

D.     Plaintiff respectfully requests that this Court enter an Order of judgment granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

      a.     abatement of the nuisance;

      b.     actual damages;

      c.     declaratory relief;

      d.     treble or multiple damages and civil penalties as allowed by statute;

      e.     punitive damages;

      f.     exemplary damages;

      g.     disgorgement of unjust enrichment;

      h.     equitable and injunctive relief, including relief in the form of Court-enforced corrective action, programs, and communications;

      i.     forfeiture, disgorgement, restitution, and/or divestiture of proceeds and assets;

      j.     attorneys' fees;

      k.     costs and expenses of suit;

      l.     pre- and post-judgment interest; and

      m.     such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all claims so triable.

DATED:  February 12, 2020.

By: */s/ James D. Young*
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
JAMES D. YOUNG
FL BAR NO. 567507
RENEE L. COOK
FL BAR NO. 1005565
JUAN MARTINEZ
FL BAR NO. 1013923
76 South Laura Street
Suite 1100
Jacksonville, FL 32202
Tel: 904/361-0012
jyoung@forthepeople.com
rcook@forthepeople.com
juanmartinez@forthepeople.com

By: */s/ Eugene K. Pettis*
HALICZER PETTIS & SCHWAMM, P.A.
EUGENE K. PETTIS
FL BAR NO. 508454
DEBRA P. KLAUBER
FL BAR NO. 055646
One Financial Plaza
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Tel: 954/523-9922
service@hpslegal.com

By: */s/ Robert C. Gilbert*
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
ROBERT C. GILBERT
FL BAR NO. 561861
SCOTT WEISELBERG
FL BAR NO. 122701
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: 305/384-7269
gilbert@kolawyers.com
weiselberg@kolawyers.com

*Attorneys for Plaintiff*
*The City of Orlando, Florida*